UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re:                                    ) | |
|                                                 ) | In Proceedings Under Chapter 11 |
| US FIDELIS, INC.,                ) | |
|                                                 ) | Case No. 10-41902-705 |
|                     Debtor.          ) | |
|                                                 ) | Motion No.: |
|                                                 ) | |
|                                                 ) | Hearing Date:  March 3, 2010 |
|                                                 ) | Hearing Time:  10:00 a.m. |
|                                                 ) | Location:  St. Louis, Missouri |
|                                                 ) | Courtroom 7-South |

**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS  AUTHORIZING: (A) DEBTOR'S USE OF CASH  COLLATERAL PURSUANT TO § 363 OF THE BANKRUPTCY CODE;  (B) AUTHORIZING DEBTOR TO OBTAIN SECURED POST-PETITION FINANCING PURSUANT TO § 364 OF THE BANKRUPTCY CODE; AND (C) APPROVING AND AUTHORIZING DEBTOR TO ENTER INTO CERTAIN RELATED LOAN DOCUMENTS**

COMES NOW Debtor and Debtor-in-Possession U.S. Fidelis, Inc. ("**Debtor**") by and through its undersigned counsel and moves the Court, pursuant to Sections 363 and 364 of the Bankruptcy Code, and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for the entry of interim and final orders: (a) authorizing the Debtor to use Cash Collateral (as such term is defined in Section 363(a) of the Bankruptcy Code); (b) authorizing the Debtor to obtain secured post-petition financing (the "**DIP Facility**"); and (c) approving and authorizing the Debtor to enter into certain related financing documents.  In support of this Motion, the Debtor respectfully states and alleges as follows:

# I     BACKGROUND

1. On March 1, 2010 (the "**Petition Date**"), Debtor filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Missouri.

2. The Debtor continues to operate its business and manage its affairs as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this case, and no official committee of creditors or equity interest holders has been established in this case.

3. Debtor was at one time the nation's largest marketer of vehicle service contracts ("VSCs") developed by independent and unrelated companies (the "Administrators"). Generally, the third-party Administrators, rather than the Debtor, are the contract parties under the VSCs, and accordingly, are obligated for claims made by the purchasers of the VSCs. Importantly, the Administrators continue to administer and honor claims made under the VSCs. In turn, the obligations of the Administrators under the VSCs, including the claims submitted by the holders of VSCs, are backed by insurance. Debtor is not itself nor has it ever been an insurance company.

4. At various times, Debtor marketed via direct mail, telemarketing, television, and Internet advertising. However, Debtor suspended all sales and marketing activity in December 2009 when cancellations of active customers more than doubled from their normal levels. Debtor currently operates an account resolution and retention center for all customers who currently own a VSC sold through Debtor. All of these activities are calculated to maximize customer retention and to minimize cancellations, thereby limiting the negative impact on the

2

CC 2168328v6

estate, the creditors, including Administrators, which may be caused by Debtor's financial difficulties and this chapter 11 filing.

5. At one time, Debtor employed more than 1,028 full time employees and contractors. At the present time, it has approximately 109 employees.

6. Debtor is owned 50% by Darain Atkinson and 50% by Cory Atkinson. While both Darain Atkinson and Cory Atkinson are on the board of directors of the Debtor and Darain Atkinson is the President of Debtor, neither party is presently active in the operation of the Debtor. From March, 2009 through February 28, 2010 the Debtor was managed on a day to day basis by a non-insider Chief Executive Officer. As of March 1, 2010 the Debtor has been managed by a Chief Restructuring Officer Scott Eisenberg of Amherst Partners, LLC.

7. Debtor has been the subject of a number of federal and state investigations since 2008, which have, in turn, generated a fair amount of mostly negative media reports. Those reports, combined with economic and competitor issues, have contributed to a dramatic increase in VSC cancellations.

8. This Chapter 11 proceeding and the insolvency of the Debtor should not directly affect the ability of any customer to have claims fairly adjudicated and paid by the Administrator.

II. **DEBTOR'S PRE-PETITION RELATIONSHIP WITH MEPCO**

9. Debtor's primary secured creditor is Mepco Finance Corporation ("**Mepco**"). Initially, pursuant to the terms of a Dealer Agreement, Mepco purchased through Debtor payment plans entered into by consumers that purchased VSCs from Debtor. Under the Dealer Agreement, for those customers who purchased a VSC utilizing a payment plan, Mepco would pay Debtor a portion of the purchase price (the "Dealer Profit") which in total is used to pay all

3

ongoing operating expenses of the Debtor. Additionally, Mepco would pay a portion of the purchase price to the Administrator for that VSC (the "Dealer Cost"), which amount was intended to compensate the Administrator for administering and paying claims made under that contract. If, however, the holder of a VSC who entered into a payment plan cancelled before making all payments required under the payment plan, Debtor was obligated to repay to Mepco the "unearned" portion of the Dealer Profit previously paid by Mepco to Debtor on that VSC (the "Dealer Refund"). Debtor's obligations to Mepco under the Dealer Agreement are secured by, among other things, a Security Agreement between Debtor and Mepco dated April 1, 2009 (the "**Mepco Security Agreement**").

10. Pursuant to the Dealer Agreement, Mepco reduced or offset the amount of its payment to Debtor for Dealer Profit on newly sold "payment plan" VSCs by the amount of Dealer Refunds due from Debtor to Mepco. In the fall of 2009, cancellations of VSCs, including those purchased by consumers under payment plans, began to mount, resulting in ever-increasing Dealer Refund amounts owed by Debtor to Mepco and decreased cash flow. Additionally, as Debtor's sales decreased, Debtor's Dealer Refund obligations to Mepco approached and then exceeded the Dealer Profit owed by Mepco, turning Debtor's cash flow negative. In an effort to obtain operating capital with which to maintain operations and pay expenses, the Debtor requested financial assistance from Mepco.

11. Accordingly, on or about October 23, 2009, Debtor entered into an Agreement with Mepco (the "**Mepco Agreement**"). Among other things, the Mepco Agreement called for Mepco to temporarily forbear from reducing or offsetting Debtor's Dealer Refund obligations against the Dealer Profit on new contracts. As a result of deferring its Dealer Refund obligations while collecting Dealer Profit, the Debtor accumulated necessary operating capital.

4

12. As of the Petition Date, Debtor owed Mepco, without defense, counterclaim or offset, the sum of $17,727,396.69 under the Dealer Agreement and the Mepco Agreement plus accrued and unpaid interest thereon and fees and costs. These amounts together with all interest, fees, costs, and charges, are identified as the "**Pre-petition Indebtedness**."

13. The Pre-petition Indebtedness is secured by valid, perfected, enforceable, first-priority liens and security interests upon and in substantially all of the assets and property of the Debtor, including without limitation, goods, inventories, equipment, accounts, chattel paper, general intangibles and proceeds of the foregoing (the "Pre-petition Collateral"). All of the cash of the Debtor constitutes Pre-petition Collateral or the proceeds of the Pre-petition Collateral and, therefore, is cash collateral of Mepco within the meaning of Bankruptcy Code §363(a) (the "Cash Collateral").

14. The Debtor believes that depending upon the collectability of certain amounts owed to the Debtor by third parties, Mepco may be undersecured.

### III. THE DEBTOR'S NEED FOR USE OF CASH COLLATERAL

15. The Debtor requires the use of cash collateral to continue its business operations and to pay its regular daily expenses, including employees' wages, utilities, and its other costs of doing business.

16. The Debtor requires cash collateral to meet post-petition payroll, to pay necessary business expenses, and to continue its operations. A Monthly Budget, showing the amount of funds needed to maintain Debtor's operations until the entry of a final order permitting use of cash collateral, is attached hereto as **Exhibit A**.

17. The Debtor does not have sufficient available sources of working capital and financing to carry on the operation of its business without the Postpetition Financing and the use

5

of the Cash Collateral. The Debtor's ability to preserve their relationship with customers who purchased vehicle service contracts, to pay its employees and to otherwise finance its operations, is essential to the Debtor's continued viability. In addition, the Debtor's need for financing is critical and immediate. In the absence of the Postpetition Financing and the use of the Cash Collateral, serious and irreparable harm to the Debtor and its estate would occur. The preservation and maintenance relations with customers who purchased vehicle service contracts, the preservation of the going concern value of the Debtor and the reduction of claims against the Debtor are of utmost significance and importance to a successful reorganization of the Debtor under Chapter 11 of the Bankruptcy Code.

18. The ability of the Debtor to continue in business and remain a viable entity and to have any prospect to propose a plan of reorganization under Chapter 11 of the Bankruptcy Code depends upon obtaining such authority to immediately use cash collateral and DIP Facility on the Petition Date.

19. Absent the requested relief, the Debtor will be unable to pay its payroll and payroll expenses, operating expenses, and to otherwise operate its business and preserve its assets. Immediate and irreparable harm to the Debtor's business and value of its estate will occur absent the relief requested herein.

20. Pursuant to Section 363(c)(2) of the Bankruptcy Code, if Mepco's interest in cash collateral is valid, the Debtor may use cash collateral only with the consent of Mepco or with the Court's approval.

21. Mepco's interest in cash collateral is adequately protected. Such adequate protection will be provided to Mepco through the preservation of the Debtor's value as a going concern.

22. Approval of the attached Interim Order is in the best interest of the Debtor's estate, and the Debtor believes that other creditors will not be prejudiced by the entry of the Interim Order.

23. The Debtor requests that it be immediately authorized, pursuant to Section 363(c) of the Bankruptcy Code, to use cash collateral according to the terms of the Interim Order.

### IV. THE DEBTOR'S NEED FOR SECURED POST-PETITION FINANCING AND DESCRIPTION OF DIP FACILITY

24. Given its current financial position and status of operations, the Debtor cannot obtain unsecured credit allowable under Bankruptcy Code §503(b)(l) as an administrative expense. Financing on a postpetition basis is not otherwise available without the Debtor (i) granting, pursuant to Bankruptcy Code §364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§503(b) and 507(b), other than as described below in respect of the Carve-Out, (ii) securing, pursuant to Bankruptcy Code §§364(c) and (d), such indebtedness and obligations with first priority security interests in and liens on substantially all of the Debtor's assets as described below, and (iii) providing for adequate protection of Mepco's interests, as Prepetition Lender, as described below.

25. Mepco is willing to extend secured post-petition discretionary financing and credit to Debtor under Sections 364(c) and 364(d) of the Bankruptcy Code in accordance with the Credit Agreement and this Court's interim and final orders approving the Credit Agreement.

26. The Credit Agreement contains the following terms:

    a. The Debtor is authorized to borrow from Mepco not more than $3,000,000.00.

    b. The Credit Agreement matures on June 30, 2010.

    c. The Debtor is authorized to use the proceeds of the Loans and to use the Cash Collateral in the operation of the Debtor's business and for payment

of Chapter 11 expenses, including professional fees, in accordance with the budget attached hereto as Exhibit A (the "Budget").

d.  Debtor's obligations under the Credit Agreement shall constitute claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code §§105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 (the "Superpriority Claims").

e.  As security for Debtor's obligations under the Credit Agreement, Mepco is granted valid and perfected security interests in and liens on (the "Liens") all present and after-acquired property of the Debtor of any nature whatsoever, including, without limitation, all tangible and intangible personal property and fixtures, all promissory notes, leasehold interests, all cash, money, certificates, investment property, securities, chattel paper and other property contained in any account maintained by or for the benefit of the Debtor, including all cash, reserves and cash equivalents maintained in any account maintained at any financial institution, insurance company or other institution, letter of credit rights, books, records, writings, data bases, customer lists, intellectual property, insurance policies, including any cash surrender value, and commercial tort claims (collectively with all proceeds and products of any or all of the foregoing, the "Collateral"): (1) pursuant to Bankruptcy Code §364(c)(2), a first priority, perfected Lien upon all of the Debtor's right, title and interest in, to and under all Collateral that is not otherwise encumbered by a validly perfected security interest or lien on the Petition Date; (2) pursuant to Bankruptcy Code §364(d)(1), a first priority, senior, priming, perfected Lien upon all of the Debtor's right, title and interest in, to and under the Prepetition Collateral; and (3) pursuant to Bankruptcy Code §364(c)(3), a junior, perfected Lien upon all of the Debtor's right, title and interest in, to and under all Collateral (other than the Prepetition Collateral) which is subject to a validly perfected security interest or lien in existence as of the Petition Date.

f.  The Liens and Replacement Liens shall constitute valid and duly perfected security interests and liens, and Mepco shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens.

g.  The Liens and Superpriority Claims granted to Mepco shall be subject and subordinate only to a carve-out for payment of quarterly fees required to be paid pursuant to 28 U.S.C. §1930(a)(6).

h.  Other than the Carve-Out, the Debtor, for itself and its estate, shall not assert a claim under Bankruptcy Code §506(c) for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by Mepco upon the Collateral or the Prepetition Collateral. Upon the

8

entry of the Final Order, the Debtor, for itself and its estate, and, by entry of the Final Order, all other parties in interest, are deemed to waive and may not assert any rights, claims and/or benefits under Bankruptcy Code §552(b).

  i. Upon the occurrence and during the continuance of an Event of Default, Mepco may exercise all rights and remedies and take all or any actions without further modification of the automatic stay pursuant to Bankruptcy Code §362 or further order of or application made to this Court in order to: (a) terminate the Secured Postpetition Financing and thereafter cease to make Loans to the Debtor; (b) declare the principal of and accrued interest, fees and other liabilities constituting the Obligations to be due and payable; (c) setoff amounts in accounts maintained with Mepco, or otherwise enforce rights against any other Collateral in the possession of Mepco; and/or (d) exercise any other right or remedy permitted to Mepco under the Loan Documents, this Order or by operation of law; provided, however, Mepco may take the actions described in clauses (c) or (d) above only after providing three business days' prior written notice to the Debtor, its counsel, the United States Trustee and any Committee and provided that no order prohibiting such actions is entered by this Court during such three business day period.

  j. A party in interest (including any statutory committee appointed in this Chapter 11 Case) shall file an adversary proceeding challenging the validity, enforceability or priority of the Pre-petition Indebtedness or Mepco's liens on the Pre-petition Collateral, or otherwise assert claims or causes of action against Mepco on behalf of the Debtor's estate, no later than the date that is forty-five (45) days after the Petition Date. If no such adversary proceeding or contested matter is commenced as of such date, the Prepetition Obligations shall constitute allowed claims, not subject to subordination and otherwise unavoidable, for all purposes in the Chapter 11 Case and any subsequent Chapter 7 case, Mepco's liens on the Prepetition Collateral shall be deemed legal, valid, binding, perfected, not subject to subordination and otherwise unavoidable, and the Prepetition Obligations and Mepco's liens on the Prepetition Collateral shall not be subject to any challenge by any party in interest seeking to exercise the rights of the Debtor's estate, including without limitation, any successor thereto.

  k. Debtor waives all claims against Mepco, including without limitation, (i) claims arising from or in any way related to this Motion and Interim and final Order, the Indebtedness, the Mepco Agreement, the DIP Loan Agreement, or the business relationship between Debtor and Mepco, and (ii) claims under the avoidance provisions of Sections 544, 547, 548 and 550 of the Bankruptcy Code, the surcharge provisions of Section 506(c) of the Bankruptcy Code, and the enhancement of collateral provisions of Section 552 of the Bankruptcy Code.

  l. Debtor irrevocably waives any right, without Mepco's prior written consent, (i) to grant or impose, under Section 364 of the Bankruptcy Code

9

or otherwise, liens or security interests in any Pre-petition or Post-petition Collateral; (ii) to use, or seek to use, cash collateral; (iii) to modify or affect any of Mepco's rights under the Credit Agreement and Interim and Final Order, by any plan of reorganization confirmed in this case or subsequent Order entered in this case.

      m.      Transaction Fee - $10,000.00 due and payable on Maturity Date.

27. Debtor will demonstrate adequate protection of Mepco's interest in the Pre-Petition Collateral by demonstrating at the hearing on this Motion that Mepco's position will be adequately protected if the relief requested in this Motion is granted. If authorized to borrow under the DIP Loan Agreement, Debtor will be able to operate reorganize its business, thereby maximizing its value and benefit to the creditors and the estate. If it is unable to borrow under the DIP Loan Agreement, Debtor has no source of funds and will shut down operations. In short, as the Debtor will demonstrate, Mepco's interests will be adequately protected, in part, if the Debtor is able to borrow under the DIP Loan Agreement and continue in operation.

28. In accordance with Sections 364(a), (b), and (c) of the Bankruptcy Code, the Debtor has attempted to obtain secured or unsecured debtor in possession financing on terms as, or more, beneficial than those set forth in the DIP Loan Agreement. Despite those efforts, however, the Debtor has been unable to obtain alternative financing. Likewise, no other prospective lender would offer terms as favorable to the Debtor as the terms set forth in the Pre-petition Loan Agreement.

29. Finally, the terms and conditions of the Mepco Agreement, including the terms under which the Mepco will receive certain security interests, are fair and reasonable under the circumstances. Obtaining credit and incurring debt pursuant to the proposed DIP Loan Agreement are actions reasonable and necessary to continue the Debtor's business operations and to preserve its bankruptcy estate. Thus, the Debtor believes that the entry of an order

granting the interim and final relief requested in this Motion is in the best interests of its estate and creditors.

30. The Court's approval of the DIP Loan Agreement described above: (a) will minimize the disruption of the Debtor's business that would otherwise result from the absence of interim debtor in possession financing; (b) will increase the likelihood that the Debtor will reorganize successfully; and (c) is necessary to avoid immediate and irreparable harm to the Debtor and its assets, business, goodwill, reputation, employees, and creditors. For these additional reasons, approval of the DIP Loan Agreement and the DIP Facility evidenced thereby is in the best interests of the Debtor, its estate and its creditors.

31. Except as otherwise provided herein, the provisions of the Credit Agreement and Interim and Final Order shall survive the Termination Date.

## V. REQUEST FOR INTERIM RELIEF

32. Use of cash collateral and the DIP Facility represents the Debtor's sole source of operating funds and working capital. Without the right to use cash collateral and borrow under the DIP Facility, the Debtor would be forced to cease operations. The Debtor seeks, therefore, after a preliminary hearing, immediate use of cash collateral and authority to borrow under the DIP Facility to avoid immediate and irreparable harm to the Debtor and its estate.

## VI. NOTICE

33. No creditors' committee has been appointed in this Chapter 11 case. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the United States Trustee; (b) the Debtor's 20 largest unsecured creditors as identified in its Chapter 11 petition; and (c) any party with an interest in the Cash Collateral. In light of the

nature of the relief requested herein, the Debtor submits that no other or further notice is required.

34. The Debtor further requests that the Court deem service of this Motion, pursuant to Bankruptcy Rules 4001(b)(1) and 4001(c)(1) and service of the Interim Order, good and sufficient notice of the final hearing.

### VII. NO PRIOR REQUEST

35. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, Debtor U.S. Fidelis, Inc. respectfully requests that the Court enter an Interim Order after a preliminary hearing:

A. Authorizing the Debtor's immediate use of cash collateral in an amount sufficient to avoid immediate and irreparable harm to the Debtor and its estate;

B. Authorizing secured post-petition financing on a superpriority basis in an amount sufficient to avoid immediate and irreparable harm to the Debtor and its estate;

C. After a final hearing, enter a final order authorizing the Debtor use of cash collateral in the ordinary course of the Debtor's business;

D. Authorizing secured post-petition financing on a superpriority basis; and

E. Granting the Debtor such other and further relief as the Court deems appropriate.

CC 2168328v6

Respectfully submitted,

LATHROP & GAGE LLP

By: */s/ Robert E. Eggmann*
Robert E. Eggmann, #3044, #37374
7701 Forsyth Blvd., Suite 400
Clayton, Missouri 63105
Telephone: (314) 613-2800
Telecopier: (314) 613-2801
reggmann@lathropgage.com

and

Crystanna V. Cox, #5214085, #60402
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Telephone: (816) 292-2000
Telecopier: (816) 292-2001
ccox@lathropgage.com

ATTORNEYS FOR DEBTOR US FIDELIS, INC.

## **CERTIFICATE OF SERVICE**

A copy of the foregoing was served by ECF electronic noticing or via first class U.S. Mail, postage prepaid, on this 2nd day of March, 2010 upon:

| | |
|---|---|
| Leonora Long, Esq.<br>Office of the U.S. Trustee<br>111 South 10th Street, Suite 6353<br>St. Louis, MO 63102 | David Going, Esq.<br>Armstrong Teasdale<br>One Metropolitan Square, Suite 2600<br>St. Louis, Missouri 63102<br>*Attorneys for MEPCO* |
| Spencer P. Desai, Esq.<br>Capes, Sokol, Goodman and Sarachan<br>7701 Forsyth Boulevard, 12th Floor<br>St. Louis, MO 63105<br>*Attorneys for Cory Atkinson* | Norman W. Pressman, Esq.<br>Goldstein & Pressman<br>121 Hunter Avenue, Suite 101<br>St. Louis, MO 63124<br>*Attorneys for Darain Atkinson* |

/s/ *Robert E. Eggmann*

13