**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) In Proceedings Under Chapter 11 |
| US FIDELIS, INC., | ) |
| | ) Case No. 10-41902-705 |
| Debtor. | ) |
| | ) Motion No.: |
| | ) |
| | ) Hearing Date: March 3, 2010 |
| | ) Hearing Time: 10:00 a.m. |
| | ) Location: St. Louis, Missouri |
| | ) Courtroom 7-South |

## AFFIDAVIT OF SCOTT EISENBERG
## IN SUPPORT OF CERTAIN FIRST DAY MOTIONS AND APPLICATIONS

Scott Eisenberg, being duly sworn on oath, deposes and says:

1.     I am a member with Amherst Partners, LLC ("Amherst"). Amherst has been employed as the financial consultant for US Fidelis, Inc. ("US Fidelis" or "Debtor"). In addition, as of March, 1, 2010, I was named the Chief Restructuring Officer of Debtor. As the financial consultant and the Chief Restructuring Office of Debtor, I am familiar with the day-to-day operations, business affairs, and books and records of Debtor.

2.     On March 1, 2010 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Missouri. Debtor intends to continue in the possession of its properties and the management of its business as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed, and no official committee of creditors or equity interest holders has yet been established in this

Chapter 11 case. In order to enable Debtor to operate effectively and to avoid the adverse effects of the Chapter 11 filing, Debtor will request various types of relief in "first day" applications and motions filed with the Court.

3.    I submit this affidavit in support of the first day applications and motions in the above captioned Chapter 11 case. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first day motion or application. Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion, based upon my experience and knowledge of the Debtor's operations and financial condition or information reported to me in the course of my duties by the Debtor's officers, agents, or employees. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this affidavit.

4.    Part I of this affidavit describes Debtor's business and the circumstances surrounding the filing of Debtor's Chapter 11 petition. Part II sets forth the relevant facts in support of Debtor's various first day applications and papers filed concurrently herewith.

## I.    BACKGROUND

1.    Debtor was at one time the nation's largest marketer of vehicle service contracts ("VSCs") developed by independent and unrelated companies (the "Administrators"). Generally, the third-party Administrators, rather than the Debtor, are the contract parties under the VSCs, and accordingly, are obligated for claims made by the purchasers of the VSCs. Importantly, the Administrators continue to administer and honor claims made under the VSCs. In turn, the obligations of the Administrators under the VSCs, including the claims submitted by the holders of VSCs, are backed by insurance. Debtor is not itself nor has it ever been an insurance company.

2.     At various times, Debtor marketed via direct mail, telemarketing, television, and Internet advertising. However, Debtor suspended all sales and marketing activity in December 2009 when cancellations of active customers more than doubled from their normal levels. Debtor currently operates an account resolution and retention center for all customers who currently own a VSC sold through Debtor. All of these activities are calculated to maximize customer retention and to minimize cancellations, thereby limiting the negative impact on the estate, the creditors, including Administrators, which may be caused by Debtor's financial difficulties and this chapter 11 filing.

3.     At one time, Debtor employed more than 1,028 full time employees and contractors. At the present time, it has approximately 109 employees.

4.     Debtor is owned 50% by Darain Atkinson and 50% by Cory Atkinson. While both Darain Atkinson and Cory Atkinson are on the board of directors of the Debtor and Darain Atkinson is the President of Debtor, neither party is presently active in the operation of the Debtor. From March, 2009 through February 28, 2010 the Debtor was managed on a day to day basis by a non-insider Chief Executive Officer. As of March 1, 2010 the Debtor has been managed by a Chief Restructuring Officer Scott Eisenberg of Amherst Partners, LLC.

5.     Debtor has been the subject of a number of federal and state investigations since 2008, which have, in turn, generated a fair amount of mostly negative media reports. Those reports, combined with economic and competitor issues, have contributed to a dramatic increase in VSC cancellations.

6.     This Chapter 11 proceeding and the insolvency of the Debtor should not directly affect the ability of any customer to have claims fairly adjudicated and paid by the Administrator.

## II.    **DEBTOR'S PRE-PETITION RELATIONSHIP WITH MEPCO**

7.      Debtor's primary secured creditor is Mepco Finance Corporation ("Mepco"). Initially, pursuant to the terms of a Dealer Agreement, Mepco purchased through Debtor payment plans entered into by consumers that purchased VSCs from Debtor. Under the Dealer Agreement, for those customers who purchased a VSC utilizing a payment plan, Mepco would pay Debtor a portion of the purchase price (the "Dealer Profit") which in total is used to pay all ongoing operating expenses of the Debtor. Additionally, Mepco would pay a portion of the purchase price to the Administrator for that VSC (the "Dealer Cost"), which amount was intended to compensate the Administrator for administering and paying claims made under that contract. If, however, the holder of a VSC who entered into a payment plan cancelled before making all payments required under the payment plan, Debtor was obligated to repay to Mepco the "unearned" portion of the Dealer Profit previously paid by Mepco to Debtor on that VSC (the "Dealer Refund"). Debtor's obligations to Mepco under the Dealer Agreement are secured by, among other things, a Security Agreement between Debtor and Mepco dated April 1, 2009 (the "Mepco Security Agreement").

8.      Pursuant to the Dealer Agreement, Mepco reduced or offset the amount of its payment to Debtor for Dealer Profit on newly sold "payment plan" VSCs by the amount of Dealer Refunds due from Debtor to Mepco. In the fall of 2009, cancellations of VSCs, including those purchased by consumers under payment plans, began to mount, resulting in ever-increasing Dealer Refund amounts owed by Debtor to Mepco and decreased cash flow. Additionally, as Debtor's sales decreased, Debtor's Dealer Refund obligations to Mepco approached and then exceeded the Dealer Profit owed by Mepco, turning Debtor's cash flow negative. In an effort to obtain operating capital with which to maintain operations and pay expenses, the Debtor requested financial assistance from Mepco.

9. Accordingly, on or about October 23, 2009, Debtor entered into an Agreement with Mepco (the "Mepco Agreement"). Among other things, the Mepco Agreement called for Mepco to temporarily forbear from reducing or offsetting Debtor's Dealer Refund obligations against the Dealer Profit on new contracts. As a result of deferring its Dealer Refund obligations while collecting Dealer Profit, the Debtor accumulated necessary operating capital.

10. As of the Petition Date, Debtor owed Mepco, without defense, counterclaim or offset, the sum of $17,727,396.69 under the Dealer Agreement and the Mepco Agreement plus accrued and unpaid interest thereon and fees and costs. These amounts together with all interest, fees, costs, and charges, are identified as the "Pre-petition Indebtedness."

11. The Pre-petition Indebtedness is secured by valid, perfected, enforceable, first-priority liens and security interests upon and in substantially all of the assets and property of the Debtor, including without limitation, goods, inventories, equipment, accounts, chattel paper, general intangibles and proceeds of the foregoing (the "Pre-petition Collateral"). All of the cash of the Debtor constitutes Pre-petition Collateral or the proceeds of the Pre-petition Collateral and, therefore, is cash collateral of Mepco within the meaning of Bankruptcy Code §363(a) (the "Cash Collateral").

12. The Debtor believes that depending upon the collectability of certain amounts owed to the Debtor by third parties, Mepco may be undersecured.

### III. MOTIONS AND APPLICATIONS

13. An important element of Debtor's successful Chapter 11 case is approval of each of Debtor's motions and applications submitted concurrently herewith. Factual information in support of such orders is provided below and in the applications and motions filed concurrently herewith.

## Retention of Lathrop & Gage LLP

14.     Continued representation of Debtor by its counsel, Lathrop & Gage LLP ("Lathrop & Gage"), is critical to the success of Debtor's Chapter 11 proceeding because Lathrop & Gage is uniquely familiar with Debtor's business and legal affairs as more fully set forth in the Application for the retention of Lathrop & Gage and Affidavit of Robert E. Eggmann.

15.     Debtor selected the firm of Lathrop & Gage as attorneys because of the firm's experience with and knowledge of Debtor's business and on-going arbitration and litigation matters, as well as its national experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code.

16.     Debtor desires to employ the firm of Lathrop & Gage under a general retainer because of the extensive legal services that will be required in connection with the Chapter 11 case.

17.     The services of attorneys under a general retainer are necessary in order to enable Debtor to faithfully execute its duties as debtor in possession.  Subject to further order of this Court, Lathrop & Gage will be required to render, among others, the following services to Debtor:

a.      Advising Debtor with respect to their rights, power and duties in this case;

b.      Assisting and advising Debtor in its consultations with any appointed committee relative to the administration of this case;

c.      Assisting Debtor in analyzing the claims of creditors and negotiating with such creditors;

d.      Assisting Debtor with investigation of the assets, liabilities and financial condition of Debtor and reorganizing Debtor's businesses in order to maximize the value of Debtor's assets for the benefit of all creditors;

e.      Advising Debtor in connection with the sale of assets or business;

f.    Assisting Debtor in its analysis of and negotiation with any appointed committee or any third party concerning matters related to, among other things, the terms of a plan of reorganization;

g.    Assisting and advising Debtor with respect to any communications with the general creditor body regarding significant matters in this case;

h.    Commencing and prosecuting necessary and appropriate actions and/or proceedings on behalf of Debtor;

i.    Reviewing, analyzing or preparing, on behalf of Debtor, all necessary applications, motions, answers, orders, reports, schedules, pleadings and other documents;

j.    Representing Debtor at all hearings and other proceedings;

k.    Conferring with other professional advisors retained by Debtor in providing advice to Debtor; and

l.    Performing all other necessary legal services in this case as may be requested by Debtor in these Chapter 11 proceedings; and

m.    Assisting and advising Debtor regarding pending arbitration and litigation matters in which Debtor may be involved, including continued prosecution or defense of actions and/or negotiations on Debtor's behalf.

18.    The firm of Lathrop & Gage has indicated a willingness to act on behalf of Debtor.

19.    To the best of Debtor's knowledge, Robert E. Eggmann, and the other members, counsel, and associates of the firm of Lathrop & Gage (i) do not have any connection with Debtor, its affiliates, creditors, or any other parties in interest, or their respective attorneys and accountants, (ii) are "disinterested persons," as that term is defined in Section 101(14) of the Bankruptcy Code, and (iii) do not hold or represent any interest adverse to the estate, except as set forth herein and in the affidavit and statement of Robert E. Eggmann, a partner of Lathrop & Gage, filed concurrently herewith.

## Retention of Amherst Partners, LLC

20.     Debtor seeks to retain Amherst Partners, LLC ("Amherst") to provide financial advisory services to Debtor in connection with its Chapter 11 case.

21.     The parties have entered into an engagement letter (the "Amherst Agreement"), which governs the relationship between Amherst and Debtor. Amherst will provide such financial advisory as Amherst and Debtor shall deem appropriate and feasible in order to advise Debtor in the course of this Chapter 11 case, including, but not limited to, the following:

       a.     Amherst shall make available to the Company Scott Eisenberg to serve as Chief Restructuring Officer (CRO);

       b.     In addition, Steve Sadowski and Terry Keating ("Additional Personnel") will assist in this engagement consistent with past consulting services provided;

       c.     Subject to Section 1(c) and 1(e), of the Amherst Agreement, the CRO shall perform such duties and hold such powers as are customarily associated with that title and office or as may be prescribed from time to time by the Board and accepted by Amherst in writing. The CRO shall perform such duties of service hereunder as the CRO deems necessary in his sole discretion;

       d.     As CRO, Scott Eisenberg, will direct all financial functions and related employees of the Company;

       e.     As CRO, Scott Eisenberg, shall file a petition for Chapter 11 in the Eastern District of Missouri;

       f.     As CRO, Scott Eisenberg, shall oversee the Company's operations;

       g.     As CRO, Scott Eisenberg, shall assist the Company in meeting with its lender(s) and presenting the revised financial plan and of maintaining their support;

       h.     The CRO and the Additional Personnel will continue to be employed by Amherst and while rendering services to the Company will continue to work with other personnel at Amherst in connection with other unrelated matters, which will not unduly interfere with services pursuant to this engagement; and

       i.     Additional Responsibilities. Upon the mutual agreement of the Debtor and Amherst, and subject to Bankruptcy Court approval if necessary, Amherst

may provide such Additional Personnel as the Debtor may request to assist in performing the services described above and such other services as may be agreed to, on such terms and conditions and for such compensation as the Debtor and Amherst shall agree.

22.     To the best of Debtor's knowledge, the directors, associates, employees, and professionals of Amherst (i) do not have any connection with the Debtor, its creditors, or any other party in interest, or their respective attorneys or accountants, (ii) are "disinterested persons" under Section 101(14) of the Bankruptcy Code, as modified by Section 1107(b) of the Bankruptcy Code, and (iii) do not hold or represent an interest adverse to the estate, except as may be set forth in the Affidavit of Scott Eisenberg.

## Professionals in the Ordinary Course of Business

23.     As more fully described in Debtor's Motion for Order Authorizing Retention of Professionals Utilized by Debtor in the Ordinary Course of Business, the Debtor employs a number of professionals in the ordinary course of business.

24.     One such professional is Debtor's legal consultant, H.E. "Bud" Cummins "Cummins"). Cummins is an attorney at law but does not render legal advice to the Debtor. However, Cummins has been essential in assisting Debtor with strategic consulting on issues involving management of outside counsel, all litigation and various state and federal investigations.

25.     Cummins is engaged by Debtor at the rate of $395.00 per hour with a $3,750 per week minimum. Cummins who lives in Little Rock, Arkansas, bills his travel time at 50% of his hourly rate. Cummins is reimbursed his reasonable expenses, including, but not limited to, airfare, hotel, meals, mileage, fuel and rental cars. Cummins will be paid on a monthly basis and his employment by the Debtor is on a week to week basis terminable by either party with no

notice. In addition, if either party elects to terminate Cummins' employment, he will be paid the full week's pay if said termination takes place after the start of the week.

**Cash Collateral and DIP Facility**

26.     The Debtor requires the use of Cash Collateral and Postpetiton Financing to continue its business operations and to pay its regular daily expenses, including employees' wages, utilities, and its other costs of doing business.

27.     The Debtor requires cash collateral to meet post-petition payroll, to pay necessary business expenses, and to continue its operations. A Monthly Budget, showing the amount of funds needed to maintain Debtor's operations until the entry of a final order permitting use of cash collateral, is attached to the Cash Collateral Motion as **Exhibit A**.

28.     The Debtor does not have sufficient available sources of working capital and financing to carry on the operation of its business without the Postpetition Financing and the use of the Cash Collateral. The Debtor's ability to preserve their relationship with customers who purchased vehicle service contracts, to pay its employees and to otherwise finance its operations, is essential to the Debtor's continued viability. In addition, the Debtor's need for financing is critical and immediate. In the absence of the Postpetition Financing and the use of the Cash Collateral, serious and irreparable harm to the Debtor and its estate would occur. The preservation and maintenance relations with customers who purchased vehicle service contracts, the preservation of the going concern value of the Debtor and the reduction of claims against the Debtor are of utmost significance and importance to a successful reorganization of the Debtor under Chapter 11 of the Bankruptcy Code.

29.     The ability of the Debtor to continue in business and remain a viable entity and to have any prospect to propose a plan of reorganization under Chapter 11 of the Bankruptcy Code

depends upon obtaining such authority to immediately use cash collateral and DIP Facility on the Petition Date.

30. Absent the requested relief, the Debtor will be unable to pay its payroll and payroll expenses, operating expenses, and to otherwise operate its business and preserve its assets. Immediate and irreparable harm to the Debtor's business and value of its estate will occur absent the relief requested herein.

31. Given its current financial position and status of operations, the Debtor cannot obtain unsecured credit allowable under Bankruptcy Code §503(b)(l) as an administrative expense. Financing on a post petition basis is not otherwise available without the Debtor (i) granting, pursuant to Bankruptcy Code §364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§503(b) and 507(b), other than as described below in respect of the Carve-Out, (ii) securing, pursuant to Bankruptcy Code §§364(c) and (d), such indebtedness and obligations with first priority security interests in and liens on substantially all of the Debtor's assets as described below, and (iii) providing for adequate protection of Mepco's interests, as Prepetition Lender, as described below.

32. Mepco is willing to extend secured post-petition discretionary financing and credit to Debtor under Sections 364(c) and 364(d) of the Bankruptcy Code in accordance with the Credit Agreement and this Court's interim and final orders approving the Credit Agreement.

33. The terms of the Credit Agreement are set for the in the Cash Collateral Motion. The terms and conditions of the Mepco Agreement, including the terms under which the Mepco will receive certain security interests, are fair and reasonable under the circumstances. Obtaining credit and incurring debt pursuant to the proposed DIP Loan Agreement are actions reasonable and necessary to continue the Debtor's business operations and to preserve its bankruptcy estate.

Thus, the Debtor believes that the entry of an order granting the interim and final relief requested in this Motion is in the best interests of its estate and creditors.

## Maintenance of Cash Management System

34.     Debtor maintains a multipart banking system (the "Cash Management System") to process its revenues and expenses.

35.     Debtor's Cash Management System is composed of multiple accounts at multiple banks and with a third-party.

36.     Four of the Debtor's accounts are maintained at Montgomery Bank. On or about the Petition Date, account no. ****8909 with Montgomery Bank contained a balance of $6,302.19. Account no. ****8909 serves as the main operating account for Debtor.

37.     On or about the Petition Date, account no. ****8887 with Montgomery Bank contained a balance of $58,194.92. Account no. ****8887 services Debtor's Health Care and Dependant Care Spending Accounts with J.W. Terrill, meaning that the payroll deductions for the Health Care and Dependant Care Spending Accounts and the claims by the participating employees against the Health Care and Dependant Care Spending Accounts flow through account no. ****8887.

38.     On or about the Petition Date, account no. ****8917 with Montgomery Bank contained a balance of $11,843.61. Account no. ****8917 services Debtor's former health insurance provider, Aetna. The Debtor's former health plan with Aetna was self-funded by the Debtor, meaning the Debtor was responsible for the payment of any claims made by the employees under the health plan with Aetna. As of September 1, 2009, the Debtor began using United Healthcare as its health insurance provider. Because employees have up to nine months to submit claims with Aetna, Debtor continues to use account no. ****8917 to pay any claims by employees with Aetna through and including May 31, 2010.

39.     On or about the Petition Date, account no. ****8895 with Montgomery Bank contained a balance of $739.49. Account no. ****8895 with Montgomery Bank no longer serves a purpose for the Debtor. Accordingly, the Debtor intends to close account no. ****8895 and move the balance of $739.49 to its main operating account with Montgomery Bank.

40.     One of the Debtor's accounts is maintained at Frontenac Bank, account no. ****2804. On or about the Petition Date, the account with Frontenac Bank contained a balance of $19,779.74. Account no. ****2804 no longer serves a purpose for the Debtor. Accordingly, the Debtor intends to close account no. ****2804 and move the balance of $19,779.74 to its main operating account with Montgomery Bank.

41.     Five of the Debtor's accounts are maintained at First Regional Bank n/k/a First Citizens Bank. On or about the Petition Date, account no. ****9767 with First Regional Bank n/k/a First Citizens Bank contained a balance of $570.11, and account no. ****6564 with First Regional Bank n/k/a First Citizens Bank contained a balance of $159.37. Account nos. ****9767 and ****6564 service the deposits from consumers, who purchase vehicle service contracts from Debtor.

42.     On or about the Petition Date, account no. ****1320 with First Regional Bank n/k/a First Citizens Bank contained a balance of $4,402.34, and account no. ****3390 with First Regional Bank n/k/a First Citizens Bank Regional Bank contained a balance of $8,547.00. Account nos. ****1320 and ****3390 service the payment plan payments from consumers, who purchase vehicle service contracts from Debtor, when Debtor is serving as the financing company.

43.     On or about the Petition Date, account no. ****3868 with First Regional Bank n/k/a First Citizens Bank contained a balance of $4,354,327.68. Intuit, Inc. f/k/a Electronic

Clearing House, Inc. is the credit card processor for the Debtor on all vehicle service contracts sold by Debtor. Each time Intuit, Inc. f/k/a Electronic Clearing House, Inc. processes a credit card transaction on behalf Debtor, Intuit, Inc. f/k/a Electronic Clearing House, Inc. requires that 5% of the transaction be deposited into account no. ****3868. Intuit, Inc. f/k/a Electronic Clearing House, Inc. is still processing credit cards on behalf of the Debtor.

44. One of the Debtor's accounts is maintained at Merrill Lynch, account no. ****7415. On or about the Petition Date, the account with Merrill Lynch contained a balance of $0.00. Account no. ****7415 no longer serves a purpose for the Debtor. Accordingly, the Debtor intends to close account no. ****7415.

45. One of the Debtor's accounts is maintained with the third-party, Warranty America. On or about the Petition Date, the account with Warranty America contained a balance of $0.00. Each time a consumer purchases a vehicle service contract from Debtor a varying percentage of the purchase price is deposited into the account with Warranty America to hedge against the potential cancellation of that vehicle service contract by the consumer. Because consumers can cancel their vehicle service contracts with the Debtor at any time during the length of the vehicle service contracts, Debtor will continue to use the account with Warranty America until the last vehicle service contract sold by Debtor expires.

46. One of the accounts is maintained at New England Financial, account no. ****1000. On or about the Petition Date, the account with New England Financial contained a balance of $1,047,000.00. Account no. ****1000 provides no business purpose to the Debtor. Although the funds in account no. ****1000 belong to Debtor, the only authorized signers on account no. ****1000 are Darain Atkinson, individually, and Cory Atkinson, individually. Accordingly, Debtor intends to take all reasonable efforts to recover the funds from account no.

****1000 and move the balance of $1,047,000.00 to its main operating account with Montgomery Bank.

47.    For its main operating account with Montgomery Bank, Debtor's Cash Management System operates as follows:

    a.    Debtor issues checks and wire transfers out of its main operating account on a normal basis. Some payments are made utilizing the Federal Reserve wire transfer system or the automated clearing house (ACH) electronic funds transfer system. Debtor has check stock on site, and internet banking abilities that result in more reasonable service charges. Payments to vendors are made primarily using checks drawn on the main operating account. Certain vendors prefer payments made via ACH, which Montgomery Bank's internet service helps to facilitate.

    b.    Debtor has employed Automatic Data Processing, Inc. (ADP) to administer its payroll every two weeks. Automatic Data Processing, Inc. (ADP) has been authorized to withdraw the needed funds from the Debtor's main operating account to pay Debtor's employees via either direct deposit or check. Also, Automatic Data Processing, Inc. (ADP) disperses the state and federal taxes automatically out of the main operating account. There are no vendors other than Automatic Data Processing, Inc. (ADP); American Express (withdrawing chargebacks by consumers who have purchased vehicle service contracts from the Debtor but who have stopped payment on those vehicle service contracts); & Eplan Services (withdrawing amounts which employees defer out of their wages towards the 401(k) plan and withdrawing amounts which are matched by the Debtor under the 401(k) plan) who have been given the rights to remove money automatically from the main operating account. All transactions are approved and initiated by authorized personnel.

48.    The Cash Management System is governed by various documents, agreements, internal procedures and understandings between Debtor and the multiple banks and the third party. Debtor believes that the rights and remedies afforded to the multiple banks, under the various account agreements between Debtor and the multiple banks and the third party, are consistent with the rights and remedies afforded to any financial institution providing cash management services such as that maintained and utilized by Debtor.

49.     Because of the nature of Debtor's Cash Management System, it would be difficult, disruptive and expensive for Debtor to close its existing accounts and open new accounts. Additionally, any disruption of the existing system would not only impair current operations, it would interrupt and delay financial reporting by Debtor to the Court because the existing internal accounting system is based on the availability of the data generated as a byproduct of the existing Cash Management System.

50.     Maintaining Debtor's existing accounts will enhance reorganization efforts and lessen the confusion among employees, vendors, and potential customers that often follows a Chapter 11 filing. Opening new bank accounts would be unduly burdensome, be disruptive to Debtor during this critical initial stage of the Chapter 11 process and may take several weeks to complete. Furthermore, Debtor has preprinted check stock that would require unnecessary time and expense to replace.

51.     To prevent the possibility that the payment of certain pre-petition obligations will be honored after the Petition Date, Debtor has implemented the following procedures:

> Accounts Payable Accounts – Debtor has, or will have by the time this Motion is heard, ordered a stop-pay with Montgomery Bank for any check drawn on the main operating account numbered below a particular number (the number is at least 100 above the last check Debtor wrote on the account pre-petition unless otherwise ordered by the Court.) Invoices subsequently entered into the system for payment are systematically put on "hold" until individually reviewed by Accounting. Based on the invoice date, delivery date, service date, etc., Accounting will release those invoices related solely to post-petition business activity and follow up on those determined to be partially or completely pre-petition.
>
> (Debtor's proposed letter to Montgomery Bank outlining this procedure is attached hereto and incorporated herein as **Exhibit B**.)

52.     Unless Debtor is allowed to maintain its existing accounts, it will be unable to effect a smooth transition into its Chapter 11 proceeding. Maintenance of the existing accounts will not prejudice any party in interest. However, the inability to maintain existing accounts will

prejudice Debtor, as well as its employees, vendors, and providers, as it may take approximately two weeks to receive new checks or may require time and expense in reprogramming certain printers and software. Accordingly, the entry of an order granting the relief requested is in the best interest of Debtor's estate, employees, and creditors.

53.    It is essential to the Debtor while it is continuing to negotiate debtor-in-possession financing and reorganization that there be minimal disruption to its ordinary business affairs. Significantly, the Cash Management System utilized by Debtor is familiar to Debtor, Montgomery Bank at which it maintains its main operating accounting, and its employees.

### Business Necessity to Pay Pre-Petition Employee Claims

54.    Debtor has requested authority to pay outstanding pre-petition Employee wages and benefits under the Emergency Motion for Order Authorizing Payment of Pre-Petition Wages, Salaries, Reimbursable Employee Expenses and Medical and Other Employee Benefits ("Wage Motion").

55.    In the past Debtor's operations included a much larger staff, but Debtor currently employs one hundred and nine (109) salaried and hourly employees, which include management, office staff, and other necessary staff. All of the employees are full-time. All of these employees are on the payroll of, and paid by, Debtor. The majority of employees are paid on an hourly basis. The employees are all non-union. A smaller percentage of employees are paid on a salaried basis. All employees will suffer great hardship if they were to lose or suffer any delay in receiving their pay and/or benefits.

56.    Failure to pay the pre-petition employee claims (the "Pre-Petition Employee Claims") as described and identified in the Wage Motion would cause Debtor's employees to suffer undue hardships and, in many instances, financial difficulties because such amounts are necessary to enable employees to meet their respective personal, household and family

obligations. Such a result would obviously destroy employee morale and result in unmanageable employee turnover. The Debtor submits that any significant deterioration in morale at this time will substantially and adversely impact the Debtor and its ability to reorganize, thereby resulting in immediate and irreparable harm to the Debtor and its estate.

57.    In addition, the Debtor believes that most, if not all, of the Pre-Petition Employee Claims will be entitled to priority status. The Debtor believes no single employee is owed more than $10,950 in total Pre-Petition Employee Claims. Thus, these employees will most likely be entitled to seek priority status for their claims under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

58.    To the extent that payment of the amounts described in the Wage Motion may subsequently be determined to be greater than a recipient thereof would otherwise have received if these cases were commenced or proceeded under Chapter 7 of the Bankruptcy Code, Debtor (or any subsequently appointed Trustee) expressly reserves the right to seek recovery of such payments.

59.    Debtor submits that the amounts to be paid to employees pursuant to the Wage Motion are reasonable compared with the importance and necessity of the services of the employees and the losses Debtor will likely suffer if those amounts are not paid.

60.    The requested relief also will reduce significantly the administrative burden which otherwise might be imposed in the Chapter 11 case. For Debtor to identify whether and to what extent individual employees hold priority or general unsecured claims for employee benefits, and to modify benefit policies to enforce these distinctions, would impose additional burdens of administration and expense which seem unwarranted under the circumstances of these cases.

## Utilities

61.     In connection with the operation of its business, Debtor obtains electricity, water, telephone and other similar services from several utility companies or utility divisions. Any interruption in these services would seriously disrupt Debtor's normal day-to-day operations, thereby causing potentially irreparable harm to the reorganization of Debtor. Exhibit A to the Debtor's Emergency Motion for Order Approving Debtor's Method of Furnishing Adequate Assurance of Payment of Post-Petition Utility Services (the "Utilities Motion") is a list of all the utility companies that provide services to Debtor. The utility companies identified in Exhibit A with respect to their function as providers of utility services shall be referred to as the "Utilities."

62.     The Utilities service Debtor's headquarters. Without utilities, Debtor's headquarters would be inoperable. Utility services are essential to Debtor's ability to reorganize.

63.     Before the Petition Date, Debtor maintained good payment histories with all of the Utilities, and as of the Petition Date, there are no arrearages owed to any of the Utilities. City of Wentzville, Missouri currently holds a $150.00 deposit from Debtor for water service.

64.     The Debtor believes that the following offer to provide adequate assurance of payment to the utilities is sufficient to preclude unilateral termination by a utility under 11 U.S.C. § 366(b):

      a.     Debtor shall provide a cash deposit to each utility company equivalent to a two months average bill;

      b.     Debtor shall timely pay for all post-petition utility services pursuant to the terms of the invoices and billing statements generated by the utility companies in the ordinary course of business;

      c.     In the event that Debtor fails to timely pay for post-petition utility service per an invoice, Debtor shall have a ten (10)-day period to cure such nonpayment, which ten (10)-day period shall begin to run automatically from the date of the non-payment notice from the utility company;

d.     Should Debtor fail to pay the invoice within the ten (10)-day time period after receipt of notice of default, the utility company shall be entitled to alter, refuse or discontinue service, without further Court order;

e.     If a utility company maintains more than one account for Debtor, the failure to pay for post-petition utility services with respect to one account shall not be deemed a failure to pay or "cross-default" with respect to any other account, provided that such other account is being paid. Each failure to pay, and the ability to alter, refuse or discontinue service shall arise on a per account basis; and

f.     To the extent that a utility company provides post-petition services that are unpaid, such utility company shall be entitled to an administrative claim, pursuant to 11 U.S.C. §§ 503(b)(1) and 507(a)(1), payable upon confirmation of a plan of reorganization or such earlier date as determined by the Court. Further, existing deposits held by Debtor's utility providers may be offset against any past-due pre-petition or post petition invoice without necessity of court order or prior notice to creditors.

65.     Debtor believes that these provisions provide utility companies with "adequate assurance" of payment.

66.     Debtor will pay all post-petition utility bills when due. If any delay occurs, Debtor believes that the proposed assurances will more than provide sufficient protection to the utility companies providing post-petition services.

### Insurance

67.     Debtor maintains various insurance policies (collectively, the "Insurance Policies") through several third-party insurance carriers (the "Insurance Carriers"). Exhibit A to the Debtor's Emergency Motion for Authority to Perform Obligations Necessary to Maintain Existing Insurance (the "Insurance Motion") is a list of all the Insurance Carriers that provide insurance to Debtor.

68.     Debtor must be permitted to maintain the Insurance Policies. If the Insurance Policies are allowed to lapse, Debtor will be exposed to substantial liability for any damages or losses resulting in persons and property of Debtor and others.

69.     If the post-petition installment payments are not paid as they come due, the Insurance Carriers could try to lift the automatic stay to terminate the Insurance Policies. If the Insurance Carriers were successful, Debtor would be forced to seek replacement insurance coverage. Even if Debtor was able to purchase replacement insurance coverage, Debtor doubts that it would be able to do so on terms and conditions as favorable as those presently in place under the current Insurance Policies. Given Debtor's current circumstances, there is no assurance that Debtor would be able to obtain replacement insurance quickly enough to prevent a lapse in coverage.

70.     The Insurance Policies provide Debtor with essential insurance coverage. Any interruption in such coverage would expose Debtor to serious risks, including: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers; (c) the possible inability to obtain similar types and levels of insurance coverage; and (d) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage.

71.     Debtor believes that maintaining continued and uninterrupted insurance coverage under the favorable terms and conditions provided by the Insurance Carriers clearly is in the best interests of the Debtor, its estate and its creditors. Debtor seeks authority to pay all of the post-petition installment payments as they come due.

72.     Debtor's ability to pay for such insurance will of course depend on Debtor's ability to obtain sufficient debtor in possession financing.

### Taxes

73.     In the ordinary course of business, Debtor pays taxes to a number of different taxing authorities at the federal, state and local levels (the "Taxes").

74.     Taxes accrue as wages are earned and are calculated based upon a statutorily mandated percentage of gross wages employees earn.

75.     Using the funds from Debtor's main operating account at Montgomery Bank, Automatic Data Processing, Inc. (ADP) administers Debtor's payroll and disburses the withholding tax obligations to the taxing authorities.

76.     Debtor has not paid certain state and local withholding taxes accruing pre-petition, but due and owing post-petition, and certain federal withholding taxes on pre-petition wages that are due and payable post-petition. In connection with the payment of the Pre-Petition Employee Claims, Debtor asks for authority to pay the Taxes.

77.     Debtor also pays Taxes involving sales and use taxes, *ad valorem*, and other miscellaneous taxes and fees levied under federal, State of Missouri, and local authorities, as identified and described in the Motion for Order Under 11 U.S.C. §§ 105(a) and 541 Confirming Authority and/or Authorizing Debtor to Pay Various Federal, State and Local Taxes (the "Tax Motion").

78.     Debtor believes that most, if not all, of the Taxes likely constitute so called "trust fund" taxes which are required to be collected from third parties and held in trust for payment to taxing authorities. Debtor seeks authority to pay the Taxes in the ordinary course of its business.

## Retention of Ordinary Course Professionals

79.     Prior to filing its Chapter 11 petition, Debtor employed, from time to time, various accountants and legal consultants in the ordinary course of its business to render accounting and audit services, and to provide consulting with respect to litigation matters (the "Ordinary Course Professionals").

80.     Debtor desires to continue to employ and retain the Ordinary Course Professionals, including, but not limited to H.E. "Bud" Cummins, to render services to its estate

similar to those rendered prior to the commencement of this Chapter 11 case. It would be impractical and inefficient for Debtor to submit individual applications and proposed retention orders to the Court for each such Ordinary Course Professional.

FURTHER AFFIANT SAYETH NOT.

Scott Eisenberg

STATE OF MICHIGAN )
                  ) SS.
COUNTY OF OAKLAND )

On this 2nd day of March, 2010, before me, the undersigned, a Notary Public, in and for the County and State aforesaid, personally appeared **SCOTT EISENBERG**, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that she executed the same as her free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in Oakland County, Michigan, the day and year last above written.

Notary Public in and for said County and State
**Andrea L. Farr**
Notary Public, Oakland County
State of Michigan
My Commission Expires 8-8-2012

My Commission Expires:

## CERTIFICATE OF SERVICE

A copy of the foregoing was sent by ECF electronic noticing or via first class U.S. Mail, postage prepaid, on this ___ day of March, 2010 upon the **Office of the US Trustee**, 111 South 10th Street, Suite 6353, St. Louis, MO 63102.

*/s/ Robert E. Eggmann*