| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (For Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| US Fidelis, Inc. | Cory Atkinson, Darain Atkinson, DC Atkinson Realty, LLC, Atkinson Construction, Inc. and Atkinson Realty, LLC |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Robert E. Eggmann #3044, #37374<br>Lathrop & Gage LLP<br>7701 Forsyth, Suite 400<br>Clayton, MO 63105<br>314-613-2800 Fax: 314-613-2801 | |

**PARTY** (Check One Box Only)

☒ Debtor  ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor  ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)

☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor  ☒ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUES INVOLVED)

**Recovery of fraudulent transfers pursuant to 11 U.S.C. Section 548 and recovery of monies owed**

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) - Recovery of Money/Property**
[ ] 11-Recovery of money/property - §542 turnover of property
[ ] 12-Recovery of money/property - §547 preference
[ 1 ] 13-Recovery of money/property - §548 fraudulent transfer
[ 2 ] 14-Recovery of money/property - other

**FRBP 7001(2) - Validity, Priority or Extent of Lien**
[ ] 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) - Approval of Sale of Property**
[ ] 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) - Objection/Revocation of Discharge**
[ ] 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) - Revocation of Confirmation**
[ ] 51-Revocation of confirmation

**FRBP 7001(6) - Dischargeability**
[ ] 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
[ ] 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
[ ] 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) - Dischargeability (continued)**
[ ] 61-Dischargeability - §523(a)(5), domestic support
[ ] 68-Dischargeability - §523(a)(6), willful and malicious injury
[ ] 63-Dischargeability - §523(a)(8), student loan
[ ] 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
[ ] 65-Dischargeability - other

**FRBP 7001(7) - Injunctive Relief**
[ ] 71-Injunctive relief - imposition of stay
[ ] 72-Injunctive relief - other

**FRBP 7001(8) Subordination of Claim or Interest**
[ ] 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
[ ] 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
[ ] 01-Determination of removed claim or cause

**Other**
[ ] SS-SIPA Case - 15 U.S.C. §§78aaa et.seq.
[ 3 ] 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

## BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES

| NAME OF DEBTOR<br>**US Fidelis, Inc.** | BANKRUPTCY CASE NO.<br>**10-41902-705** | |
|---|---|---|
| DISTRICT IN WHICH CASE IS PENDING<br>**Eastern District of Missouri** | DIVISION OFFICE<br>**Eastern Division** | NAME OF JUDGE<br>**Charles E. Rendlen, III** |

### RELATED ADVERSARY PROCEEDING (IF ANY)

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

SIGNATURE OF ATTORNEY (OR PLAINTIFF)


 */s/ Robert E. Eggmann*

 **Robert E. Eggmann #3044, #37374**

| DATE<br>**April 28, 2010** | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>**Robert E. Eggmann #3044, #37374** |
|---|---|

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re | ) | In Proceedings Under Chapter 11 |
| | ) | |
| US FIDELIS, INC., | ) | Case No. 10-41902-705 |
| | ) | |
| Debtor. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | Adv. No. ‗‗‗‗‗‗‗‗‗‗‗‗ |
| | ) | |
| US FIDELIS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| CORY ATKINSON, an individual | ) | |
| | ) | |
| DARAIN ATKINSON, an individual | ) | |
| | ) | |
| DC ATKINSON REALTY, L.L.C., a Missouri | ) | |
| limited liability company, | ) | |
| | ) | |
| ATKINSON CONSTRUCTION, INC., a | ) | |
| Missouri corporation, and | ) | |
| | ) | |
| ATKINSON REALTY, LLC, a Missouri | ) | |
| limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |

US Fidelis, Inc., as Debtor and Debtor-in-Possession of the Chapter 11 estate of

Debtor ("US Fidelis"), submits the following Complaint against Defendants Cory

Atkinson, Darain Atkinson, DC Atkinson Realty L.L.C., Atkinson Construction, Inc., and

Atkinson Realty, L.L.C.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over these actions pursuant to 28 U.S.C. §§ 157(b)(2)(A), (H), and (O), and 1334 in that these actions arise under Title 11 and arise in the captioned Chapter 11 bankruptcy case.

2.      This is a "core proceeding" as defined in 28 U.S.C. § 157(b).

3.      Venue is proper in this Court under 28 U.S.C. § 1409.

## PARTIES

4.      Defendant Darain Atkinson is a resident of Lake St. Louis, Missouri, who presently owns, and at all other times material hereto Darain Atkinson owned, 50% of the shares of US Fidelis.  At all times material hereto Darain Atkinson has also been the President of US Fidelis and also one of its two directors.  As such, he is an "insider" of US Fidelis as that term is defined in 11 U.S.C. § 101.

5.      Defendant Cory Atkinson, who is Darain Atkinson's brother (Cory and Darain being sometimes referred to herein as the "Atkinsons"), is a resident of Wentzville, Missouri, who presently owns, and at all other times material hereto Cory Atkinson owned, 50% of the shares of US Fidelis.  At all times material hereto Cory Atkinson has also been the Vice President of US Fidelis and also one of its two directors. As such, he is an "insider" of US Fidelis as that term is defined in 11 U.S.C. § 101.

6.      US Fidelis is a Missouri corporation that is headquartered in Wentzville, Missouri and is the debtor in possession in the captioned bankruptcy case.  It filed its voluntary petition for relief in this Court on March 1, 2010.  It is currently operating under the authority of Scott Eisenberg in his capacity as Chief Restructuring Officer

appointed by the Bankruptcy Court of the U.S. District Court for the Eastern District of Missouri by Interim Order dated March 9, 2010 and by Final Order dated April 13, 2010.

7.     Atkinson Realty, L.L.C. ("Atkinson Realty") is and at all times material hereto was a Missouri limited liability company.  Upon information and belief, the only members of Atkinson Realty are Darain Atkinson and Cory Atkinson.

8.     DC Atkinson Realty, L.L.C. ("DC Realty") is and at all times material hereto was a Missouri limited liability company.  Upon information and belief, the only members of DC Atkinson Realty are Darain Atkinson and Cory Atkinson.

9.     Atkinson Construction, Inc. ("Atkinson Construction") is and at all times material hereto was a Missouri corporation in which Darain Atkinson and Cory Atkinson were sole officers and shareholders.

10.     Atkinson Realty, DC Realty, and Atkinson Construction are sometimes collectively referred to as the "Atkinson Affiliates."

## ALLEGATIONS COMMON TO ALL COUNTS

### A.     The Flawed US Fidelis Business Model

11.     Since its inception in approximately 2001, US Fidelis had been involved in the marketing and selling of vehicle service contracts, or "VSCs."   Under these contracts, a third party agreed to pay some or all of the VSC customer's expenses if a covered automobile part or system required repair.  The cost of VSCs varies according to the scope of coverage and the age, make, and condition of the vehicle, but VSCs typically range in cost from $1,500 to $4,500, and can run for up to five years.

12.     US Fidelis marketed VSCs to customers through a variety of methods, including direct mail, telemarketing, television, and internet advertising.

CC 2258594v5

13.     US Fidelis grew to become the largest seller of VSCs in the United States. By December 2009, US Fidelis claimed to have 300,000 customers. http://www.usfidelis.com/ usfidelis/us-fidelis-news.

14.     US Fidelis received a commission for each VSC that it sold.  In 2008, its revenues, as reported in its financial statements, were more than $264 million.  At one point, US Fidelis employed approximately 1,100 people at its Wentzville headquarters.

15.     Although US Fidelis received a commission on each VSC sale, in most cases US Fidelis was not responsible for paying claims under the contracts.  Instead, third-party administrators paid and administered claims under the VSCs, and funding for covered claims was guaranteed by an insurance company.

16.     Although US Fidelis was not generally responsible for paying claims brought under VSCs, it did have significant potential post-sale liability.  For example, a customer could cancel his or her VSC at any time during the length of the contract.  Upon a cancellation, US Fidelis was obligated to refund a prorated portion of the commission that it received for the sale.  The refunded amount of the prorated commission is known as the "unearned" portion of the commission.

17.     Cancellations and refunds were the norm for the VSCs that US Fidelis sold.  In 2006 and 2007, for example, US Fidelis paid refunds due to cancellations of $30,898,864 and $52,330,004, respectively.  Cancellations and refunds were over $62,200,000 in 2008, and $114,600,000 in 2009.

18.     US Fidelis' financial statements for 2006 and 2007 note that its "historical contract cancellation rate . . . ranges between 29% - 31% of sales."  But there is reason to believe that the true cancellation rate of VSCs sold by US Fidelis was much higher.

4

19.     For one thing, utilizing the comparison of cancellations occurring during a given year to sales of new contracts during the same year is flawed because VSCs typically run for several years and many cancellations presumably involve contracts that US Fidelis sold in prior years – i.e., when it sold fewer overall VSCs.  Thus, during a period of consistent year-over-year sales growth, the 29% to 31% range reported by US Fidelis substantially understated the true cancellation rate for newly sold policies.  In fact the actual cancellation rate was 35% of 2008 revenues and 43% of 2009 revenues.

20.     Moreover, the financial results from 2007 – when the cancellation rate topped 36% – indicate that US Fidelis' historic cancellation rates did not accurately predict the company's future refund liabilities.

21.     The house-of-cards aspect of this arrangement lay in the inevitable leveling off or decrease in VSC sales.  It should have been obvious to the Atkinsons, who were familiar with the US Fidelis business model, that when sales began to decline, the operating cash flows would no longer cover present cancellation and refund liabilities.  In that event, the company would require additional sources of cash flow to pay its operating expenses and meet its other obligations.

22.     US Fidelis never established cash reserves dedicated to satisfying potential refund obligations.  Early on, this did not create a cash flow problem because US Fidelis experienced sustained sales and revenue growth for several years that were sufficient to cover liability for cancellation and refund expenses for its older VSCs.

23.     Under the direction and control of Darain and Cory Atkinson, US Fidelis attempted to avoid this problem by using a "modified cash basis" accounting method that allowed it to recognize all revenue as income as soon as the VSCs were funded.  Even

5

though the company fully expected a cancellation rate of roughly 30% – that is, tens of millions of dollars in refund-related liability each year – it did not record any portion of that amount as accounts receivable or otherwise make any allowance for paying future cancellations.

24.     The exposure of US Fidelis for the hundreds of thousands of active contracts that could be canceled and create refund liability was upwards of $100 million, none of which were recorded in the books, records, or financial statements of US Fidelis.

**B.     Cory and Darain Atkinson's *$101 Million* Spending Spree**

25.     For many years, Cory and Darain Atkinson reaped the financial benefits that come with owning an ostensibly highly-profitable business. Each of them received a salary and weekly "draws" and other compensation that exceeded $1,000,000 annually.

26.     Both Cory Atkinson and Darain Atkinson also routinely used their influence, dominion, and control over US Fidelis and other related entities to direct US Fidelis to pay out additional millions upon millions of dollars directly to them, on their behalf, or for their benefit. These additional payments were never properly documented as shareholder distributions, loans, or any other proper and lawful transaction. As described below, millions upon millions of dollars in miscellaneous payments were made to the Atkinsons, the Atkinson Affiliates, the Atkinsons' extended family, their friends, third-party vendors, and other persons and entities with no business relationship to US Fidelis.

27.     Departing from the duty of loyalty, faithfulness, reliability, and trust that the Latin word "*fidelis*" was intended to inspire, Darain and Cory Atkinson stripped US Fidelis of the money its customers entrusted to it to keep their vehicles running.

Astonishingly, through the end of 2009 Cory Atkinson and Darain Atkinson wrongfully and improperly appropriated at least **$101 million** from US Fidelis.

28.     Cory Atkinson and Darain Atkinson engineered all or substantially all of these payments for their own personal benefit, and not for any legitimate business purpose of US Fidelis.  The Atkinsons caused US Fidelis to make these payments via transactions that were not conducted at arm's length and for which US Fidelis did not receive any reasonably equivalent value, with the possible exception of reasonable salary payments.

29.     With respect to these payments, Cory and Darain Atkinson exercised complete dominion over US Fidelis.  There was no distinction between money that was dedicated for paying operating expenses and other corporate obligations and money that Cory Atkinson and Darain Atkinson treated as personal slush funds.

30.     There was no written employment agreement or other written contract between US Fidelis and either Cory Atkinson or Darain Atkinson concerning either brother's compensation for any services furnished to US Fidelis.

31.     There were practically no minutes, board resolutions, or other corporate records one would typically expect in a business such as this, and which would document and explain Darain Atkinson's and Cory Atkinson's withdrawal and transfer of such large sums of money.  There were no procedures in place governing approval procedures, authority, or documentation for these withdrawals and transfers, which could and did regularly occur merely upon a verbal instruction, at the whim of either Darain or Cory Atkinson.  In their management of US Fidelis as officers and directors and shareholders, Darain and Cory Atkinson observed few, if any, corporate formalities.

32.     Under the circumstances, Cory Atkinson and Darain Atkinson knew or should have known that paying themselves or withdrawing for their own benefit more than $101 million over an approximate four-year period would make it impossible for US Fidelis to meet its mounting obligations to customers and other creditors.

33.     Any services that either Defendant purportedly furnished to US Fidelis during that time had little or no marginal value and in no way justified the amounts that US Fidelis paid to the Atkinsons.

34.     The $101 million that the Atkinsons appropriated from US Fidelis' accounts between 2005 and February of 2010 also included payments to third parties for personal debts and other obligations of Cory Atkinson and Darain Atkinson, and of various entities controlled by Cory Atkinson or Darain Atkinson.

35.     Regardless of the form that the payments took, it is clear that the vast majority of the $101 million went toward creating lifestyles for the Atkinsons filled with every manner of extravagance and staggering excess, as set forth in the paragraphs immediately below.  Through discovery, a fuller picture will come to light of where the US Fidelis funds wound up, but the information currently available shows a clear pattern of illicit activity in Defendants' $101 million spending spree.

**C.     Lifestyles of Darain and Cory Atkinson**

36.     From approximately 2005 to 2009, Darain Atkinson directed payments to himself or for his personal benefit totaling more than $54 million.  Very little, if any, of this $54 million in payments served any legitimate business purpose of US Fidelis.

37.     During this same period of time, Cory Atkinson directed payments to himself or for his personal benefit totaling more than $47 million. Very little, if any, of this $47 million in payments served any legitimate business purpose of US Fidelis.

38.     Using this money drawn directly, wrongfully, and improperly from US Fidelis, and in many cases paid at the express direction of Darain Atkinson to vendors having no business relationship with US Fidelis, Darain Atkinson purchased numerous houses and parcels of real estate for use as his personal dwellings, and not for any business purpose of US Fidelis, including but not limited to the following:

A.      A Lake St. Louis mansion approximately three-quarters the size of the White House and costing in excess of $15,000,000 to build, replete with 14 bath rooms, two swimming pools (one indoor, one outdoor), a movie theater, a bowling alley, a spiral marble stair case costing nearly $1 million, and eight garages for Darain's fleet of luxury automobiles also purchased with US Fidelis funds (as described below);

B.      An additional adjoining house costing in excess of $1.5 million that was used simply as temporary housing while the substantial structure described above was constructed;

C.      An additional vacation home located in the Cayman Islands at 414 Water Cay Road, Cayman Island, KY1-1106;

D.      An additional home located at 9 Woodview Dr., Lake St. Louis, MO;

E.      An additional home located at 15 Woodview Drive, Lake St. Louis, MO;

F.      An additional home located at 215 Pigeon Drive, Lake St. Louis, MO; and

CC 2258594v5

G. An additional home located at 1009 Hawks Landing Dr., Lake St. Louis, MO.

39. Matching the excess of his brother, Cory Atkinson amassed a substantial real estate portfolio of his own using US Fidelis' money. Using money drawn directly, wrongfully, and improperly from US Fidelis, and in many cases paid at the express direction of Cory Atkinson to vendors having no business relationship with US Fidelis, Cory Atkinson purchased numerous houses and parcels of real estate for use as his personal dwellings, and not for any business purpose of US Fidelis, including but not limited to the following:

A. A personal residence costing over $10,000,000 located at 302 Atkinson Way, Wentzville, MO;

B. A Lake Tahoe vacation residence costing over $2,900,000 located at 1756 Grouse Ridge, Truckee, California;

C. An additional vacation home located near Lake of the Ozarks, Missouri at 45 Via Preminenta, Sunrise Beach, MO;

D. Additional residences located at:

1. 505 Lias Way, Wentzville, MO;

2. 718 Wenstone Crossing Way, Wentzville, MO;

3. 229 Bless Us Drive East, Wentzville, MO; and

4. 611 Burr Ridge Drive, Wentzville, MO.

40. To visit and travel between their vacation homes, their many other residences, and other destinations, the Atkinsons used US Fidelis funds to finance luxurious travel by every conceivable mode. Using money drawn directly, wrongfully,

10

and improperly from US Fidelis, and in many cases paid at the express direction of Cory and/or Darain Atkinson to businesses having no business relationship with US Fidelis, Cory and/or Darain Atkinson caused the following to be paid with funds taken from US Fidelis:

A.   Extensive travel via private jet aircraft throughout North America in amounts exceeding $350,000;

B.   Purchase, storage, maintenance, and operation of pleasure boats and personal watercraft at Darain's Cayman Island vacation house and other locations in amounts exceeding hundreds of thousands of dollars;

C.   Purchases of luxury automobiles, including but not limited to rare Lamborghini and Ford GT sports cars costing hundreds of thousands of dollars each, and the repair and maintenance thereof, in amounts exceeding hundreds of thousands of dollars; and

D.   The purchase of other forms of transportation and recreation, including the most trivial items, using US Fidelis funds to purchase same.

41.   Not being content to acquire numerous personal residences (using US Fidelis funds) merely for themselves, Darain Atkinson's and Cory Atkinson's largesse with US Fidelis' money also extended to numerous other relatives. Using money drawn directly, wrongfully, and improperly from US Fidelis, and in many cases paid at the express direction of Darain or Cory Atkinson to vendors having no business relationship with US Fidelis, Darain and/or Cory Atkinson purchased houses and real estate for use as their family members' personal dwellings, and not for any business purpose of US Fidelis, including but not limited to the following:

11

A.      A personal residence for their parents valued in excess of $1,500,000, along with maintenance expenses and utilities; and

B.      A personal residence for Darain's wife's parents.

42.      Darain and Cory Atkinson used US Fidelis funds to pay for the most personal of items, ranging from minor expenses to very substantial expenditures. Using money drawn directly, wrongfully, and improperly from US Fidelis, and in many cases paid at the express direction of Cory and/or Darain Atkinson to vendors having no business relationship with US Fidelis, Cory and/or Darain Atkinson caused the following personal expenses to be paid with funds drawn from US Fidelis:

A.      Advertising for a new nanny for Darain's children;

B.      Payments made on behalf of Darain's wife's grandparents;

C.      Payment of a personal American Express statement belonging to Darain Atkinson's wife, Mia Atkinson, in the amount of more than $91,000;

D.      Funding for Cory's wife's "trust account" in the amount of at least $100,000;

E.      Apparent payment of Cory's traffic violations to the Wentzville Municipal Court; and

F.      Personal income taxes and use taxes paid to the US Treasury and the Missouri Department of Revenue in amounts exceeding $700,000.

43.      Darain and/or Cory Atkinson also sought to diversify their investments by wrongfully and improperly diverting money from US Fidelis into other investments owned and operated by one or more of the Atkinsons. Using money drawn directly, wrongfully, and improperly from US Fidelis, and in many cases paid at the express

direction of Cory and/or Darain Atkinson to entities having no business relationship with US Fidelis, Cory and/or Darain Atkinson caused the following to be paid with funds drawn from US Fidelis:

A.      Money to fund the purchase and operation of a non-alcoholic Christian night club called Club Exodus, amounting to an investment exceeding $410,000 for Cory and $295,000 for Darain, all made with money taken directly from US Fidelis;

B.      An investment in and/or payments to an internet business named Huge, L.L.C. doing business as egoob.com, in amounts exceeding $72,000, all made with money taken directly from US Fidelis; and

C.      Payments to a church near one of the Atkinsons' residences, the Element Church, in amounts exceeding $100,000, all made with money taken directly from US Fidelis.

44.     US Fidelis believes that additional money was likely withdrawn or transferred directly, wrongfully, and improperly from US Fidelis by Darain and Cory Atkinson, but which transactions are presently unknown but are likely to be discovered during the discovery process. US Fidelis reserves the right to amend this Complaint and seek recovery for such transfers when they are discovered.

**D.      US Fidelis' Epic Collapse**

45.     While Darain and Cory Atkinson were consumed with their $101 million spending spree, however, there were clear signs that the company to which they owed their fidelity was a collapsing house of cards.

46.     US Fidelis was beset with customer complaints.  The Better Business Bureau ("BBB"), for example, reported receiving more than 1,500 complaints about US Fidelis during the three-year period ending July 21, 2009.  [http://stlouis.bbb.org/article/complaints-continue-against-u-s-fidelis-despite-promised-changes-from-top-official-11650]  The BBB categorizes the majority of the complaints received regarding US Fidelis as involving non-compliance with the terms of its VSCs, refund issues, and sales practices.     [http://www.bbb.org/stlouis/business-reviews/auto-service-contract-companies/u-s-fidelis-in-wentzville-mo-310016763#ratingdetails].

47.     US Fidelis was previously known as "National Auto Warranty Services, Inc."  In 2008, Missouri's Attorney General filed suit against National Auto Warranty Services alleging several unlawful and deceptive sales practices and violations of state and federal telemarketing laws.  Attorneys General from at least 40 other states have since launched investigations into US Fidelis' practices and products.

48.     As consumer complaints and law enforcement attention mounted, US Fidelis' VSC sales began decreasing rapidly, and not surprisingly refund requests rose, all as previously set forth above.  Darain and Cory Atkinson ignored all of these and other warning signs and declined to establish reasonable financial reserves for the refunds, because to do so would have required them to reign in their free-spending practices, including spending on their jets, cars, boats, mansions, vacation homes, and other luxuries.

49.     The Atkinsons' decisions not to establish cash reserves for refunds and not to cease their withdrawal of funds for personal expenses all but guaranteed that US Fidelis would eventually become unable to satisfy its liability arising from canceled

14

VSCs.  That is because, as its sales increased, the number of customers who might later cancel their VSCs and require refunds grew apace.  Thus, a permanent and continued upward growth in sales was necessary to provide enough funds to pay the company's growing refund liabilities.

50.     Permanent growth in sales proved unattainable, however, and by late 2009 revenues from new sales had sagged so low that US Fidelis could no longer pay its debts.

51.     US Fidelis owed the lion's share of its refund obligations to Mepco, Inc., a Chicago-based company that owned the right to collect periodic payments from customers who purchased VSCs pursuant to payment plans.  Mepco's agreement with US Fidelis called for US Fidelis to receive its full brokerage commission as soon as the customer began making payments.  If the customer later canceled the VSC, then US Fidelis was obligated to refund the "unearned" portion of its commission to Mepco.

52.     In order to hold on to enough cash to meet its basic operating expenses, US Fidelis sought and obtained Mepco's agreement to temporarily suspend payment of its refund obligations to Mepco.  The debt to Mepco, which is secured by liens against company assets, stands at approximately $17.7 million.

53.     Even the forbearance of $17 million in refund obligations wasn't enough to rescue US Fidelis from its downward spiral, however, and in December 2009 the company suspended all sales of VSCs.  Its sole operational function at present is to respond to and resolve customer inquiries and cancellations.  It has terminated more than 1,000 employees since the Company's heyday, all unfortunate victims of the Atkinsons' greed.

54.     US Fidelis' outstanding debt is not limited to the refund liability that it owes to Mepco.  To date, creditors have asserted claims against US Fidelis totaling approximately $25 million, but that amount does not include hundreds, if not thousands, of additional claims for "unknown" amounts.  US Fidelis' debts could ultimately exceed $100 million.

55.     Darain and Cory Atkinson binged on mansions, private jets, exotic cars, vacation homes, and other extravagances for years, all at the ultimate expense of US Fidelis' customers, employees, and other creditors.  At all relevant times, the Atkinsons knew or should have known that the distributions and transfers made to them and others were improper and unreasonably excessive, that payments made on the Atkinsons' behalf and to or for the benefit of third parties served no legitimate business purpose, and that US Fidelis' business operations could not sustain the excessive payments that Darain and Cory Atkinson were engineering.

## COUNT I

## DISREGARD OF CORPORATE FORM

56.     US Fidelis adopts and incorporates the preceding allegations of paragraphs 1 through 55, inclusive, as if set forth fully herein.

57.     Cory Atkinson and Darain Atkinson treated US Fidelis and the Atkinson Affiliates as their personal ATM machine, withdrawing funds and paying their personal bills, without the slightest regard for the legal formalities or realities of doing business as a Missouri corporation.

58.     With respect to the Atkinson transactions, which resulted in the payment by US Fidelis of at least $101 million to Cory Atkinson and Darain Atkinson, or on their

behalf and at their behest to the Atkinson Affiliates or the Atkinsons' family and friends, the Atkinsons exercised complete domination of all of US Fidelis' finances, policies, and business practices, in that they made all decisions concerning the transactions and no other person or entity could intervene to prevent or limit the transactions. As a consequence, US Fidelis at no time had any separate mind, will, or existence of its own.

59. Both Cory Atkinson and Darain Atkinson used their control of US Fidelis to divert at least $101 million in corporate funds to themselves, the Atkinson Affiliates, their families, acquaintances, projects, and other third parties, none of which had any business affiliation with US Fidelis, and such activities constitute dishonest and unjust actions in violation of US Fidelis' legal rights.

60. The corporate assets that Cory Atkinson and Darain Atkinson diverted to their own personal purposes by virtue of their complete domination of US Fidelis were needed by US Fidelis in order to meet its obligations to its employees, lenders, and other creditors.

61. Darain and Cory Atkinson merely associated with each other as co-owners of a business for profit, agreeing to share profits and losses, without regard to the corporate form US Fidelis purported to take, and thus Darain and Cory are and should be deemed to be and treated as partners within the meaning of Chapter 358 of the Missouri Revised Statutes, with unlimited joint and several liability for everything chargeable to the partnership as provided by Mo. Rev. Stat. § 358.150.

62. People who treat the corporate form with such disdain and lack of respect do not deserve the protections ordinarily afforded to them by the corporate form. Darain

and Cory Atkinson did not treat US Fidelis as though it was a corporation, so neither should this Court.

WHEREFORE, US Fidelis respectfully requests the Court's judgment as against all of the defendants, as follows:

A.  A declaration that, with respect to the payments, transfers, and other transactions that are at issue in this Adversary Action, it is appropriate to disregard the corporate form of US Fidelis and the Atkinson Affiliates because US Fidelis and the Atkinson Affiliates were merely the alter egos of Cory Atkinson and Darain Atkinson;

B.  A declaration that Darain Atkinson and Cory Atkinson bear unlimited joint and several liability for all of the payments, transfers, and other transactions that are at issue in this Adversary Proceeding; and

C.  An Order for such other and further relief as the Court may deem just and proper.

<u>**COUNT II**</u>

<u>**DISREGARD OF CORPORATE FORM – RECOVERY RELATING TO SPECIFIC TRANSACTIONS**</u>

63.  US Fidelis adopts and incorporates the preceding allegations of paragraphs 1 through 62, inclusive, as if set forth fully herein.

64.  At the times they were made, individually and cumulatively, both Cory Atkinson and Darain Atkinson knew or should have known that US Fidelis could not afford to continue to pay the aforesaid owner distributions, transfers, and payments to the Atkinsons and to third parties on the Atkinsons' behalf, and payments to or on behalf of other third parties described in paragraphs 25 through 44 hereof (which also specifically

18

include the "Darain Atkinson Two-Year Transfers," the "Cory Atkinson Two-Year Transfers," the "Darain Atkinson Four-Year Transfers" and the "Cory Atkinson Four-Year Transfers" described in paragraphs 80, 86, 92, and 97 below, all of which transactions and asset transfers collectively are referred to as the "Atkinson Transfers") while also paying its ordinary and necessary operating expenses.

65.     As to the specific assets and transactions described above, US Fidelis has standing to assert claims to pierce the corporate veil as to Darain and Cory Atkinson jointly and severally.

WHEREFORE, US Fidelis respectfully requests the Court's judgment as against all of the defendants, as follows:

A.     A determination that, with respect to the specific payments, assets, transfers, and other transactions identified above, it is appropriate to disregard the corporate form of US Fidelis and the Atkinson Affiliates because US Fidelis and the Atkinson Affiliates were merely the alter egos of Cory Atkinson and Darain Atkinson; and

B.     A judgment in the amount of at least $101 million against Darain Atkinson and Cory Atkinson such that the Atkinsons bear unlimited joint and several liability for all of the specific payments, assets, transfers, and other transactions identified above, plus costs and attorney fees; and

C.     An Order for such other and further relief as the Court may deem just and proper.

## COUNT III

## BREACH OF FIDUCIARY DUTIES/CORPORATE WASTE

66.     US Fidelis adopts and incorporates the preceding allegations of paragraphs 1 through 65, inclusive, as if set forth fully herein.

67.     At all times material hereto, Cory Atkinson and Darain Atkinson, as owners, officers, and directors of US Fidelis (and as controlling shareholders, by reason of their sole ownership interests), owed fiduciary duties to US Fidelis in managing and conducting its business affairs, as well as to its creditors during all times that US Fidelis was insolvent.

68.     At all times material hereto, Cory Atkinson and Darain Atkinson controlled the financial and business operations of US Fidelis, and owed fiduciary duties to US Fidelis as a result of this control.

69.     At all times material hereto, Darain Atkinson and Cory Atkinson each owed US Fidelis fiduciary duties of good faith, of an undivided and unselfish loyalty, and of due care, as well as a duty to protect the interests of US Fidelis and a duty not to act in their own self-interest to the detriment of US Fidelis.

70.     As part of the duty of good faith, Darain Atkinson and Cory Atkinson each was required to act with honesty of purpose and a genuine care for US Fidelis' constituents.

71.     At the times they were made, individually and cumulatively, both Cory Atkinson and Darain Atkinson knew or should have known that US Fidelis could not afford to continue to engage in Atkinson Transfers while also paying its ordinary and necessary operating expenses.

20

72.     Cory Atkinson and Darain Atkinson materially breached their fiduciary duties to US Fidelis by allowing, authorizing, participating in, failing to stop or control the payment of excessive owner distributions and transfers in the form of the Atkinson Transfers paid to themselves and to third parties for the Atkinsons' own direct or indirect benefit.

73.     As a result of these breaches of the Atkinsons' fiduciary duties, US Fidelis has paid excessive or unearned owner distributions and transfers to various entities and persons in the form of the Atkinson Transfers without receiving any consideration in return, and has grossly overpaid for the services actually rendered or for the quality of the services furnished.

74.     All of the acts and omissions described above were breaches of the duty of unselfish loyalty and good faith that the Atkinsons and each of them owed to US Fidelis. At a minimum, all of such acts and omissions were careless, negligent, and below the standard of care required of an officer or director of US Fidelis.

75.     Through these breaches of fiduciary duties, the Atkinsons have deprived US Fidelis of operating funds necessary to pay ordinary business expenses and obligations.

76.     As a direct result of the Atkinsons' various breaches of fiduciary duties, US Fidelis has been damaged in an amount in excess of $101 million during the five-year period preceding the bankruptcy petition's filing.

77.     As a direct result of the Atkinsons' breaches of fiduciary duty, US Fidelis and its creditors suffered serious damage.

21

78.     No reasonable businessperson would have engaged in the Atkinson Transfers, and consequently these transactions constituted a waste of US Fidelis' assets, which financially damaged US Fidelis and its creditors.

WHEREFORE, US Fidelis respectfully requests the Court's judgment, as follows:

A.      A finding that Cory Atkinson is liable for the behavior and actions described in this count;

B.      A finding that Darain Atkinson is liable for the behavior and actions described in this count;

C.      An award of actual and compensatory damages against Cory Atkinson and/or Darain Atkinson, jointly and severally, in an amount to be determined at trial, together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court; and

D.      An Order for such other and further relief as the Court may deem just and proper.

## COUNT IV

## AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 548(a)(1)(A) AND (B) – DARAIN ATKINSON

79.     US Fidelis adopts and incorporates the preceding allegations of paragraphs 1 through 78, inclusive, as if set forth fully herein.

80.     The "Darain Atkinson Two-Year Transfers" are Atkinson Transfers that took place within two (2) years of the date on which US Fidelis filed its voluntary petition in bankruptcy.

22

81. The Darain Atkinson Two-Year Transfers were made with the actual intent to hinder, delay or defraud US Fidelis' creditors.

82. In the alternative, US Fidelis received less than a reasonably equivalent value for the Darain Atkinson Two-Year Transfers and: (a) the Darain Atkinson Two-Year Transfers were made while US Fidelis was insolvent, (b) the Darain Atkinson Two-Year Transfers rendered US Fidelis insolvent, (c) US Fidelis was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with US Fidelis was an unreasonably small capital, and/or (d) US Fidelis intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

83. The Darain Atkinson Two-Year Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A) or, in the alternative, 11 U.S.C. § 548(a)(1)(B).

84. In the alternative, and in the event Darain Atkinson is treated by this Court as though he was a general partner pursuant to Counts I and II, then in such case the Darain Atkinson Two-Year Transfers are avoidable pursuant to 11 U.S.C. § 548(b).

WHEREFORE, US Fidelis respectfully requests that the Court enter the following as to the defendants:

A. An Order, pursuant to 11 U.S.C. § 548(a)(l)(A), avoiding the Darain Atkinson Two-Year Transfers that US Fidelis made to Defendant Darain Atkinson;

B. Judgment in this action against Darain Atkinson in the amount of at least $54,000,000, together with all applicable pre-judgment interest, post-

judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court;

C.      An Order, pursuant to 11 U.S.C. § 550, for recovery of the Darain Atkinson Two-Year Transfers, or an amount equal to the Darain Atkinson Two-Year Transfers, together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court, and requiring Darain Atkinson to pay such amount to US Fidelis; and

D.      An Order for such other and further relief as the Court may deem just and proper.

## COUNT V

## AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 548(a)(1)(A) AND (B) – CORY ATKINSON

85.     US Fidelis adopts and incorporates the preceding allegations of paragraphs 1 through 84, inclusive, as if set forth fully herein.

86.     The "Cory Atkinson Two-Year Transfers" are Atkinson Transfers that took place within two (2) years of the date on which US Fidelis filed its voluntary petition in bankruptcy.

87.     The Cory Atkinson Two-Year Transfers were made with the actual intent to hinder, delay or defraud US Fidelis' creditors.

88.     In the alternative, US Fidelis received less than a reasonably equivalent value for the Cory Atkinson Two-Year Transfers and: (a) the Cory Atkinson Two-Year Transfers were made while US Fidelis was insolvent, (b) the Cory Atkinson Two-Year

24

Transfers rendered US Fidelis insolvent, (c) US Fidelis was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with US Fidelis was an unreasonably small capital, and/or (d) US Fidelis intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

89.     The Cory Atkinson Two-Year Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A) or, in the alternative, 11 U.S.C. § 548(a)(1)(B).

90.     In the alternative, and in the event Cory Atkinson is treated by this Court as though he was a general partner pursuant to Counts I and II, then in such case the Cory Atkinson Two-Year Transfers are avoidable pursuant to 11 U.S.C. § 548(b).

WHEREFORE, US Fidelis respectfully requests that the Court enter the following as to the defendants:

A.     An Order, pursuant to 11 U.S.C. § 548(a)(l)(A), avoiding the Cory Atkinson Two-Year Transfers that US Fidelis made to Cory Atkinson;

B.     Judgment in this action against Cory Atkinson in the amount of at least $47,000,000, together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court;

C.     An Order, pursuant to 11 U.S.C. § 550, for recovery of the Cory Atkinson Two-Year Transfers, or an amount equal to the Cory Atkinson Two-Year Transfers, together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence

25

submitted to the Court, and requiring Cory Atkinson to pay such amount to US Fidelis; and

D.      An Order for such other and further relief as the Court may deem just and proper.

## COUNT VI

## AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. § 544(B) – DARAIN ATKINSON

91.     US Fidelis adopts and incorporates the preceding allegations of paragraphs 1 through 90, inclusive, as if set forth fully herein.

92.     The "Darain Atkinson Four-Year Transfers" are Atkinson Transfers that took place within four (4) years of the date on which US Fidelis filed its voluntary petition in bankruptcy.

93.     The Darain Atkinson Four-Year Transfers were made with the actual intent to hinder, delay, or defraud US Fidelis' creditors

94.     Alternatively, US Fidelis received less than a reasonably equivalent value for the Darain Atkinson Four-Year Transfers and (a) the Darain Atkinson Four-Year Transfers were made while US Fidelis was insolvent; (b) the Darain Atkinson Four-Year Transfers rendered US Fidelis insolvent; (c) US Fidelis was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (d) US Fidelis intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as those debts became due.

CC 2258594v5

95.     The Darain Atkinson Four-Year Transfers are avoidable under the Missouri Uniform Fraudulent Transfer Act, Mo. Rev. Stat. §§ 428.005 et seq., and 11 U.S.C. § 544(b).

WHEREFORE, US Fidelis respectfully requests that the Court enter the following as to the defendants:

A.      An Order, pursuant to 11 U.S.C. § 544(b), avoiding the Darain Atkinson Four-Year Transfers;

B.      Judgment in this action against Darain Atkinson in the amount of at least $57,000,000 together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court;

C.      An Order, pursuant to 11 U.S.C. § 550, for recovery of the Darain Atkinson Four-Year Transfers, or an amount equal to the Darain Atkinson Four-Year Transfers, together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court, and requiring Darain Atkinson to pay such amount to US Fidelis; and

D.      An Order for such other and further relief as the Court may deem just and proper.

CC 2258594v5

## COUNT VII

## AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. § 544(B) – CORY ATKINSON

96.     US Fidelis adopts and incorporates the preceding allegations of paragraphs 1 through 95, inclusive, as if set forth fully herein.

97.     The "Cory Atkinson Four-Year Transfers" are Atkinson Transfers that took place within four (4) years of the date on which US Fidelis filed its voluntary petition in bankruptcy.

98.     The Cory Atkinson Four-Year Transfers were made with the actual intent to hinder, delay, or defraud US Fidelis' creditors.

99.     Alternatively, US Fidelis received less than a reasonably equivalent value for the Cory Atkinson Four-Year Transfers and (a) the Cory Atkinson Four-Year Transfers were made while US Fidelis was insolvent; (b) the Cory Atkinson Four-Year Transfers rendered US Fidelis insolvent; (c) US Fidelis was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (d) US Fidelis intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as those debts became due.

100.    The Cory Atkinson Four-Year Transfers are avoidable under the Missouri Uniform Fraudulent Transfer Act, Mo. Rev. Stat. §§ 428.005 et seq., and 11 U.S.C. § 544(b).

WHEREFORE, US Fidelis respectfully requests that the Court enter the following as to the defendants:

28

A.	An Order, pursuant to 11 U.S.C. § 544(b), avoiding the Cory Atkinson Four-Year Transfers;

B.	Judgment in this action against Cory Atkinson in the amount of at least $47,000,000 together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court;

C.	An Order, pursuant to 11 U.S.C. § 550, for recovery of the Cory Atkinson Four-Year Transfers, or an amount equal to the Cory Atkinson Four-Year Transfers, together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court, and requiring Cory Atkinson to pay such amount to US Fidelis; and

D.	An Order for such other and further relief as the Court may deem just and proper.

## COUNT VIII

## AVOIDANCE AND RECOVERY PURSUANT TO 11 U.S.C. § 550

101.	US Fidelis adopts and incorporates the preceding allegations of paragraphs 1 through 100, inclusive, as if set forth fully herein.

102.	Cory Atkinson is an initial transferee, immediate transferee, or mediate transferee of one or more of the Atkinson Transfers, and one or more of the Atkinson Transfers was for the benefit of Cory Atkinson.

29

103.    To the extent that he is an immediate or mediate transferee, Cory Atkinson did not take the Atkinson Transfers for value, in good faith, and without knowledge of the potential voidability of such transfer.

104.    Darain Atkinson is an initial transferee, immediate transferee, or mediate transferee of one or more of the Atkinson Transfers, and one or more of the Atkinson Transfers was for the benefit of Darain Atkinson.

105.    To the extent that he is an immediate or mediate transferee, Darain Atkinson did not take the Atkinson Transfers for value, in good faith, and without knowledge of the potential voidability of such transfer.

106.    Under 11 U.S.C. § 550(a), US Fidelis may recover either the property or the value of the property transferred in any Atkinson Transfer avoided in this action pursuant to the provisions of 11 U.S.C. §§ 544 and 548.

WHEREFORE, US Fidelis respectfully requests that the Court grant the following relief as to the defendants:

A.    An Order requiring Cory Atkinson to pay an amount equal to the value of every Atkinson Transfer avoided in this action that was made for his benefit, or of which he was the initial, mediate, or immediate transferee, or, in the alternative, imposing a constructive or resulting trust on any property obtained by Cory Atkinson, irrespective of how such property may currently be titled, in exchange for money or property obtained through any such transfer;

B.    An Order requiring Darain Atkinson to pay an amount equal to the value of every Atkinson Transfer avoided in this action that was made for his

30

benefit, or of which he was the initial, mediate, or immediate transferee, or, in the alternative, imposing a constructive or resulting trust on any property obtained by Darain Atkinson, irrespective of how such property may currently be titled, in exchange for money or property obtained through any such transfer;

C.     Judgment in this action against each Defendant in an amount to be determined at trial, together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court; and

D.     An Order for such other and further relief as the Court may deem just and proper.

## COUNT IX

## ALTERNATIVE CLAIM FOR RECOVERY
## ON UNPAID LOAN(S) – DARAIN AND CORY ATKINSON

107.     US Fidelis adopts and incorporates the preceding allegations of paragraphs 1 through 106, inclusive, as if set forth fully herein.

108.     There is no indication from the documentation at US Fidelis that any of the Atkinson Transfers described in this Complaint were properly documented as loans or as any other type of legitimate and proper transaction.

109.     However, if the Atkinsons or either of them claim that they borrowed the funds that US Fidelis paid to them or at their direction, and that all or any one or more of the Atkinson Transfers were or were intended to be loans, then US Fidelis claims that

repayment of all such loans is now due, that demand for same has been made, that the Atkinsons and each of them have failed and refused to pay same, that no payments of interest or principal have been paid on such loans, that such loans remain unpaid, and that such loans are now past due and are owing in full.

WHEREFORE, US Fidelis respectfully requests that the Court enter the following as to the defendants:

A.   Judgment in this action against Cory Atkinson and Darain Atkinson, jointly and severally, in the amount of at least $101,000,000, together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court; and

B.   An Order for such other and further relief as the Court may deem just and proper.

## COUNT X

## ALTERNATIVE CLAIM FOR UNJUST ENRICHMENT

110.   US Fidelis adopts and incorporates the preceding allegations of paragraphs 1 through 109, inclusive, as if set forth fully herein.

111.   Through and by virtue of making the Atkinson Transfers, US Fidelis conferred benefits upon each Defendant.

112.   Defendants Cory Atkinson and Darain Atkinson and the Atkinson Affiliates each knew of, appreciated, received, and retained such benefits.

113.   Such benefits came at the expense of US Fidelis.

CC 2258594v5

114. The Atkinsons' and the Atkinson Affiliates' acceptance and retention of such benefits without exchange of consideration of equivalent value is unjust and inequitable.

WHEREFORE, US Fidelis respectfully requests that the Court enter the following as to the defendants:

A.   A Judgment in the action against Cory Atkinson in the amount of the benefit conferred on the same as determined at trial, together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court;

B.   A Judgment in the action against the Atkinson Affiliates in the amount of the benefit conferred on the same as determined at trial, together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court;

C.   A Judgment in the action against Darain Atkinson in the amount of the benefit conferred on the same as determined at trial, together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court; and

D.   An Order for such other and further relief as the Court may deem just and proper.

CC 2258594v5

## COUNT XI

## DISALLOWANCE OF CLAIMS

115.    US Fidelis adopts and incorporates the preceding allegations of paragraphs 1 through 114, inclusive, as if set forth fully herein.

116.    Section 502(d) of the Bankruptcy Code provides that "[n]otwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550 or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544 , 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title."

117.    Defendants have failed to turn over to US Fidelis certain property that US Fidelis is entitled to recover under applicable provisions of the Bankruptcy Code, and/or is a transferee of a transfer avoidable under 11 U.S.C. §§ 544, 547 and 548.  Accordingly, any claim filed by Defendants should be disallowed pursuant to 11 U.S.C. § 502(d).

WHEREFORE, US Fidelis requests that the Court enter judgment disallowing any claims of the Defendants pursuant to 11 U.S.C. § 502(d), and granting US Fidelis such other and further relief as the Court deems just and equitable.

## COUNT XII

## UNLAWFUL DIVIDEND

118.    US Fidelis adopts and incorporates the preceding allegations of paragraphs 1 through 117, inclusive, as if set forth fully herein.

34

119.    Cory Atkinson and Darain Atkinson were officers and directors of US Fidelis during the times and events described above, and as such were charged with the sound management of US Fidelis.

120.    Under Missouri law, "directors of a corporation may declare and the corporation may pay dividends on its outstanding shares in cash, property or its own shares," subject to the limitation that  "no dividend shall be declared or paid at a time when the net assets of the corporation are less than its stated capital or when the payment thereof would reduce the net assets of the corporation below its stated capital . . . ."  Mo. Rev. Stat. § 351.220(1).

121.    Under Missouri law, "directors of a corporation who shall knowingly declare and pay any dividend except as permitted by and in accordance with the provisions of sections 351.210 and 351.220 . . . shall be jointly and severally liable for all of the debts of the corporation then existing, and for all that shall be thereafter contracted as long as they shall respectively continued in office; provided, that the amount for which they shall be liable shall not exceed the amount of such dividend …."  Mo. Rev. Stat. § 351.345.

122.    As described herein, upon the direction of Cory Atkinson and Darain Atkinson, US Fidelis made the Atkinson Transfers.  To the extent that US Fidelis is not treated as a partnership as alleged in Counts I and II, and if instead US Fidelis is deemed to be a corporation for all purposes, then these transfers were essentially equity distributions of corporate assets to Cory Atkinson and Darain Atkinson.  At all times material hereto, US Fidelis was insolvent.  Thus, US Fidelis did not have adequate "surplus" to permit the issuance of dividends to Cory Atkinson or Darain Atkinson.

35

123.     In the alternative to the claims asserted in Counts I and II hereof, and to the extent this Court deems US Fidelis, as operated by the Atkinsons, to be a valid Missouri corporation, then to such extent US Fidelis is entitled to recover from Cory Atkinson and Darain Atkinson an amount equal to the Atkinson Transfers.

WHEREFORE, US Fidelis prays for a judgment as follows:

A.     A finding that Cory Atkinson is liable for the misbehavior and actions described in this count;

B.     A finding that Darain Atkinson is liable for the misbehavior and actions described in this count;

C.     An award of actual and compensatory damages in an amount of at least $101,000,000, together with all applicable pre-judgment interest, post-judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court; and

D.     An Order for such other and further relief as the Court may deem just and proper.

## COUNT XIII

## IMPOSITION OF EQUITABLE LIEN AND CONSTRUCTIVE TRUST AND/OR RESULTING TRUST

124.     US Fidelis adopts and incorporates the preceding allegations of paragraphs 1 through 123, inclusive, as if set forth fully herein.

125.     Darain and Cory Atkinson caused US Fidelis to transfer money to Darain and Cory Atkinson and the Atkinson Affiliates for the acquisition of the houses, real estate, personal property, and other goods, as part of the Atkinson Transfers described

36

above, plus such additional property as may be determined in discovery (the "Acquired Assets").

126.     Upon information and belief, title to the Acquired Assets is currently held by Darain Atkinson, Cory Atkinson, the Atkinson Affiliates, and/or other Atkinson family members.

127.     Darain and Cory Atkinson, the Atkinson Affiliates, and other Atkinson family members, have utilized and benefitted from the Acquired Assets and from US Fidelis making the improper payments to or on behalf of Darain and Cory Atkinson that facilitated the acquisition of the Acquired Assets.

128.     It is unjust and inequitable to allow Darain and Cory Atkinson, and any other Atkinson family member or the Atkinson Affiliates, to profit or otherwise benefit from these improper payments made by US Fidelis that financed the acquisition of the Acquired Assets.

129.     By virtue of Darain and Cory Atkinson's wrongful conduct and acceptance and retention of the benefits of the Acquired Assets and payments made by US Fidelis as set forth above, an equitable lien on the Acquired Assets still owned by Darain and Cory Atkinson, and any other Atkinson family member, arises in favor of US Fidelis to the extent US Fidelis payments (or payments made with US Fidelis assets) were utilized to acquire the Acquired Assets, and said equitable lien is prior and superior to any interest of Darain and Cory Atkinson, or any Atkinson family member in the Acquired Assets.

130.     By virtue of the previously described conduct and actions of Darain and Cory Atkinson, a constructive trust and/or a resulting trust should be imposed against any

37

existing or future sales proceeds of any of the Acquired Assets, and any net proceeds due Darain or Cory Atkinson, or any other Atkinson family member, or already received by Darain or Cory Atkinson, or any other Atkinson family member, should be ordered held in trust for US Fidelis to reimburse US Fidelis for the improper payments made for the acquisition of the Acquired Assets.

131. US Fidelis reserves the right to amend the Complaint and add as additional parties any person, firm, or entity that may have received property directly or indirectly through the actions of the Defendants Darain and Cory Atkinson further described herein.

WHEREFORE, Plaintiff prays for a judgment as follows:

A. A finding that US Fidelis has an equitable lien on the Acquired Assets still owned by Darain Atkinson and Cory Atkinson, or any other Atkinson family member or any Atkinson Affiliate, for amounts to be determined at trial that is superior to the interests of Darain and Cory Atkinson, or any other Atkinson family member;

B. A finding that Darain and Cory Atkinson, or any other Atkinson family member or Atkinson Affiliate, shall hold any future sales proceeds from the sale of any of the Acquired Assets or sales proceeds already received in trust for US Fidelis for the amounts determined at trial, together with all applicable pre-judgment interest, post judgment interest, and costs and attorneys' fees to the extent recoverable under applicable law and the evidence submitted to the Court; and

C. An Order for such other and further relief as the Court may deem just and proper.

Respectfully submitted,

LATHROP & GAGE LLP

*/s/ Robert E. Eggmann*

Robert E. Eggmann # 37374 and #3044
Thomas H. Riske #61838 and #5246062
Pierre Laclede Center
7701 Forsyth Boulevard, Suite 400
Clayton, Missouri 63105
Telephone:  (314) 613-2800
Telecopier:  (314) 613-2801
reggmann@lathropgage.com
triske@lathropgage.com


and

James L. Moeller #27296 and #33558
Brian T. Fenimore #41308 and #497607
James Moloney # 56267
2345 Grand Boulevard, Suite 2800
Kansas City, Missouri 64108
Telephone:  (816) 292-2000
Telecopier:  (816) 292-2001
jmoeller@lathropgage.com
bfenimore@lathropgage.com

CC 2258594v5