UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

In re:

    U.S. FIDELIS, INC.

                        Debtor.

Case No. 10-41902-705
Chapter 11
Hon. Charles E. Rendlen, III

**MEMORANDUM OF LAW OF WARRANTECH CORPORATION AND AFFILIATES
IN SUPPORT OF CONFIRMATION OF FIRST AMENDED PLAN OF LIQUIDATION**

      Warrantech Corporation and its affiliates Warrantech Automotive, Inc. and Vemeco, Inc., (collectively, "Warrantech") submit this Memorandum of Law in support of Confirmation of the First Amended Plan of Liquidation (the "Plan") proposed by the Official Unsecured Creditors' Committee (the "Creditors Committee") of U.S. Fidelis, Inc.  In light of the other submissions to the court concerning confirmation of the Plan generally, Warrantech's memorandum focuses on the third party releases and the related injunction contained in Article XIII of the Plan. Warrantech will address the applicable legal standards for determining the appropriateness of such release provisions and will analyze the Plan's release provisions in light of those standards. The factual assertions contained herein are based upon the Affidavit of Michael Rasnick, which is being filed contemporaneously with this memorandum.

      Warrantech acts as administrator for approximately one-fourth of the Vehicle Service Contracts ("VSCs") sold by U.S. Fidelis.  The Warrantech entities have asserted substantial reimbursement and indemnification claims against U.S. Fidelis based on pending and threatened suits against them on behalf of consumers who did not receive refunds to which they were allegedly entitled.   Although the U.S. Fidelis estate has no claims against Warrantech,

Warrantech has agreed to make substantial monetary contributions to the estate as well as to the Consumer Restitution Fund under the Plan and to waive distributions on its claims. What Warrantech has bargained for in exchange is the finality of releases from third party claims relating to U.S. Fidelis.

Releases of non-debtor claims in chapter 11 plans is expressly addressed in the Bankruptcy Code only in Section 524(g), which is expressly limited to debtors with asbestos-related liabilities.[1] However, most courts have approved plans containing releases of non-debtor and related injunctions in certain situations not involving asbestos claims.

A threshold step in the analysis is jurisdiction. The Bankruptcy Court has jurisdiction over claims involving non-debtor third parties pursuant to its "related-to" jurisdiction provided in 28 U.S.C. §1334(b). The leading case is *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1094), which held that in order for related-to jurisdiction to exist over a third party, the "outcome of [a proceeding involving the third party] could conceivably have any effect on the estate being administered in bankruptcy." The *Pacor* court further stated that "[a]n action is related to bankruptcy if the outcome could alter the debtor' rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate. *Id.* Along with most of the other Circuit Courts of Appeal, the Eighth Circuit has followed the *Pacor* test. *In re Dogpatch USA Inc.*, 810 F.2d 782, 786 (8th Cir. 1987).

The third party claims to be released under the Plan against Warrantech are derivative of claims against U.S. Fidelis. Warrantech has filed proofs of claim in the U.S. Fidelis bankruptcy

---

[1] Section 524(g) is itself a codification of the case law that developed concerning non-debtor in certain asbestos cases. See, e.g. In re Johns Manville, 843 F.2d 636 (2d Cir. 1988).

case seeking reimbursement and indemnification for them. In the absence of the Plan, greater third party claims asserted against Warrantech would result in Warrantech asserting a larger claim against the bankruptcy estate. This impact on the U.S. Fidelis estate is sufficient for related-to jurisdiction to exist with respect to third party claims against Warrantech.

The Bankruptcy Court has the statutory authority pursuant Section 105(a) of the Bankruptcy Code to approve third party releases and a related channeling injunction. That section provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The majority of circuits to consider the issue have found non-debtor releases and channeling injunctions permissible under § 105(a) and § 1123(b)(6) in appropriate cases. *Compare In re Ingersoll, Inc.*, 562 F.3d 856, 864-65 (7th Cir. 2009) (permitting non-consensual non-debtor releases), *In re Dow Corning Corp.*, 280 F.3d 648, 657 (6th Cir. 2002) (same), *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2nd Cir. 1992) (same), and *In re A.H. Robins Co.*, 788 F.2d 994, 1003 (4th Cir. 1986) (same), *with In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995) (prohibiting non-consensual non-debtor releases), *and In re Western Real Estate*, 922 F.2d 592, 600 (10th Cir. 1990) (same).

Although neither the Eighth Circuit nor the District Court in this district has considered the issue, in at least two prior occasions, Bankruptcy Courts in this district have confirmed plans containing third party releases. *In re Union Financial Services Group, Inc.*, 303 B.R. 390, 427-28, 435 (Bankr. E.D. Mo. 2003) (Schermer, J.) (confirming chapter 11 plan that contained third party releases); *In re Trans World Airlines, Inc.*, 185 B.R. 302, 322 (Bankr. E.D. Mo. 1995) (Schermer, J.) (approving non-debtor releases that were an "integral" part of the plan).

Generally, among the circuits that do not prohibit third party releases, appropriateness is a fact based inquiry requiring a case by case analysis. The Second Circuit, for example, has

- 3 -

noted that third party releases are not permitted in the absence of circumstances that could fairly be considered "unique." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2nd Cir. 2005); *see also In re Ingersoll, Inc.*, 562 F.3d at 865 (considering the "unique" facts of the case in enforcing the release of a non-debtor in the case by third parties that were not creditors of the debtor); *In re Dow Corning Corp.*, 280 F.3d at 659 (holding that enjoining a non-consenting creditor's claim is appropriate only in "unusual circumstances"). Nevertheless, in the unusual cases that arise from time to time, particularly those dealing with mass torts, channeling injunctions and non-debtor releases are "customary and ordinary." *In re Am. Family Enters.*, 256 B.R. 377, 406 (D.N.J. 2000).

The more recent cases concerning non-debtor releases move away from the application of rigid factors and towards a consideration of the circumstances of the case as a whole. For instance, the Second Circuit focuses on whether the release or injunction is "important" to the debtor's plan, but has declined to define "importance" any further. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2nd Cir. 2005) ("[T]his is not a matter of factors and prongs."). The Seventh Circuit keeps to the literal language of § 1123(b)(6), seeking to determine whether a release is "appropriate" and not inconsistent with any of the other provisions in the Bankruptcy Code. *In re Airadigm Comm., Inc.*, 519 F.3d 640, 657 (7th Cir. 2008). Indeed, the Fourth Circuit recently instructed its lower courts to look beyond the specific facts in its earlier decision in *A.H. Robins*, and determine the appropriateness of third party releases on factors they deem relevant to the specific case. *Behrmann v. Nat. Heritage Foundation*, 663 F.3d 704, 711-12 (4th Cir. 2011).

Many courts continue to use as a guide the factors set forth in *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 934–35 (Bankr. W.D. Mo. 1994), one of the first cases to

analyze the issue in depth. *Master Mortgage* compiled the then-existing case law and derived five factors considered in evaluating third party releases in the context of a plan.

Those five criteria are: (1) an identity of interest between the debtor and the third party and whether there is an indemnity relationship such that a suit against the non-debtor is essentially a suit against the debtor or will deplete assets of the estate; (2) the non-debtor has contributed substantial assets to the plan; (3) the injunction is essential to the plan; (4) a substantial majority of the creditors agree to such injunction, specifically the impacted class or classes has overwhelmingly voted to accept the proposed plan treatment; and (5) the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

The *Master Mortgage* court noted that, in prior decisions, courts have engaged in a fact-specific review, weighing the equities of each case rather than setting out a rigid set of factors to be applied in every circumstance. "The courts seem to have balanced these five listed factors most often. However, these factors do not appear to be an exclusive list of considerations, nor are they a list of conjunctive requirements". *Id*. at 935.

Application of the five Master Mortgage factors and other relevant considerations shows that the proposed third party releases contained in the Plan are appropriate exercises of Bankruptcy Court authority and discretion.

<u>Identity of Interest</u>

The Warrantech entities have each filed substantial claims against the U.S. Fidelis estate for reimbursement and contribution for liability that they may have to consumers that arises from the actions and omissions of U.S. Fidelis, including sales-related conduct and failure to make refunds to consumers. Warrantech's claims arise pursuant to its agreement with U.S. Fidelis

- 5 -

dated as of June 15, 2006, which contains express indemnification obligations on the part of U.S. Fidelis.  Prior to U.S. Fidelis' bankruptcy, Warrantech sent substantial amounts for its share of consumer refunds to U.S. Fidelis, either directly or through Mepco.  Those monies represented the portion of the Dealer Cost payments that consumers were entitled to receive as part of their refunds upon cancellation of their VSCs.  The apparent failure of U.S. Fidelis to make refund payments to the consumers was a breach of its agreement with Warrantech and triggered its indemnification obligations under that agreement.  Consequently, consumer claims against Warrantech result in additional claims by Warrantech against U.S. Fidelis.  Therefore, there is a substantial identity of interest between U.S. Fidelis and Warrantech in these circumstances.

<u>Substantial Contributions By Warrantech Under the Plan and Global Settlement Agreement</u>

One of the important elements of the Plan and the Global Settlement Agreement is the monetary contributions to be made by Warrantech.  Warrantech has agreed to make cash contributions totaling of $7,668,000 pursuant to the Plan.   Of that amount, $1.1 million has been earmarked directly for the Consumer Redress Fund and another $1.4 million has been allocated to the U.S. Fidelis estate not in settlement of any claim asserted by the estate against Warrantech but instead enabled the estate to resolve other liabilities having nothing to do with Warrantech.  This payment benefits the Consumer Restitution Fund by the same amount since it allows the estate to fully fund the agreed amount of $13 million to the Consumer Restitution Fund.  Warrantech has agreed to reimburse the estate for $368,000 in noticing costs in connection with the Plan and has already paid that amount to the estate.

Warrantech has also agreed to pay $4.8 million to Mepco in settlement of the related disputes between them.  That settlement facilitated Mepco's agreement to its settlement with the U.S. Fidelis estate, which spared all parties considerable time and expense in further litigation.

That settlement also allowed Mepco to consent to the use of $13 million of estate assets, on which it claimed a lien, as a contribution to the Consumer Restitution Fund. Therefore, the various interrelated agreements imbedded in the Global Settlement Agreement form the essence of the Plan. Therefore Warrantech's monetary contributions are substantial in the context of the Global Settlement Agreement and the Plan.

<u>The Third Party Releases and the Related Injunction Are Essential to the Plan</u>

The funding being contributed by Warrantech and the waiver of any distribution on its claims as provided by the Plan is expressly conditioned upon its receipt of releases from the claims of consumers, governmental agencies and other creditors of U.S. Fidelis. Those releases are set forth in sections 13.2(a), 13.3(a), 13.7 and 13.8 of the Plan. In addition, Section 13.13(b) of the Plan enjoins the releasing parties from prosecuting a released claim against any released party, including Warrantech.

Without Warrantech's substantial financial contributions and waiver of distributions on its claims, the estate would not be able to make the payments to the Consumer Restitution Fund and to various creditor classes as provided in the Plan, Warrantech's settlement with Mepco would collapse, and Warrantech would seek payment on its claims. In addition, litigation on a variety of complex issues would resume, including both the Creditor Committee's adversary action against Mepco and Warrantech adversary action against Mepco, resulting in what is likely to be a substantial delay in winding up the U.S. Fidelis estate. The numerous factual uncertainties include what happened to the series of refund payments that Warrantech sent to Mepco and U.S. Fidelis.

Warrantech's claims against the estate could not be determined until such litigation was resolved. The cost of such efforts threatens to consume most or all available estate assets. The

third party releases and the related injunction in favor of Warrantech are therefore critical to the success of the Plan as well as a successful outcome of this case.

Acceptance By Classes of Creditors Impacted by the Releases

The releases and injunction in favor of Warrantech have already been agreed to by representatives of the primary groups of creditors affected by them through the mediation process that resulted in the Global Settlement Agreement. The Attorney General Steering Committee agreed to the releases and injunction provisions on behalf of consumers generally as well as representatives of the other state attorneys general, subject to the rights of states to object and attempt to opt-out of the Plan releases and participation in the Consumer Restitution Fund, as provided in Section 13.3(d) of the Plan. No states objected to the releases or to any other portion of the Plan.

In addition, by order of this Court, state attorneys general were authorized to file class proofs of claim on behalf of their residents and to vote these claims in connection with the Plan. Consumer class ballots have been filed by 30 state attorneys general on behalf of approximately 412,500 consumers in favor of the plan, including the release and injunction provisions. The WARN Act class of claimants has agreed to the releases by its attorney and has voted to accept the Plan. The Creditors Committee agreed to the release of Warrantech on behalf of unsecured creditors through its attorney. Unsecured creditors unanimously voted in favor of the Plan. Accordingly, there was been overwhelming acceptance of the Plan, including the release and injunction provisions contained within it.

Provision for Payment of Claims Being Released

The Plan and the underlying Global Settlement Agreement is formed around the concept of maximizing payments to consumers and other creditors. The Plan establishes a Consumer

Restitution Fund through which consumers will be able to recover on their claims against U.S. Fidelis. A total of $14.1 million will be contributed to the Consumer Restitution Fund under the Plan. Consumers will maintain their claims against other parties who are not being released under the Plan, including the administrators of VSCs other than Warrantech VSCs. Since the Warrantech VSCs accounted for only about one-fourth of the total VSCs sold by U.S. Fidelis, most of the consumers will not be releasing claims against the administrator of their VSCs.

In addition, Warrantech has entered into agreements with the Attorney General Steering Committee outside the Plan to make substantial refund payments directly to groups of consumers who purchased Warrantech VSCs. These agreements, which are part of certain Assurances of Voluntary Compliance incorporated by reference into the Global Settlement Agreement, require Warrantech to make refund payments to groups of consumers who cancelled their Warrantech VSCs after December 1, 2009 or March 1, 2010, depending on the group of consumers. While the total amount of the direct refund payments is not currently known, Warrantech estimates that it will be at least $5.3 million, in addition to the nearly $7.7 million that Warrantech will be contributing under the Plan.

Warrantech understands that its direct payment of these consumer refunds will satisfy a large number of refund claims in connection with Warrantech VSCs as well as a number of consumers not entitled to refunds under the terms of the Warrantech VSCs. As a result, the funds Warrantech is contributing under the Plan will be shared with consumers who purchased VSCs of other administrators.

The scope and language of the release provisions contained in Section 13.2(a) and 13.3(a) with respect to Warrantech were extensively negotiated with the Unsecured Creditors Committee and the Attorney General Steering Committee, acting on behalf of consumers and other

- 9 -

Case 10-41902   Doc 1156   Filed 07/12/12   Entered 07/12/12 18:34:42   Main Document
Pg 10 of 13

governmental entities.  Although the Warrantech release provisions are detailed, they are narrowly drafted to limit them to issues arising under Warrantech VSCs sold by U.S. Fidelis and do not apply to other situations.

They also expressly exclude Warrantech's ongoing contractual obligations with respect to existing VSCs and its refund obligations under the Assurances of Voluntary Compliance.  The release provisions also expressly exclude various types of governmental claims and actions other than claims for violations of consumer protection statutes and regulations relating to U.S. Fidelis, as specified in detail in Section 13.3 of the Plan.  Consequently, the releases do not provide Warrantech with blanket immunity from claims and instead are tailored to fit the U.S. Fidelis circumstances.

The Plan also provides for substantial payments to the other groups of creditors who are giving releases to Warrantech.  The class of WARN Act claimants agreed to accept the treatment of claim as set forth in the Global Settlement Agreement and will receive payment in full of the amount they agreed to.   The class of unsecured trade creditors was represented by the Unsecured Creditors Committee during the mediation and the subsequent negotiation and drafting of the Plan.

Other Considerations Relating To The Releases

This case also presents several other factors that are relevant to whether the releases should be approved as part of the Plan.  Most importantly, the interests of the 650,000 affected consumers have been effectively represented by the active and vocal involvement of the Attorney General Steering Committee.  The Steering Committee requested that the Court direct the parties to a mediation process and stay the pending litigation in the meantime.  The Steering Committee negotiated and drafted the Consumer Restitution Fund provisions for the Plan,

including the level of funding needed for it.  The Steering Committee also negotiated with Warrantech regarding making direct refund payments to consumers outside of the Plan which will total approximately $5.3 million.  The Steering Committee also took the lead in negotiating the details of the releases with Warrantech and Mepco.  The Steering Committee has been an effective counterweight to the interests of the parties receiving releases under the Plan, and the endorsement of the Steering Committee regarding the fairness and reasonableness of those releases and the terms of the Plan generally should be an important factor in the Court's weighing of the considerations relating to the Plan.

This case presents unusual and particularly challenging circumstances.  A large number of consumers were affected by the widespread abuses of U.S. Fidelis, which resulted in its two principals pleading guilty to criminal fraud charges.  Without the Plan, the limited assets of this estate would likely be largely consumed by the cost of resumed litigation over the many complicated unresolved issues, leaving little or nothing to provide a remedy to consumers and other creditors.

Another important factor is that the economic terms of the Plan and the details of the releases and injunction were worked out through mediation presided over by Chief Judge Schermer.  This mediation was initially conducted at the outset of the settlement process to facilitate conceptual agreement on overall terms.  Judge Schermer was also involved towards the end of the Plan negotiation process, during which the specific Plan release provisions were hammered out between the parties.  The involvement and oversight of Judge Schermer provides additional assurances regarding the fairness of the resulting terms and the appropriateness of the release provisions.

The U.S. Fidelis estate has articulated no claims against Warrantech, and it is clear

Warrantech would not be voluntarily contributing nearly $7.7 million in cash towards a Global Settlement Agreement in the absence of a confirmed Plan that includes the third party releases and injunction. Instead, Warrantech would continue to assert its sizable claims against the estate. Nor would Warrantech be obliged to pay consumers approximately $5.3 million in direct refunds outside the Plan, since the effectiveness of the Assurances of Voluntary Compliance is conditioned upon the confirmation and effectiveness of the Plan.

Although consumers would be the biggest losers under should the Plan not be confirmed, the other groups of creditors would be substantially impacted as well. In it beyond questions that the Plan cannot be confirmed without including the requested releases, given the importance of the releases to Warrantech and to Mepco, without whose substantial financial support the Plan cannot be confirmed. It is equally clear, under the unique circumstances of this case, that the proposed releases appropriate in scope and in the best interests of all creditors, including those creditors who will be subject to the release provisions under the Plan.

For all the reasons stated above, Warrantech urges the court to enter an order confirming the Plan and to grant such other relief as is appropriate in the circumstances.

> Respectfully Submitted,
> WARRANTECH CORPORATION,
> WARRANTECH AUTOMOTIVE,
> INC. AND VEMECO, INC.
>
> By: /s/Stephen T. Bobo
>      One of their attorneys

Stephen T. Bobo
Reed Smith LLP
10 S. Wacker Drive, 40th Flr.
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
sbobo@reedsmith.com

## CERTIFICATE OF SERVICE

I, Stephen T. Bobo, hereby certify that on July 12, 2012, I caused a copy of the forgoing to be filed via the Court's ECF system and served on all parties receiving notice through the Court's CM/ECF system.

    /s/ Stephen T. Bobo