**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | § | **Case No. 10-41902-705** |
| | § | |
| **U.S. Fidelis, Inc.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | **[Docket Nos. 1135, 1129, 1144, 1167,** |
| | § | **& 1182]** |

**ORDER OVERRULING THE OBJECTION TO CONFIRMATION OF THE PLAN**
**AND MEMORANDUM OPINION IN SUPPORT OF CONFIRMATION**

On June 5, 2012, the Official Committee of Unsecured Creditors (the "UCC") filed a First Amended Plan of Liquidation (the "First Amended Plan") [Docket No. 1097] and a First Amended Disclosure Statement [Docket No. 1098]. On July 3, 2012, the UCC filed a supplement to the First Amended Plan [Docket No. 1129]. On July 9, 2012, three creditors, including Jackie L. High (collectively, the "High Objectors"), filed a joint objection to confirmation of the First Amended Plan (the "High Objection") [Docket No. 1135]. On July 10, 2012, the UCC filed an additional supplement to the First Amended Plan (together with the July 3 supplement, the "Plan Supplements") [Docket No. 1144]. On July 13, 2012, a modified version of the First Amended Plan (the "First Amended Plan, as Modified") [Docket No. 1167] was filed with leave of the Court.

On July 16, 2012, the hearing on confirmation of the First Amended Plan, as Modified was held. The High Objectors did not appear at the hearing. Uncontested evidence was admitted in support of confirmation, including declarations and affidavits (including those at Docket Nos. 1148, 1149, 1153, 1157, 1161, and 1161). No testimony or other evidence controverting these declarations and affidavits was offered, and the Court **FINDS** the representations

1

therein to be reliable and persuasive, and adopts them as findings of fact.  Also at the hearing, the First Amended Plan, as Modified was further modified to include a carve-out in favor of the High Objectors (the "Carve-Out").  This orally made Carve-Out was reduced to writing following the hearing [Docket #1182].  As a result, the confirmed plan (the "Plan") consists of the First Amended Plan, as Modified, the Plan Supplements, and the Carve-Out.

Consistent with its bench ruling, the Court now makes the following findings of facts and conclusions of law in support of confirmation of the Plan, and **ORDERS** that the High Objection be **OVERRULED** as set forth herein.[1]

## I.    FACTS

***The Formation, Operation, and Demise of the Debtor.***  In 2003, the Debtor was formed by two scam artist brothers with prior criminal histories, Darain and Cory Atkinson (together, the "brothers" or the "Atkinsons").[2]  The Debtor provided telephonic direct-marketing of vehicle service contracts (each, a "VSC").[3]  A VSC is an aftermarket contract whereby a non-manufacturer third-party, known as an administrator, agrees to cover the repair costs of the vehicle

---

[1] To the degree that any finding of fact or conclusion of law rendered from the bench is inconsistent with this Order, such portion of the bench ruling is vacated.

[2] The brothers each owned a 50% interest in the Debtor, and used the Debtor's assets to amass luxury realty and personalty. They are now incarcerated, having pleaded guilty to charges in connection with their operation of the Debtor.

[3] The Debtor also sold engine additive with a very high per-bottle price. The purchase of the bottle of engine additive also usually was financed.  This line of business similarly attracted the attention of state consumer protection advocates.

of the contract purchaser (the "consumer").[4]  The marketing of the VSCs by the Debtor involved no verification of creditworthiness of the consumer.  The Debtor sold more than 650,000 VSCs between 2004 and 2009.

The Debtor did not enter into the VSC directly with the consumer.  Instead, it pitched the VSC to the consumer on behalf of an administrator, and the administrator entered into the VSC with the consumer. The majority of the VSC purchases were financed, and the Debtor provided to the consumer a financing agreement, pursuant to which the consumer and yet-another entity, the financier (but not the Debtor), were the contracting parties.

The financed purchase of a VSC set into motion a complex system of advances and payments among and between the four parties involved with the VSC business model (the Debtor, the administrator, the financer, and the financer's insurer). When a VSC was cancelled, things became even more complicated. Commissions and advances paid to the Debtor and the administrator had to be refunded; holdbacks, offsets and guaranties had to be calculated; and in some cases, consumer refunds were required.

By 2009, the Debtor was near collapse, amid high cancellation rates and the Atkinsons' treating the Debtor as their personal ATM.  It also was facing investigations from numerous attorneys general (the states attorneys general, along with the Attorney General for the District of Columbia, collectively, the "Attorneys General") for deceptive trade practices and other issues.    The

---

[4] A VSC is not an extended warranty.  An extended warranty is a policy issued by the vehicle's manufacturer to warranty against defects. Unlike a manufacturer's warranty, a VSC is cancellable at any time by the consumer.

breaking point came on December 7, 2009, when Mepco Finance Corporation ("Mepco"[5]), the principal financer, advised that it would no longer finance VSC contracts. Shortly thereafter, the Debtor stopped marketing VSCs and made several rounds of mass layoffs.

   *The Bankruptcy Case.*   On March 1, 2010 (the "Petition Date"), the Debtor filed a petition for relief [Docket No. 1] under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"[6]), thereby commencing this case (the "Case").  On March 11, 2010, the UCC was appointed [Docket No. 40] and soon became the oarsman of the Case. The Case was often contentious, marked by palpable hostility in darker moments. Within the first month of the Case, an adversary proceeding was brought by former employees claiming WARN Act violations [Adv. Proc. Case No. 10-4160], the Attorney General for the State of Missouri filed a motion to appoint a trustee [Docket No. 41], and the UCC brought an adversary proceeding for an extension of the automatic stay [Adv. Proc. No. 10-4172], seeking to enjoin numerous parties, including the Atkinsons' personal creditors, from satisfying judgments from the Atkinsons' personal assets.

   *The Temporary Restraining Order.* Despite these dynamics, on April 13, 2010, a preliminary injunction was entered [Adv. Proc. No. 10-4172, Docket No. 24].  The injunction halted the race-to-the-courthouse that was occurring outside the Case, whereby the Atkinsons' personal creditors were seeking to obtain the

---

[5] Hereinafter, any reference to "Mepco" refers to its parent corporation, Independent Bank, as well, where applicable under the facts.

[6] Hereinafter, any reference to "section(s)" or "§[§]" refers to the indicated section[s] of the Bankruptcy Code, unless otherwise noted.

4

personal assets of the Atkinsons and their wives—assets that had been siphoned off the Debtor. If those assets had been seized by the Atkinsons' creditors, the ability of the UCC to recover those assets for the estate later would have been seriously jeopardized. The injunction also bought the UCC time to ascertain the financial relationship between the Atkinsons and the Debtor. Eventually, a deal was struck, whereby the brothers returned to the estate almost all their assets.

*The UCC-Mepco-Warrantech Litigation.*  Following the settlement with the Atkinsons, the parties turned their focus to other issues that needed to be resolved.  However, after months of negotiating and posturing among the parties, there were no resolutions, and adversary proceedings between and among the UCC, Mepco, and Warrantech Automotive, Inc. and Vemeco, Inc. (two administrators; together, "Warrantech") were commenced.[7] These actions would have been expensive and lengthy to litigate, and offered little certainty of result to any party.  By the end of the summer of 2011, the Case again stood perilously close to becoming an operation for paying attorneys and sorting out secured creditors' interests, instead of returning a distribution to the unsecured creditors and the Debtor's consumer victims.

On September 19, 2012, several Attorneys General filed a Joint Motion to Compel Parties to Mediation [Docket No. 881], asking the Court to authorize a global mediation of the major pending matters.  On October 26, 2011, the Court

---

[7] On September 6, 2011, the UCC filed a complaint against Mepco, seeking a declaratory judgment regarding the validity and priority of Mepco's security interests and subordination of Mepco's claims [Adv. Pro. No. 11-4308, Docket No. 1]. On September 13, 2011, Warrantech filed a complaint for equitable subordination against Mepco [Adv. Proc. No. 11-4313, Docket No. 1].

entered an order [Docket No. 992] authorizing mediation before another bankruptcy judge of this District. The Court provided for the participation of all major parties that had been actively involved in the Case, and did not exclude any party that requested to participate. Over the next eight months, the parties prepared for and participated in multiple mediation meetings.  In April, the UCC announced that the parties had reached a global resolution agreement (the "GSA"), and that it planned to include the GSA terms in a plan of liquidation.

*The Plan of Liquidation.*    On May 1, 2012, the UCC filed a Plan of Liquidation (the "Original Plan") [Docket No. 1066] and a Disclosure Statement (the "Original Disclosure Statement") [Docket No. 1067].   On June 5, 2012, the Court approved the Original Disclosure Statement subject to certain amendments and, later that day, the UCC filed a First Amended Plan and a First Amended Disclosure Statement.  The First Amended Plan included a class of the claims of consumer creditors (Class 6), and created the $14.1 million Consumer Restitution Fund ("CRF"), funded by cash contributions from the Debtor and Warrantech, for making distributions to Class 6 claimants.  In addition, to make the CRF possible, Mepco compromised $60 million in claims it held against the Debtor.[8]   The First Amended Plan incorporated the GSA's releases of claims held by consumer creditors against certain non-debtors, including Mepco.[9]

---

[8] The High Objectors argue that this $60 million compromise is illusory.  The Steering Committee and the UCC do not agree with this dismissive assessment of the value of Mepco's compromise—and they certainly have shown no inclination to roll over for Mepco at any point in the Case.  In their judgment, Mepco's compromise has considerable value to the creation and funding of the CFR. It ensures that Mepco does not tie up and drain away assets of the estate in litigation and possible negative-outcome judgments for the estate.  Without

***Objections to Confirmation.*** The deadline for casting ballots on the First Amended Plan and for filing objections to confirmation was July 9, 2012 [Docket No. 1101]. No party that had actively participated in the Case filed an objection to confirmation. Mepco, Warrantech, and the Steering Committee of the Attorneys General (the "Steering Committee") filed briefs in support of confirmation [Docket Nos. 1138, 1156 & 1160].

Two objections were timely filed by four consumer creditors. One was filed by Mr. Robert Schulz [Docket No. 1139], objecting to confirmation on the basis of the treatment of his claim. The other was filed by the High Objectors (filed jointly, the "High Objection") [Docket No. 1135], objecting to confirmation on the basis of the inclusion of the releases of the consumer creditors' claims against Mepco. The High Objection arises from the High Objectors' desire to protect their interests in another federal lawsuit not before this Court. The High Objectors are the three named plaintiffs in a lawsuit in the U.S. District Court for the Northern District of California (the "Civil Action"), where they are suing Mepco in connection with the financing of the VSCs. The complaint in the Civil Action

---

commenting on the merits of the adversary proceeding filed by the UCC against Mepco, the Court agrees that Mepco's compromise is not illusory.

[9] Warrantech also receives releases under the Plan. No party objected to confirmation based on the inclusion of the Warrantech releases or suggested that Warrantech's contribution is illusory. Pursuant to the GSA, Warrantech will contribute more than $7.6 million to the settlement, with $1.1 million in cash to go to the CRF and another $1.4 million to go to the Debtor's estate. It will waive any distribution on its claims against the Debtor and reimburse the estate for $368,000 in noticing costs related to the Plan. In addition, Warrantech will make an anticipated $5.3 million in direct refund payments in connection with its Assurances of Voluntary Compliance negotiated with certain Attorneys General.

lists other, unnamed consumers as co-plaintiffs and appears to seek (but has not received) class action certification.[10]

*Motion to Modify.*  On July 11, 2012, the UCC filed a Motion to Amend by Interlineation (the "Motion to Modify") [Docket No. 1147], seeking to modify the First Amended Plan by creating a new class, Class 12, into which the claims of the High Objectors and Mr. Schulz would be placed. Class 12 claims would be paid in full, and thus be unimpaired.  This modification was sought to protect the estate the expense of litigation the objections and to prevent the consumer creditors from the risk of losing the GSA and its CRF.  It would have cost more to litigate the objections than the combined value of the objectors' claims (approximately $11,000.00), while the cost of the objections being sustained was high: denial of confirmation and the collapse of the GSA and the Plan. As the Plan supporters have made clear: this is the only shot at a confirmed plan, and without it, the opportunity to ensure a significant distribution from the estate to the consumer creditors would be lost. The Debtor, the UCC, Mepco and Warrantech each have already given up significant positions and interests to reach the terms of the GSA, and there is no more ground for further compromise.

The Court set the Motion to Modify and the related Motion to Expedite for hearing on July 13, 2012.  On July 12, 2012, the High Objectors filed a response (the "Response") [Docket No. 1155].  Mr. Schulz did not file a response.

---

[10] As of the date of the last filing by the High Objectors, there has been no representation to this Court that the Civil Action has been class action certified. In this Case, the High Objectors have standing to represent only their own interests, not the interests of the unnamed co-plaintiffs in the Civil Action. (*See* Order Clarifying Standing [Docket No. 1140].)

At the July 13th hearing, the High Objectors appeared through counsel and stated that they did not object to the Motion to Modify.  Rather, they declined to take a position on the Motion to Modify, arguing that they had not had enough time to determine how to respond.  In an order [Docket No. 1163] entered later that day, the Court (1) construed the Response to include an objection to the Motion to Expedite and overruled the objection, (2) found that no objection to the Motion to Modify had been brought, and (3) granted the Motion to Modify.

In that order, the Court also questioned the suggestion made at the hearing that the High Objectors now lacked standing to assert any objection, because of the now-unimpaired nature of their claims against the estate.  It reserved the issue of whether the High Objectors had standing to object to confirmation on a ground other than that of the treatment of their claims, and construed the Objection to include an objection based on a lack of good faith—a ground some courts have suggested may afford a creditor with an unimpaired claim standing upon which to bring an objection to confirmation.[11]

**_The Plan and Confirmation._**  On July 14, 2012, the UCC filed the First Amended Plan, as Modified.  At 10:32 P.M. on July 15, 2012, the Objectors filed a "Submission by Consumer Objectors re: Hearing to Confirm Modified Plan of Liquidation" (the "Submission") [Docket No. 1169]. In the Submission, the High Objectors represented, among other things, that they would not appear at the

---

[11] That the Objection contains a good faith objection seemed to be a reasonable construction, given that the High Objectors charge that the First Amended Plan: assigns value to the compromise of Mepco's allegedly valueless claims; is unfair; abuses the bankruptcy process; and affords relief which the Court has no jurisdiction to order.  However, the High Objectors since have been clear that they do not object on a lack of good faith.

confirmation hearing. They also rejected the construction of their Objection as including an objection based on a lack of good faith, and stated specifically that they did not object on that ground.

On July 16, 2012, at 7:46 A.M., the UCC circulated to certain counsel, including counsel for the High Objectors, the dial-in information for telephonic appearances for the confirmation hearing.  (*See* Certificate of Service [Docket No. 1173]).

At 9:27 A.M. on July 16, 2012,[12] the Court entered an order related to the Submission [Docket No. 1171], disregarding several irrelevant or improperly raised points, and stating that the High Objectors were free to bring any objection, on a good faith ground or otherwise, provided they had standing to raise such objection.  The order was transmitted contemporaneously via email to counsel (including to the High Objectors' counsel) through the electronic docketing system.

The confirmation hearing commenced at 10:09 A.M. on July 16, 2012, and lasted one hour and twenty-six minutes. Neither the High Objectors nor their counsel appeared.[13]  By the time of the hearing, Mr. Schulz had withdrawn his objection [Docket No. 1168], and no party appearing raised an objection to

---

[12] This was the earliest the order could have been entered, given the late hour at which the Submission was filed and the need for the Court to consider it and opine.  The order was electronically transmitted to counsel more than a half an hour before the confirmation hearing began.

[13] Participants could have joined telephonically at any point during the hearing.

confirmation.[14]  In addition, Mepco orally represented that it would not enforce the releases in the First Amended Plan, as Modified, as those releases applied to the High Objectors' claims against Mepco.[15] The Court treats this representation—the Carve-Out—as constituting a further modification of the First Amended Plan, as Modified.[16]

Consistent with its bench ruling, the Court now enters this order overruling the High Objection.  By separate order, the Court will approve confirmation of the First Amended Plan, as Modified, along with Plan Supplements and the Carve-Out (together, the "Plan").

## II.  SUBJECT MATTER JURISDICTION

The bankruptcy court, like every federal court, is a court of limited jurisdiction.  It cannot adjudicate matters outside its jurisdiction, even if the parties consent, because jurisdiction cannot be created by consent.  And it cannot rely upon § 105(a) to prop up jurisdiction, as § 105(a) cannot create or expand jurisdiction.

---

[14] At the July 13 hearing, the High Objectors' counsel represented that she had been unable to contact all her clients to obtain their responses to the proposed modification.  In the July 15th Submission, she stood by the Objection (which had been filed prior to the modification).  The Court assumes that the High Objectors maintain their objection even in light of the Carve-Out.

[15] Post-hearing, Mepco filed a document captioned "Confirmation of Representation Made in Aid of Confirmation of the [Plan]" [Docket No. 1182]. This filing was made at the request of the Court, to formalize in writing the orally made representation, to ensure clarity in scope and intent.

[16] Even if notice of the Carve-Out was technically required, its inclusion as part of the Plan results in no prejudice.  It does not change the rights under the Plan of any party other than Mepco and the High Objectors, and the High Objectors cannot colorably complain about their claims against Mepco being carved-out from the releases.

Jurisdiction to hear cases filed under title 11 of the United States Code is vested in the district court.  28 U.S.C. § 1334(a) & (b).  The district court refers bankruptcy cases to the bankruptcy court pursuant to a standing order of automatic reference, as permitted under 28 U.S.C. § 157(a).

A proceeding before a bankruptcy court is either core or non-core. The bankruptcy court may hear and enter a final order in a core proceeding.  28 U.S.C. § 157(b).  The bankruptcy court also may hear a non-core proceeding. However, it does not have authority to enter a final order or judgment in a non-core proceeding without the consent of the parties. If the parties do not consent, the court makes recommendations of findings of fact and conclusions of law to the district court.  28 U.S.C. § 157(c)(1). The bankruptcy court is obligated to determine whether a proceeding before it is core.  28 U.S.C. § 157(b)(3).

Confirmation of a plan is a core proceeding. 28 U.S.C. § 157(b)(2)(L). Therefore the Court clearly has jurisdiction to adjudicate the issue of whether confirmation of the Plan is proper.  However, the consumer creditors claims against non-debtor parties that are proposed to be released in the Plan are the subject of non-core proceedings.  They do not arise under title 11 or arise in a case in title 11, 28 U.S.C. § 157(b)(1), and they are not comparable to the examples of core proceedings in 28 U.S.C. § 157(b)(2). As such, if the Court confirms the Plan, it also would adjudicate the consumer creditors' non-core claims against Mepco through approval of the releases.  Therefore, even though the Court has undisputed jurisdiction to adjudicate the issue of confirmation of the Plan, it separately must determine: (1) whether it has jurisdiction to

adjudicate the consumer creditors' claims against non-debtors such as Mepco; and (if it does have jurisdiction) (2) whether it may enter a final order or judgment on the adjudication of those claims in conjunction with confirming the Plan.

### A. The Court has jurisdiction to adjudicate the consumer creditors' claims against Mepco under the "related to" jurisdictional provision.

The Court has jurisdiction over a non-core proceeding if that proceeding is "related to" the bankruptcy case.  28 U.S.C. § 157(c)(1)(providing that "[a] bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11"). This Circuit has adopted the well-established "conceivable effect" test of *Pacor, Inc. v. Higgins* for determining whether a non-core proceeding is "related to" a bankruptcy case. *Dogpatch Properties, Inc. v. Dogpatch U.S.A., Inc. (In re Dogpatch U.S.A., Inc.)*, 810 F.2d 782, 786 (8th Cir. 1987).  A non-core proceeding is "related to" a bankruptcy case if its outcome "*could conceivably have any effect on the estate being administered in bankruptcy.*" *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)(emphasis in original).  This includes any outcome that "could alter the debtor's rights, liabilities, options, or freedom of action . . . and which in any way impacts upon the handling and administration of the bankrupt estate." *Id.*

The consumer creditors' claims against Mepco satisfy the "conceivable effect" test due to the financially entwined relationship between the Debtor and Mepco.  Under certain 2004 and 2009 agreements, upon cancellation of a VSC, the Debtor is obligated to refund and pay Mepco for unearned costs and profits, as well as late charges.  In addition, the Debtor also agreed to broadly indemnify

13

Mepco.[17]   As a consequence of these obligations, a consumer claim against Mepco results in an additional claim by Mepco against the Debtor—and the prosecution and outcome of these claims has a conceivable effect on the estate. Resolution of the claims could take years and, due to the indemnities, this Case and the distribution to creditors could be protracted considerably. The Debtor could be drawn into the complicated, expensive and lengthy discovery process and litigation.   Moreover, the indemnity obligations could be an issue in the equitable subordination adversary proceeding already pending before this Court. The claims against Mepco have not merely a conceivable effect on the estate, but a potentially significant one.   Accordingly, the Court has jurisdiction to adjudicate the consumer creditors' claims against Mepco.[18]

### B. The Court may enter a final order or judgment related to the consumer creditors' claims against Mepco because the parties, including the consumer creditors to be released, consented.

No consumer creditor holding a claim against Mepco that would actually be released objected to the Court entering a final order or judgment on his claim against Mepco by way of confirmation of the Plan. The bankruptcy court's jurisdiction to enter a final order or judgment in a non-core proceeding may be established by implied consent where no objection to jurisdiction is raised. *Abramowitz v. Palmer*, 999 F.2d 1274, 1280 (8th Cir. 1993)(internal citations omitted). Therefore, those consumer creditors consented to jurisdiction to enter a

---

[17] Warrantech had a similar such relationship and identity with the Debtor.  The Debtor had agreed to indemnify Warrantech.  As with Mepco, claims against Warrantech also would result in additional Warrantech claims against the Debtor.

[18] Similarly, the Court also has jurisdiction to adjudicate the claims against Warrantech that are proposed to be released in the Plan.

final order or judgment. To the degree that the High Objectors do not consent to the Court exercising jurisdiction, their non-consent is irrelevant. The Court does not need the consent of the High Objectors because their claims against Mepco are carved out from the releases and will not be adjudicated by way of confirmation of the Plan.

### III. FINDING OF GOOD FAITH

To be confirmed, a plan must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Because there has been no objection based on the allegation that the Plan is proposed in bad faith or by a means forbidden by law, pursuant to Federal Rule of Bankruptcy Procedure ("Rule") 3020(b)(2),[19] the Court finds that the Plan is proposed in good faith and not by any means forbidden by law. In the alternative, upon the evidence received, including evidence of the arms' length negotiations through mediation conducted by a bankruptcy judge, the Court would find that the Plan is proposed in good faith and not by any means forbidden by law.

### IV. THE HIGH OBJECTION IS OVERRULED FOR LACK OF STANDING.

In the High Objection, the High Objectors allege that they have standing to object under § 1109(b). At the time the High Objection was filed, the High Objectors' claims against the estate were impaired. Following the July 13th modification of the First Amended Plan, their claims against the estate were unimpaired. In their Submission filed on July 15th, the High Objectors did not

---

[19] Rule 3020(b)(2) provides that "[i]f no objection is timely filed, the court may determine that the plan has been proposed in good faith and not by any means forbidden by law without evidence on such issues."

address the issue of standing in light of their now-unimpaired claims.   And because they did not appear at the confirmation hearing, the Court has not heard from the High Objectors on the issue of standing in light of the Carve-Out. The Court assumes the High Objectors still object to confirmation and maintain that they have standing to do so.

The High Objectors, as holders of unimpaired claims, do not have standing to object to the treatment under the Plan of their claims against the estate.   *See, e.g., In re A.P.I., Inc.,* 331 B.R. 828, 862 (Bankr. D. Minn. 2005). In addition, to the degree that the High Objectors may object based on the treatment under the Plan of any other creditor's claim against the estate, they also lack standing.  They cannot object on behalf of another party.  *Id.* at 859.

The High Objectors also lack standing to raise an objection on any other ground.   Section 1109(b) establishes standing in a chapter 11 case, providing that "[a] party in interest, including . . . a creditor . . . may raise and may appear and be heard on any issue in a case under this chapter."   This section does not mean that every creditor is a party in interest.   It means that a creditor *may* be party in interest.   A "party in interest" is a person who holds a pecuniary interest that could be adversely affected by the outcome of the proceeding.   *See, eg., Jeffries v. Browning (In re Reserves Dev. Corp. and RDC Monongah, Inc.)*, 78 B.R. 951, 957 (Bankr. W.D. Mo. 1986).  A person, including a creditor, must be a "party in interest" to have standing under § 1109(b).

The Plan proposes to pay the High Objectors in full and carves out the High Objectors' claims against Mepco from the releases. As a result, the High

16

Objectors have no pecuniary interest that would be adversely affected by confirmation of the Plan.[20]  Without a pecuniary interest, whatever objection the High Objectors may have is a generalized grievance, which does not establish standing.  *See In re A.P.I., Inc.*, 331 B.R. at 859 (providing that a "generalized grievance" does not afford standing).  Therefore, the Court **HOLDS** that the High Objectors are not parties in interest to the confirmation proceeding, and **ORDERS** that the High Objection be **OVERRULED** for lack of standing.

## V.  IN THE ALTERNATIVE, THE HIGH OBJECTION WOULD BE OVERRULED ON OTHER GROUNDS.

In the alternative, if the High Objectors have standing, the Court nevertheless would overrule their objections on other grounds, as set forth below.

### A.  Objection Based on an Alleged Violation of the Right to Due Process.

The bankruptcy court may not order relief that results in a violation the U.S. Constitution or other federal law.  The High Objectors argue that confirmation of the Plan violates their right to due process by enjoining them from proceeding on their claims against Mepco.  However, the Plan carves out from the releases the High Objectors' claims against Mepco.  Nothing in the Plan prevents the High Objectors from proceeding on those claims. There is no violation of a right to due process.

---

[20] The only effect the High Objectors would experience from the release of other consumers' claims against Mepco would be the indirect, collateral effect of making it less likely that the Civil Action will be class action certified. The High Objectors do not have a pecuniary interest in class action certification; they have a pecuniary interest in their claims against Mepco.

## B.  Objection Based on
## an Alleged Improper Discharge of Mepco.

The High Objectors argue that the Plan should not be confirmed because it violates § 1129(a)(1), which requires that a plan to comply with bankruptcy law. They assert that the Plan violates bankruptcy law because the releases "impermissibly discharge Mepco."

**1.      The Plan does not "discharge" Mepco.**

As a preliminary matter, the Court will clarify what may be a misunderstanding about how the Plan's releases of the non-debtors, including Mepco, would operate.  The releases in the Plan would not "discharge" Mepco, or any other non-debtor, as the term "discharge" is usually meant in the bankruptcy context.  A "discharge" (or a "bankruptcy discharge") is a statutory construct and a bankruptcy law term of art. *See, eg.*, 11 U.S.C. §§ 727(a), 1129(d) & 1328(a). It refers to a form of relief that permanently enjoins attempts to collect debts of a debtor by creditors of that debtor.  A bankruptcy discharge is granted to a debtor under certain circumstances (such as upon an individual's fulfillment of his statutory obligations, or pursuant to a plan). By statute, a bankruptcy discharge is a form of relief available only to a debtor.  By confirming a plan that includes a release of a non-debtor, the bankruptcy court is not entering a bankruptcy discharge for that non-debtor; it is entering a release for that non-debtor.   While there is similarity in effect between a bankruptcy discharge and a release of a non-debtor (both forms of relief adjudicate a claim for a debt), they are not interchangeable concepts. *See In re Digital Impact, Inc.*, 223 B.R. 1, 15 n.9 (Bankr. N.D. Okla. 1998)(noting that a release is "arguably

18

broader" than a discharge).  They are based on different law, embody different scopes, serve different purposes, and are imposed upon under different circumstances.  Therefore, even if the Plan discharged the Debtor—which it does not[21]—it would not discharge Mepco or any other non-debtor of any debt.

Unfortunately, the Plan shows a lawyer's engrained tendency toward redundancy in drafting, which may have contributed to the confusion.  The Plan uses "releases and discharges" to describe the scope of third-party releases in several places.  The Court interprets this "discharges" language to have the common legal definition of the term ("acquits completely").  It is not a reference to granting a bankruptcy discharge to the Debtor or anyone else.  The Court therefore construes the High Objectors' objection to be that the releases in the Plan impermissibly release and acquit Mepco.

**2.    The releases do not impermissibly release and acquit Mepco in violation of § 524(e).**

Section 524(e) provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."  For example, a co-obligor on a debtor's debt cannot use the debtor's bankruptcy discharge to relieve himself of his obligations on that debt.  The High Objectors argue that the releases impermissibly release and acquit Mepco in violation of this section.  However, on its face, § 524(e) cannot apply. The Debtor is not receiving a discharge and, even if it were, the Debtor and Mepco do not share liability for "such debt" related to the consumer creditors.  Their debts—while related by virtue of the indemnifications—are distinct.

---

[21] *See* First Amended Plan, as Modified § 13.13.

3. **The releases do not impermissibly release and acquit Mepco in violation of an unequivocal prohibition on third-party releases.**

In support of their § 1129(a)(1) objection, the High Objectors point to the Ninth and Tenth Circuits, and contend that these Circuits hold that third-party releases are unequivocally impermissible. The Court first notes that it is not bound the Ninth or Tenth Circuit law. Second, a review of the law of the Ninth and Tenth Circuits shows that the prohibition on third-party releases is not as unequivocal as the High Objectors suggest. The Ninth Circuit does not permit confirmation of a plan that includes compelled third-party releases. *Billington v. Winograde (In re Hotel Mt. Lassen, Inc.)*, 207 B.R. 935, 941 (Bankr. E.D. Cal. 1997). However, it does not appear to preclude confirmation of a plan that contains consensual third-party releases. *Id.* at 941 n.7; *see also In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007) ("Most courts allow consensual nondebtor releases to be included in a plan."). Further, within the Tenth Circuit, the bankruptcy court in *In re Digital Impact, Inc.* noted the contract nature of a release and the need for consent.[22]

Permitting confirmation of a plan that includes consensual releases recognizes that such releases sound in contract law, rather than arise under statutory bankruptcy law. *In re Wool Growers Cent. Storage Co.*, 371 B.R. at 768 (internal citations omitted).

---

[22] The *Digital Impact* court ultimately determined that, regardless of whether a contract existed between the proposed third-party releasor and releasees, it did not have jurisdiction over the claims. As discussed in Part II, jurisdiction exists over the third-party claims at issue here.

**4.    The third-party releases are consensual and, as such, do not impermissibly release and acquit Mepco.**

Some courts have held that voting to accept a plan establishes consent to the third-party releases proposed in the plan. Given that a consensual third-party release sounds in contract law, the Court would agree that consent is necessary, and that voting to accept a plan may be the proper standard for establishing consent in many contexts. However, under the facts here, the Court would hold that voting to accept the plan is not required to establish the consent.

The Court first notes that a vote to reject a plan is not per se a refusal to consent to a third-party release in that plan—especially when the creditor does not file an objection to confirmation, the plan provides for a significant distribution to the creditor, and the creditor has not expressed an intent to pursue the third-party claim proposed to be waived. The purpose of voting is to express acceptance or rejection of the plan, to determine whether cramdown must be accomplished for confirmation. Its purpose is not to act as a mechanism for consent to third-party releases in a plan that is otherwise confirmable. If a creditor wants to preserve his right to object to confirmation, on whatever ground, he must file an objection. If he does not file an objection, he generally cannot complain about the results of the confirmation proceeding—even if he voted to reject the plan.

The facts of the Case establish that the Plan's third-party releases of the non-debtors, including Mepco, are consensual, regardless of the fact that not every single one of the more than 600,000 consumer creditors voted to accept the Plan. The support of those consumer creditors who cast ballots was

21

overwhelming.   Of the 412,589 consumer creditors who cast a ballot, 412,586 (99.9993%) voted to accept the Plan.  That is, all but three (or .0007%) voted to accept the Plan—and even those three dissenters did not object to confirmation.

    In addition, consent of the consumer creditors is shown by the support for confirmation of the Attorneys General.  The Attorneys General are authorized to participate and intervene on behalf of the consumer creditors under Rule 2018(b), and have played a critical role in representing those consumer creditors. Throughout this Case, the Attorneys General have been organized, public, and vocal. They were in contact with their consumer constituencies. Their positions were unbiased by the squeakiest wheel on the UCC, security interests of institutional clients, or the potential for class action certification and its attendant benefits.  They formed the Steering Committee, led by the particularly effective counsel from the Attorney General of the State of Texas.  The counsel for the members of the Attorneys General Executive Committee attended every hearing affecting the consumer creditors' interests. It was upon the motion of certain Attorneys General that the mediation was ordered.  Members of the Attorney General Executive Committee attended the mediation and played a critical role in facilitating the GSA.  The Consumer Fund Advisory Committee provided for in the GSA is composed of state attorneys general. The Attorneys General filed proofs of claim, and several obtained authority to cast ballots on behalf of their constituencies.   The presence of the Attorneys General gave the Court comfort

that the interests of the consumer creditors were being vigorously pursued, allaying concerns that the Court had voiced at the beginning of the Case.[23]

The support of the Attorneys General for confirmation reflects the will of the consumer creditors as to all terms of the Plan, including as to the releases. If their constituencies were not in favor of confirmation of the Plan, or if the Plan and its releases were not in their constituencies' best interests, the Attorneys General would not have supported it.  Thirty of the fifty-one Attorneys General voted in favor of the Plan (on behalf of their constituent consumer creditors) and no Attorney General voted to reject the Plan.

Under these circumstances, where the consumer creditors have clearly relied on the Attorneys General and the Attorneys General have borne the mantle of that responsibility, the Court would find that affirmative consent of the consumer creditors is established.  State attorneys general are empowered under federal bankruptcy law to intervene on behalf of the consumer creditors for a reason: to ensure that the legal process results in the best possible resolution for the consumers without burdening each consumer with active participation (otherwise, many consumers would be marginalized, as meaningful participation may require personal legal expertise and sufficient resources to personally participate, or the financial wherewithal to obtain counsel to participate). To hold that the more commonly applied standard for establishing consent (that each affected creditor vote to accept the plan) is required under these circumstances

---

[23] The Court stated early on that it would not permit well-heeled interests to run roughshod over the victims of the Debtor's malfeasance. The Debtor would not proceed in chapter 11 liquidation purely for the purpose of facilitating the secured creditors' recovery and paying case professionals.

would be impractical, undercut the role of attorneys general as contemplated under Rule 2018(b), and risk a less accurate indication of consent (as many consumer would not vote, even if they would consent).

5. **In the alternative, even if the releases are not consensual, their inclusion in the confirmed Plan would not result in the improper release and acquittal of Mepco.**

Even if the releases in the Plan cannot be determined to be consensual, under persuasive precedent from the U.S. Bankruptcy Court for the Western District of Missouri, this fact does not make confirmation of the Plan per se improper. *See In re Master Mortgage Invest., Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994). Under *Master Mortgage*, the court may confirm a plan that includes compelled releases of non-debtors, if such extraordinary relief is warranted. Specifically, releases may be included in a confirmed plan if exceptional circumstances exist, the releases are widely supported by the creditor constituency (including those creditors who will be restrained), the constituency to be restrained receives significant benefits, and the creditors as a whole are being treated fairly. *Id.* at 935.

All these *Master Mortgage* requirements are fulfilled here. Exceptional circumstances exist. Despite the incredibly complex nature of the claims and interests among and between the major parties in this Case, a unique and singular opportunity has presented itself in the hard-negotiated GSA: a significant return to the consumer creditors. However, if the third-party releases are not permitted in the Plan, the GSA evaporates, as neither Mepco nor Warrantech

24

would agree to its terms.[24]   Instead, the UCC, Mepco, and Warrantech would spend years litigating, resulting in a significant loss to the estate.  Meanwhile, the consumer creditors most likely would end up with little return, and no return in the near future (further devaluing whatever return they may receive, if any).  This is not a circumstance where the Debtor and its secured creditors filed for bankruptcy relief with the pre-conceived purpose of buying third-party releases at a lowball price.  The opposite is true, and the GSA offers the rare opportunity to actually serve the truly injured.

Additionally, the releases are widely supported by the consumer creditors, directly and through the Attorneys General.  No consumer creditor who would actually be restrained by the releases objected to confirmation, and the overwhelming majority of consumer creditors who cast a ballot voted to accept the Plan.  All the Attorneys General that cast ballots voted to accept the Plan (and none objected), and the Steering Committee filed a brief in support of confirmation.  And, the consumer creditors stand to obtain the significant benefit in the form of a distribution from the CRF.

Last, the consumer creditors as a whole would be treated fairly *Master Mortgage* provides that the court should look at five factors in determining the necessity and fairness of third-party releases included in a proposed plan.

**First Factor:  whether there is an identity of interest between the debtor and the third-party, such as an indemnity relationship, such that the**

_____

[24] Neither is being intractable or unreasonable.  For example, if Mepco is not released from the third-party claims, after confirmation, it stands to be sued by the very consumers whose restitution it funded.  Mepco would face the possibility of paying those claimants twice.

*suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the debtor.* As discussed in Part II.A, there is a significant financial relationship between the Debtor and Mepco. The third-party claims against Mepco, if litigated, would involve the Debtor, either by interpleading or discovery or both. The litigation would drain assets of the estate and cost considerable time and resources, possibly forcing the Case from a chapter 11 liquidation into a chapter 7 liquidation, which would result only in less of a return for the unsecured creditors.

*Second Factor: whether the non-debtor has contributed substantially to the reorganization.* The Debtor is not reorganizing. Its business plan was built on fraud and deception. There is nothing around which to reorganize. This Case is—in bankruptcy vernacular—a "liquidating 11." A bankruptcy case may proceed as a liquidating 11, if doing so would benefit the creditors (including the unsecured creditors). It is a well-established use of chapter 11 relief.

A few courts suggest that compelled releases may not be appropriate in a liquidating 11 because the debtor necessarily does not need such extraordinary relief for the purpose of reorganizing. The Court recognizes this concern and the possible abuse that could occur if the releases of non-debtors are commonly included in a plan of liquidation. However, an orderly liquidation is a valid use of chapter 11 and one of its chief purposes—to ensure the best return for the unsecured creditors—should be promoted. If the plan of liquidation ensures the best possible outcome for unsecured creditors and the releases therein are

26

critical to confirmation of the plan, then the fact that the case is not a reorganization should not per se prohibit confirmation of the plan.  As discussed at Footnote 8 herein, Mepco will substantially contribute to the orderly liquidation of the Debtor, just as Warrantech and the Debtor itself will do.

*Third Factor: whether the injunction is so essential to the reorganization that, without it, there is little likelihood of success.*  Again, even though this Case is a liquidation, the same principal applies as in a reorganization.  A release of a non-debtor is appropriate only if, without it, there would be little likelihood of the accomplishing of the goal of the chapter 11: the confirmation of a successful plan of liquidation that benefits the creditors, including the unsecured creditors.  Here, there is no chance of a plan of liquidation without the releases, and if there is no confirmed plan, the Case either will be converted to a chapter 7 case or dismissed.

*Fourth Factor: whether a substantial majority of creditors agreed to the injunction, including an overwhelming majority of the creditors to be restrained.*  Even if the result of the balloting of the consumer creditors alone does not establish the consumers creditors' consent to the releases in the Plan, it clearly indicates that, of those consumer creditors who chose to vote and assert their right to be heard, the overwhelming majority voted to accept the Plan.  In addition, all the Attorneys General that cast ballots  (on behalf of their constituent consumer creditors) voted to accept the Plan, suggesting that the consumer creditors that they represent are supportive of the Plan. And no consumer

27

creditor actually affected by the third-party releases or an Attorney General filed an objection to the Plan.

**Fifth Factor: whether the plan provides a mechanism for payment of all, or substantially all, of the claims of the class affected by the injunction.** As the evidence adduced at the confirmation hearing establishes, the funding of the $14.1 million CRF will ensure a return to the consumer creditors.

**Fairness in general.** In addition, the Court notes that the truly unfair result would be the one resulting if the High Objection is sustained. Without inclusion of the releases in the Plan, the GSA falls apart and there is no Plan. And no other plan will be presented. Instead, the Case eventually would be dismissed or converted to chapter 7. Under either scenario, it is unlikely that the consumer creditors would receive a distribution anywhere close to that offered through the Plan, if they obtain one at all. The High Objectors' implied argument that denial of confirmation is the fairer result is disingenuous, at best. Their position should be viewed for what it is: an effort to preserve the possibility of class action certification in their Civil Action on the backs of hundreds of thousands of consumer creditors, who have not objected to confirmation and who would receive a distribution on their claims via the CRF—without incurring the risk, time, expense, and class action attorney's contingency fee that would be involved in a class action.

**Public interest.** Last, the Court notes that the public interest would not be served by sustaining the High Objection. The bankruptcy process would not provide a better form of relief and greater justice to the victims of the Debtors'

28

fraud and deception by denying them a distribution today, in exchange for allowing them to keep whatever claims the High Objectors happen to think those creditors may have against Mepco—claims that no creditor, other than the High Objectors, have suggested that they believe that they have or that they are interested in pursuing.

Therefore, if the releases of the consumer creditors' claims against Mepco cannot be found to be consensual, then given the facts of this Case, the extraordinary circumstances, the analysis under *Master Mortgage*, public policy, and the interests of justice, the Court would overrule the High Objection, hold that confirmation of the Plan is proper, and order confirmation of the Plan.

## VI.    CONCLUSION

For the reasons set forth above, the Court **ORDERS** that the High Objection be **OVERRULED** for lack of standing. Alternatively, the Court would order that the High Objection be overruled as to each ground for the reasons set forth herein. Further, the Court **ORDERS** the UCC to serve a copy of this Order upon all parties entitled to such service, and to file a Certificate of Service evidencing such service within four (4) business days.


DATED:  August 28, 2012                                    CHARLES E. RENDLEN
St. Louis, Missouri 63102                                  U.S. Bankruptcy Judge
mtc