4UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | Case No. 10-41902 |
| | ) | |
| US FIDELIS, INC., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | [Related to Docket Nos. 1129, 1144, 1167, & 1182] |

## ORDER APPROVING CONFIRMATION OF THE PLAN

On July 16, 2012, the First Amended Plan of Liquidation, as Modified on July 13, 2012 (the "First Amended Plan, as Modified") [Docket No. 1167], and the related supplements (the "Plan Supplements") [Docket Nos. 1129 and 1144][1] filed by the Official Committee of Unsecured Creditors (the "UCC") came for confirmation hearing (the "Confirmation Hearing"). As of that date, the only objection to confirmation pending was a joint objection (the "High Objection") [Docket No. 1135] filed by three consumer creditors, one of whom was Jackie L. High (the "High Objectors"). At the hearing, the First Amended Plan was further modified, without objection, by the inclusion of a carve-out (the "Carve-Out," collectively, with the First Amended Plan, as Modified and the Plan Supplements, the "Plan").)[2] [Docket No. 1182]). Now, incorporating the findings of facts and conclusions of law set forth in the contemporaneously entered Order Overruling the Objection to Confirmation of the Plan and Memorandum Opinion

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan. Any term used in the Plan or in this Order that is not defined in the Plan or in the Order, but that is used in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

[2] At the confirmation hearing, Mepco Financial Corporation ("Mepco") represented for the first time that it would not enforce certain releases in the First Amended Plan, as Modified on July 13, 2012. Those releases are related to third-party claims that the High Objectors assert against Mepco. Mepco later also made representation in writing [Docket No. 1182].

in Support of Confirmation (the "Objection Order")[3]; and adopting the facts established by the

declarations, affidavits, and certificates entered into evidence (including those at Docket Nos.

1148, 1149, 1153, 1157, 1161 and 1166); and accepting as true all other evidence adduced at the

hearing; and upon review of the entire Case record; and upon consideration of the pleadings and

memoranda filed in support of and against confirmation of the Plan and argument made on the

papers and at oral argument; and upon finding that the record, including the applicable

certificates of service, establishes proper notice and service of all confirmation-related

documents, solicitations, notices, and disclosures, the Court **FINDS** the following facts and

**MAKES** the following conclusions of law, and **ORDERS** that the Plan be **CONFIRMED**.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

   A.     **Findings of Fact and Conclusions of Law**.  The findings and conclusions set

forth herein and in the Objection Order constitute the Court's findings of fact and conclusions of

law related to the confirmation of the Plan, pursuant to Fed. R. Bankr. P. 7052, made applicable

to the proceeding pursuant to Fed. R. Bankr. P. 9014. The procedural history of the Plan,

including the filing and service of the Plan and other confirmation-related documents, is set forth

in the Case Docket and the Objection Order, and is uncontested.  It need not be memorialized

here, and is accepted as fact.  All necessary notice and service of the Plan and other

confirmation-related documents has been properly and sufficiently accomplished upon all parties

entitled to such notice and service.  To the extent any of the following findings of fact constitute

conclusions of law, they are adopted as such.  To the extent any of the following conclusions of

law constitute findings of fact they are adopted as such.

---

[3] All findings of fact and conclusions of law set forth in the Objection Order are incorporated in
the instant Order.

B.     **Incorporation of Declarations**. No objections were raised to the admission of

any declaration, affidavit, or certificate entered into evidence at the Confirmation Hearing.  No

countervailing evidence was offered.  The Court finds these documents to be true and persuasive,

and adopts as a finding of fact the factual statements contained in each.

C.     **Transmittal and Mailing of Materials, Notice.**  The service of the various

documents and materials and the posting of the materials on the website

www.usfbankruptcy.com (the "USF Notice Website") as described in the certificates of services

[Docket Nos. 1108, 1110 and 1114], the affidavit of mailing [Docket No. 1110], and the affidavit

of publication [Docket No. 1120] shall be deemed to have been transmitted and served in

compliance with the solicitation order [Docket No. 1101], the Bankruptcy Rules, and the local

Bankruptcy Rules for the Eastern District of Missouri.  Such transmittal and service was

adequate and sufficient, and no other or further notice is or shall be required.

D.     **Balloting and Acceptances of the Plan.**  The UCC did not solicit votes from

Classes 1, 4, and 12 (because they are deemed to have accepted the Plan under § 1126(f)) or

from Classes 9, 10, and 11 (because they are deemed to reject the Plan under § 1126(g)).   The

outcome of the voting by the remaining classes on the Plan was as follows:

[REMAINDER OF PAGE IS BLANK]

- 3 -

| Class | Accept the Plan | | Reject the Plan | |
|---|---|---|---|---|
| | Dollar Amount Voted/ Percentage of Total Dollar Amount | Number of Votes/ Percentage of Number of Votes | Dollar Amount Voted/ Percentage of Total Dollar Amount | Number of Votes/ Percentage of Number of Votes |
| 2 | $57,974,530.03 /100% | 1 /100% | $0.00 /0% | 0 /0% |
| 3 | $19,999,996.00 /100% | 4 /100% | $0.00 /0% | 0 /0% |
| 5 | $4,851,958.71 /100% | 31 /100% | $0.00 /0% | 0 /0% |
| 6 | $2,062,916,244.00 / 99.9994% | 412,586 / 99.9993% | $12,575.00 / 0.0006% | 3 / 0.0007% |
| 7 | $1,019,428,000.00 / 100% | 30 / 100% | $0.00 / 0% | 0 / 0% |

As a result of the balloting described above, and applying the rules for determining the acceptance or rejection of a plan under § 1126(c), (d), (f), and (g), the Classes voted to accept or reject the Plan as follows:

[REMAINDER OF PAGE IS BLANK]

| Class | Status | Voting Outcome |
|---|---|---|
| 1- Non-Tax Priority Claims | Unimpaired | Deemed to accept |
| 2 - Mepco Claims | Impaired | Accept |
| 3 - Warrantech Claims | Impaired | Accept |
| 4 – WARN Litigation Claims | Unimpaired | Deemed to accept |
| 5 - Trade Claims | Impaired | Accept |
| 6 - Consumer Claims | Impaired | Accept |
| 7 - Subordinated Governmental Fines and Penalties Claims | Impaired | Accept |
| 8- Prestige Claims | Impaired | Did not vote because it withdrew its proof of claim (ECF # 1133) |
| 9 - WARN Litigation Class Exclusion Claims | Impaired | Deemed to reject |
| 10 - Intercompany Claims | Impaired | Deemed to reject |
| 11 - Equity Interests | Impaired | Deemed to reject |
| 12 - Consumer Objectors' Claims | Unimpaired | Deemed to accept |

E.    **Compliance with the Bankruptcy Code.**  Except as noted below, the Plan

satisfies all applicable requirements for confirmation of a plan as set forth in § 1121 *et seq.* of the

Bankruptcy Code.  In particular, the Plan satisfies all applicable requirements for confirmation

contained in § 1129(a) of the Bankruptcy Code, except for the requirement in § 1129(a)(8) of the

Bankruptcy Code that every impaired class shall have voted to accept the Plan.

F.    **Fair and Equitable:  No Unfair Discrimination (11 U.S.C. § 1129(b)).**  Class 9,

Class 10, and Class 11 are deemed to reject the Plan.  Based on the Master Disclosure Statement

of June 5, 2012, the UCC's Confirmation Brief and Response, the Eisenberg Declaration, and the

evidence adduced at the Confirmation Hearing, the Plan does not discriminate unfairly and is fair

and equitable with respect to Classes 9, 10, and 11, as required by § 1129(b)(1) of the

Bankruptcy Code.  Thus, the Plan may be confirmed notwithstanding the failure to satisfy

§ 1129(a)(8) of the Bankruptcy Code.  Upon Confirmation and occurrence of the Effective Date,

the Plan shall be binding on the members of Classes 9, 10, and 11.

G.    **Modifications to the Plan**.  The modifications to the First Amended Plan

[Docket # 1097] do not materially adversely affect or change the treatment of any Claims or

Interests.  The modifications to the Plan that added Class 12 for the Consumer Objectors' Claims

did not adversely affect the treatment of the Consumer Objectors' Claims and included only a

minor alteration to the treatment of Class 5 claims so that the change was so minor that it is not a

materially adverse change.  Accordingly, pursuant to Bankruptcy Rule 3019, such modifications

do not require additional disclosure under § 1125 of the Bankruptcy Code or resolicitation of

votes under § 1126 of the Bankruptcy Code, nor do they require that holders of Claims or

Interests be afforded an opportunity to change previously cast acceptances or rejections of the

Plan, thereby satisfying § 1127 of the Bankruptcy Code.

H.     **Objections**.  All parties have had a full and fair opportunity to litigate all issues raised in any objection, or which might have been raised, and all objections have been fully and fairly litigated.

I.     **No Opt-Out; No Objection to Releases by State Attorney General.**  Neither Mepco nor Warrantech has exercised the Opt-Out rights described in Section 12.2 of the Plan. No State Attorney General objected to the releases described in Article XIII of the Plan.  In fact, twenty-nine State Attorneys General and the Attorney General for the District of Columbia, representing over $ 2 billion in Consumer Claims voted to accept the Plan.

J.     **Qualified Settlement Fund**.  The Consumer Restitution Fund shall be a qualified settlement fund within the meaning of §1.468B-1(c) of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code.

## RELIEF

Therefore, the Court **ORDERS** as follows:

1.     **Confirmation.**  The Plan in the form attached hereto as Exhibit A, Exhibit B, Exhibit C,[4] and Exhibit D (collectively, the "Exhibits") is approved and confirmed under § 1129 of the Bankruptcy Code.  The terms set forth in each of the Exhibits are incorporated by reference into and are an integral part of the Plan as a whole and this Confirmation Order.  In particular, and without limiting the generality of the foregoing, the compromises, settlements, releases, exculpations, and injunctions described in Article XIII of Exhibit A are approved and confirmed.

---

[4] The exhibits attached to Exhibit C (which are voluminous) also are fully incorporated and are available at Docket No. 1129].

- 7 -

2.        **Global Settlement Agreement.**  The Global Settlement Agreement is approved

and upon the occurrence of the Effective Date terms of the Global Settlement Agreement shall be

binding upon the parties in accordance with the terms thereof.  Pursuant to Section 2.1(a)(i)(b) of

the Plan, on the Effective Date, Debtor shall assign to Mepco Finance PM, LLC all of its right,

title and interest in and to the Sale and Purchase Agreement with Darain and Mia Atkinson dated

November 30, 2010 for the Caymans House, and Darain and Mia Atkinson shall transfer to

Mepco Finance PM, LLC all of their right, title and interest in and to the Caymans House.

3.        **Objections**.  As of the date of the Confirmation Hearing, only the High

Objector's objection remained pending.  It was overruled as set forth in the Objection Order.  All

other objections are or were waived, settled, untimely or otherwise unmeritorious.

4.        **Bar Dates for Certain Claims.**

(a)        As previously ordered in the Solicitation Order, October 5, 2012 shall be

fixed as the final date for filing Consumer Claims.  All Consumer Claims shall be filed in

accordance with the procedures and processes approved in the Solicitation Order.

(b)        All Holders of Claims arising as a result of the rejection of a prepetition

executory contract or unexpired lease hereunder shall File with the Bankruptcy Court proofs of

Claim on or before (30) days after the Effective Date or forever be barred from doing so;

(c)        All Holders of asserted Administrative Claims, except for Professional Fee

Claims, not paid prior to the Confirmation Date shall File with the Bankruptcy Court an

application for allowance of an administrative expense claims or before thirty (30) days after the

Confirmation Date.  or forever be barred from doing so; and

(d)        All Professionals and other entities requesting compensation or

reimbursement of Professional Fee Claims pursuant to section 327, 328, 330, 331, or 503(b) of

the Bankruptcy Code for services rendered prior to the Effective Date shall File with the

Bankruptcy Court an application for final allowance of compensation and reimbursement of

expenses no later than thirty (30) days after the Effective Date, or forever be barred from doing

so.

5.      **Confidentiality Provisions.**  Any documents provided to the Consumer Restitution

Fund, its agents, any Office of the Attorney General or any member of the Consumer Restitution

Fund Advisory Committee that contains personally identifiable information as defined in 11 U.S.C.

§ 101(41A), (41B) shall be treated as confidential and not subject to public disclosure under state

and federal laws.   The Consumer Restitution Fund, its agents, any Office of the Attorney General

or any member of the Consumer Restitution Fund Advisory Committee that possesses personally

identifiable information made confidential and privileged shall not delete information from a

document so as to permit its disclosure.  Consumers' personally identifiable information,

however, may be disclosed to the obligor, the Administrator, or the financing company associated

with the Consumer's Vehicle Service Contract for the purpose of determining the Consumer's

claim value.  Consumers' personally identifiable information related to a Consumer Claim may

also be disclosed to an obligor if the Consumer Restitution Advisory Committee determines the

obligor has potential liability for a Consumer Claim.  Notwithstanding anything in the foregoing

to the contrary, the Consumer Restitution Fund shall disclose documents in response to a valid

subpoena and upon the request of a member of the Consumer Restitution Advisory Committee.

6.      **Releases, Exculpations and Injunctions.**  Pursuant to applicable law, the

releases, exculpations and injunctions set forth in the Plan and implemented in this Order shall be

and hereby are approved as proper, lawful and permissible.  They are an integral part of the Plan

and as fair, equitable, reasonable and in the best interests of the Debtor, the Estate and the

holders of Claims.  The releases, exculpations and injunctions set forth in the Plan and

implemented in this Order shall be and hereby are effective, binding and enforceable in

accordance with their terms against and upon all persons and entities who may have had standing

to assert such claims or causes of action against any of the parties protected by the releases,

exculpations or injunctions.  Notwithstanding the foregoing, the releases, exculpations, and

injunctions with respect to Mepco contained in the Plan do not apply to the High Objectors

(Jackie High, Loretta Alva, and Travis Peavy).

7. **Notice of Entry of Confirmation Order.**  On or before the fourth (4th) business

day following the date of the entry of this Confirmation Order, the UCC shall (a) serve notice of

entry of this Confirmation Order (which, in the UCC's discretion, may be combined with the

Notice of Effective Date) (the "Confirmation Notice") pursuant to Bankruptcy Rule 2002(f)(7),

2002(k), and 3020(c) by mail on all holders of all Non-Consumer Claims, the United States

Trustee, and any other parties-in-interest entering their appearance in the Court's ECF Notice

System, (b) cause the Confirmation Notice to be published on the USF Notice Website, and (c)

cause the Notice of Confirmation to be published in the *St. Louis Daily Record*.

8. **Immediate Effectiveness.**  Notwithstanding the possible applicability of

Bankruptcy Rule 6004(h), 7062, and 9014, the terms and provisions of the Confirmation Order

shall be immediately effective and enforceable upon its entry, and shall become effective

immediately upon occurrence of the Effective Date.  The Bankruptcy Court shall retain

jurisdiction with respect to all matters arising from or related to the implementation of this

Confirmation Order.

Further, the Court **ORDERS** the UCC to serve a copy of this Order upon all parties

entitled to such service, and to file a Certificate of Service evidencing such service within four

(4) business days.


DATED:  August 28, 2012                        CHARLES E. RENDLEN
St. Louis, Missouri 63102                      U.S. Bankruptcy Judge
mtc

# EXHIBIT A

# PART I
# OF THE CONFIRMED
# PLAN OF LIQUIDATION:

# THE FIRST AMENDED PLAN, AS
# MODIFIED ON JULY 13, 2012

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| US FIDELIS, INC., | ) | Hon. Charles E. Rendlen, III |
| | ) | |
| Debtor. | ) | Case No. 10-41902 |
| | ) | |

**FIRST AMENDED PLAN OF LIQUIDATION FOR US FIDELIS, INC.
DATED JUNE 5, 2012 PROPOSED BY THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS (AS MODIFIED)**

THOMPSON COBURN LLP

By: _/s/ David A. Warfield_
    David A. Warfield, 34288MO
    dwarfield@thompsoncoburn.com
    Brian W. Hockett, 52984MO
    bhockett@thompsoncoburn.com
    One US Bank Plaza, Suite 2600
    St. Louis, MO 63101
    Telephone: (314) 552-6000
    Telecopier: (314-552-7000

    Attorneys for the Official Unsecured Creditors
    Committee

**INTRODUCTION**

US Fidelis, Inc., formerly known as National Auto Warranty Services, Inc., d/b/a Dealer Services, NAWS, and Big Time Productions (the "Debtor"), is the debtor and debtor-in-possession in the above-captioned chapter 11 case. The Official Committee of Unsecured Creditors appointed in the above-captioned chapter 11 case pursuant to section 1102 of the Bankruptcy Code (the "Creditors Committee") hereby proposes the following plan of liquidation for the resolution of the outstanding Claims against and Interests in the Debtor pursuant to section 1121(a) of the Bankruptcy Code. Reference is made to the Disclosure Statement (as that term is defined herein), distributed contemporaneously herewith, for a discussion of the Debtor's history, business properties and operations, a summary and analysis of the Plan, and certain related matters. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Fed. R. Bankr. P. 3019, the Creditors Committee reserves the right to alter, amend, modify, revoke or withdraw the Plan prior to the Confirmation Date (as that term is defined herein).

**ARTICLE I**

DEFINED TERMS AND RULES OF INTERPRETATION

As used herein, capitalized terms shall have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1.     ***Administrative Claim*** means a Claim for costs and expenses of administration of the Chapter 11 Case Allowed under section 503(b) or 507(a)(2) of the Bankruptcy Code, including: (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Debtor's Estate and operating the business of the Debtor (such as wages, salaries, commissions for services and payments for inventories, leased equipment and premises) and Claims of governmental units for taxes; (b) compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 330, 331 or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date; and (c) all fees and charges assessed against the Debtor's Estate under section 1930, chapter 123 of title 28, United States Code.

1.2.     ***Affiliates*** means the Atkinsons, AGI Administration Services, Inc., Association of Service Contract Administrators, Atkinson Construction, Inc., Atkinson Group of Companies, Inc., Atkinson Realty, LLC, the Reinsurance Companies, Crescent, DS Direct, Inc., DC Atkinson Realty, LLC, Exodus LLC, Huge LLC, US Fidelis Administration Services, Inc., US Fidelis Insurance Risk Retention Group, Inc., and Wentzville International Speedway, Inc.

1.3.     ***Allowed . . . Claim*** means an Allowed Claim in the Class or category specified. Any reference herein to a particular Allowed Claim includes both the secured and unsecured portions of such Claim.

1.4.    ***Allowed Claim*** means (a) any Claim for which a proof of claim has been timely Filed by the applicable Bar Date (or which pursuant to the Bankruptcy Code or a Final Order is not or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as of the Effective Date as not disputed, not contingent, and not unliquidated, and for which no proof of claim has been timely Filed; or (c) any Claim allowed pursuant to the Plan; *provided, however*, that with respect to any Claim in clauses (a) or (b) above, such Claim shall be considered Allowed only if and to the extent that (a) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (b) such an objection is so interposed and the Claim shall have been Allowed for Distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as disputed, contingent, or unliquidated, and for which no proof of claim has been timely Filed is not considered Allowed and shall be expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

1.5.    ***Atkinsons*** means collectively Darain E. Atkinson, Mia Atkinson, Cory C. Atkinson, and Heather Atkinson, and their respective heirs, successors and assigns.

1.6.    ***Atkinsons Settlement Order*** means that certain Order Granting the Settlement Motion entered by the Bankruptcy Court on October 22, 2010 where the Bankruptcy Court approved the Darain and Mia Atkinson Settlement Agreement and the Cory and Heather Atkinson Settlement Agreement.

1.7.    ***Attorney General – Debtor Actions*** means litigation commenced by the Litigating States against the Debtor and other non-Debtors related to the Debtor's business.

1.8.    ***Attorney General Executive Committee*** means a committee comprised of representatives of the Attorneys General for the following states: Ohio, Texas, and Washington.

1.9.    ***Attorney General Steering Committee*** means a committee comprised of representatives of the Attorneys General for the Attorney General Executive Committee and the state of Missouri.

1.10.    ***Authorized Telemarketer*** means a business or other entity that is not an Affiliate of Warrantech, which Warrantech has authorized to conduct telemarketing on Warrantech's behalf and/or which Warrantech has authorized to sell Vehicle Service Contracts on its behalf, in connection with the offer or sale of Vehicle Service Contracts to consumers that have no pre-existing relationship with the Authorized Telemarketer. A pre-existing relationship is not created when an Authorized Telemarketer sells a Vehicle Service Contract to a consumer. Authorized Telemarketer does not include: (a) a business or other entity that acts as a motor vehicle wholesaler, manufacturer, dealer or seller; (b) an Original Equipment Manufacturer; (c) a business or other entity that offers or provides a Vehicle Service Contract to its members, employees, customers, or clients in connection with another transaction, service, or benefit; and (d) a business or other entity with an established business relationship with a consumer other than a relationship based solely on the offer or sale of a Vehicle Service Contract.

1.11.    ***Available Cash*** means unrestricted Cash or other immediately available funds owned by the Debtor, the Estate, or the Liquidating Trust, as the case may be.

1.12.   ***Avoidance Actions*** means any claims belonging to the Debtor or the Estate arising under sections 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code.

1.13.   ***Ballot*** means each of the ballot form or forms distributed to each Holder of a Claim in a Voting Class, on which the Holder is to indicate acceptance or rejection of the Plan.

1.14.   ***Bankruptcy Code*** means title 11, United States Code, as now in effect or hereafter amended, as to be applicable to this Chapter 11 Case.

1.15.   ***Bankruptcy Court*** means the United States Bankruptcy Court for the Eastern District of Missouri.

1.16.   ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern District of Missouri, as now in effect or hereafter amended, as to be applicable to this Chapter 11 Case.

1.17.   ***Bar Date*** means the applicable deadline by which a proof of claim must have been or must be Filed, as established by an order of the Bankruptcy Court, including the Bar Date Order (Non-Consumer) and the Consumer Class Proof of Claims Order.  The term "Bar Date" also includes the deadline for Filing Administrative and Professional Fee Claims established pursuant to Section 15.4(a) and (b) of the Plan respectively, and the deadline for Filing Claims arising from rejection of executory contracts and unexpired leases established pursuant to Article X of the Plan.

1.18.   **Bar Date Order (Non-Consumer)** means the Order Granting Joint Motion To Establish Trade Claim Bar Date And Approve Trade Claim Bar Date Notice (Docket No. 419) entered by the Bankruptcy Court on October 7, 2010.

1.19.   ***Business Day*** means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.20.   ***CARRG*** means the Capital Assurance Risk Retention Group acting by or through its Receiver appointed by the court of Common Pleas of the Fifth Judicial Circuit in Richland County, South Carolina.

1.21.   ***Cash*** means legal tender of the United States of America and equivalents thereof.

1.22.   ***Caymans House*** means the real and personal property owned by Darain and Mia Atkinson, located at 414 Water Kai Road in the Rum Point area of Grand Cayman Island that is subject to a Sale and Purchase Agreement with Debtor dated November 30, 2010.

1.23.   ***Chapter 11 Case*** means the chapter 11 case pending for the Debtor in the Bankruptcy Court as Case No. 10-41902.

1.24.    ***Claim(s)*** means a "claim," as defined in section 101(5) of the Bankruptcy Code.

1.25.    ***Claims Objection Deadline*** means the last day for Filing objections to Non-Consumer Claims against the Debtor, which day shall be the later of thirty (30) days after the Effective Date or 30 days after the Bar Date applicable to a particular Claim.

1.26.    ***Class*** means a category of Holders of Claims or Interests, as described in Article V of the Plan.

1.27.    ***Committee-Atkinsons Litigation*** means that certain litigation filed by the Committee against the Atkinsons *et al*. in the Bankruptcy Court and pending as Adv. Proc. No. 10-04172.

1.28.    ***Committee-Mepco Subordination Litigation*** means litigation commenced by the Creditors Committee against Mepco seeking *inter alia* the equitable subordination of the Mepco Claims which is pending as Adv. Proc. No. 11-04308.

1.29.    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court for the Chapter 11 Case.

1.30.    ***Confirmation Hearing*** means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.31.    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.32.    ***Consumer*** means a Person (a) that purchased, entered into or was solicited to purchase or enter into a Vehicle Service Contract (a defined term at Section 1.120) from or through the Debtor or an Affiliate, or (b) to whom the Debtor or an Affiliate marketed, offered, contacted, solicited or attempted to sell a Vehicle Service Contract.

1.32a    ***Consumer Objectors*** means Jackie L. High, Loretta Alva, Travis Peavy, and Robert Schulz.

1.33.    ***Consumer Class Proofs of Claim*** means those class Proofs of Claims for Consumer Claims filed by certain of the States Attorneys General on behalf of the Consumers.

1.34.    ***Consumer Class Proof of Claims Order*** means that certain Order entered by the Bankruptcy Court permitting the States Attorneys General to file the Consumer Class Proofs of Claim for voting purposes.

1.35.    ***Consumer Claims*** means any and all Claims held by a Consumer:

(a)　　that arise out of or relate to a Vehicle Service Contract purchased or entered into by a Consumer from or through the Debtor or an Affiliate, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim;

(b)　　that arise out of or relate to the actions and conduct of the Debtor or an Affiliate in soliciting, marketing or contacting a Person to purchase or enter into a Vehicle Service Contract, whether or not the Person purchased a Vehicle Service Contract, and whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to the such Claim;

(c)　　that arise out of or relate to the actions and conduct of the Debtor or an Affiliate in refunding all or a portion of the consideration paid for Vehicle Service Contracts purchased from or through the Debtor or an Affiliate, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim;

(d)　　that arise out of or relate to the actions and conduct of the Debtor or an Affiliate with regard to a Consumer Payment Plan sold or offered to a Consumer by the Debtor or an Affiliate, including but not limited to the statements, representations or disclosures made to a Consumer by the Debtor or an Affiliate, and the servicing or the termination of the Consumer Payment Plan, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim;

(e)　　that arise out of or relate to the actions and conduct of the Debtor or an Affiliate with regard to the termination of a Vehicle Service Contract purchased or entered into by a Consumer from or through the Debtor or an Affiliate, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim; and

(f)　　for or arising from: (i) violations of consumer protection statutes, regulations or codes by the Debtor or Affiliates; (ii) unfair and deceptive practices in the sale and marketing of Vehicle Service Contracts by the Debtor or an Affiliate or the Debtor's agents[1]; (iii) violations of state or federal telemarketing laws and regulations by the Debtor, an Affiliate, or the Debtor's agents; (iv) violations of state or federal automatic dialing, "Do Not Call" and announcing device laws and regulations by the Debtor, an Affiliate, or the Debtor's agents; (v) violations of business registration laws by the Debtor or an Affiliate; (vi) violations of the Drivers' Privacy Protection Act by the Debtor or an Affiliate; (vii) unfair and deceptive refund practices by the Debtor or an Affiliate; (viii) aiding or abetting or providing substantial assistance or support by Warrantech or Mepco to the Debtor or an Affiliate with respect to any of the foregoing; or (ix) Warrantech or Mepco consciously, intentionally, or negligently avoiding knowing of the telemarketing practices of the Debtor or an Affiliate, and as to each of the foregoing whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim.

**The foregoing definition includes all Consumer Claims, whether asserted by an individual Consumer or on behalf of one or more Consumers by any other Person in any litigation, class action, arbitration or administrative proceeding.**

---

[1] "Agent" does not include an administrator, including but not limited to Tier One Warranty, LLC.

1.35a    ***Consumer Objectors' Claims*** means the Claims of the Consumer Objectors, which shall be deemed Allowed Claims in the following amounts: Jackie L. High in the amount of $2,923.02; Loretta Alva in the amount of $2,600.00; Travis Peavy in the amount of $2,323.00; and Robert Schulz in the amount of 3,359.00.

1.36.    ***Consumer Payment Plan*** means a contract between a Consumer and a third party pursuant to which the Consumer agreed to pay the purchase price of a Vehicle Service Contract over a period of time and in installments as set forth in the payment plan.

1.37.    ***Consumer Restitution Fund*** means the fund established pursuant to Section 8.2 of the Plan and the Consumer Restitution Fund Agreement.

1.38.    ***Consumer Fund Advisory Committee*** means the committee composed of States Attorneys General as established by the Attorney General Executive Committee pursuant to Section 8.2(e) of the Plan to supervise and direct the Consumer Restitution Escrow Agent.

1.39.    ***Consumer Restitution Fund Agreement*** means the agreement between and among the Debtor and the Attorney General Steering Committee, specifying the rights, duties and responsibilities of the Consumer Restitution Escrow Agent under the Plan, in substantially the form set forth in the Plan Supplement.

1.40.    ***Consumer Restitution Fund Assets*** means the assets listed in Section 8.2(b) and (c).

1.41.    ***Consumer Restitution Fund Distribution Procedures*** means the procedures for liquidating Consumer Claims and distributing funds from the Consumer Restitution Fund

1.42.    ***Consumer Restitution Escrow Agent*** means the Person(s) to serve as the custodian and claims administrator for the Consumer Restitution Fund pursuant to Section 8.2(d) or such successor as appointed pursuant to the Consumer Restitution Fund Agreement.

1.43.    ***Cory and Heather Atkinson Settlement Agreement*** means that certain Settlement Agreement dated September 29, 2010 which was approved by the Bankruptcy Court in the Atkinsons Settlement Order.

1.44.    ***Creditor*** means the Holder of a Claim against the Debtor.

1.45.    ***Creditors Committee*** has the meaning ascribed to it in the Introduction hereto.

1.46.    ***Crescent*** means Crescent Manufacturing Company, L.L.C., a limited liability company organized under and existing by virtue of the laws of Missouri and regularly referred to as Crescent Manufacturing Company and Crescent Manufacturing, LLC.

1.47.    ***Darain and Mia Atkinson Settlement Agreement*** means that Amended and Restated Settlement Agreement dated October 19, 2010 which was approved by the Bankruptcy Court in the Atkinsons Settlement Order.

1.48.   ***Debtor*** has the meaning ascribed to it in the Introduction hereto.

1.49.   ***Disallowed Claim*** means a Claim, or any portion thereof, that (a) has been disallowed by Final Order, (b) is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no proof of claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) is not Scheduled and as to which a Bar Date has been established but no proof of claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

1.50.   ***Disclosure Statement*** means the written disclosure statement (including all schedules thereto or referenced therein) that relates to the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented.

1.51.   ***Disputed . . .Claim*** means a Disputed Claim in the Class or category specified.

1.52.   ***Disputed Claim*** means any Claim, or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim.

1.53.   ***DS Direct*** means DS Direct, Inc.

1.54.   ***ECHO Merchant Agreement*** means that certain Merchant Bank Card Agreement and/or ACH Services Agreement dated July 21, 2004 by and between First Regional Bank and Electronic Clearing House, Inc. and National Auto Warranty Services, Inc.

1.55.   ***ECHO Reserve Account*** mean (a) that certain Reserve Account maintained by First Citizens Bank & Trust Company in the name of the Debtor at WestAmerica Bank pursuant to the ECHO Merchant Agreement and (b) the Debtor's Account at US Bank into which funds released from the WestAmerica Bank Reserve Account are held pursuant to and in accordance with the ECHO Settlement Order.

1.56.   ***ECHO Settlement Order*** means that certain Order entered by the Bankruptcy Court on September 30, 2010 in Adversary Proceeding No. 10-04223 approving the Agreement of Settlement and Release dated September 29, 2010 by and among the Debtor, First Citizens Bank and Trust Company, Intuit, Inc., and Electronic Clearing House, Inc.

1.57.   ***Effective Date*** means the Business Day upon which the Plan becomes effective as provided in Article XII of the Plan.

1.58.   ***Estate*** means the estate of the Debtor created under section 541 of the Bankruptcy Code.

1.59.   ***Face Amount*** means (a) when used in reference to a Disputed or Disallowed Claim, the full stated amount claimed by the Claim Holder in any proof of claim

timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of
the Bankruptcy Court or other applicable bankruptcy law, and (b) when used in reference to an
Allowed Claim, the allowed amount of such claim.

      1.60.    ***File, Filed or Filing*** means file, filed or filing with the Bankruptcy Court
or its authorized designee in the Chapter 11 Case.

      1.61.    ***Final Order*** means an order or judgment of the Bankruptcy Court, or
other court of competent jurisdiction, as entered on the docket in the Chapter 11 Case, the
operation or effect of which has not been stayed, reversed, or amended and as to which order or
judgment (or any revision, modification, or amendment thereof) the time to appeal or seek
review or rehearing has expired and as to which no appeal or petition for review or rehearing was
filed or, if filed, remains pending; *provided, however*, that the possibility that a motion under
section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil
Procedure or any analogous rule may be, but has not been, filed shall not cause an order not to be
a Final Order.

      1.62.    ***Global Settlement Agreement*** means that certain Global Settlement
Agreement by and among the Debtor, the Creditors Committee, Mepco, Warrantech, the WARN
Litigation Class Claimants, and the Attorney General Steering Committee, as may be amended,
together with all exhibits annexed thereto setting forth the compromise and settlement of various
issues among the parties thereto, a copy of which will be Filed as part of the Plan Supplement.

      1.63.    ***Governmental Fines and Penalties Claims*** means Claims against the
Debtor held by a Governmental Unit that are in the nature of fines or penalties and are not
compensation for any actual pecuniary loss suffered by such Governmental Unit.

      1.64.    ***Governmental Unit*** shall have the same meaning as set forth in section
101(27) of the Bankruptcy Code.

      1.65.    ***Holder*** means the Person holding the beneficial interest in a Claim or
Interest.

      1.66.    ***Impaired*** means, when used in reference to a Claim or Interest, a Claim or
Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code,

      1.67.    ***Individual Consumer Proofs of Claim*** means all of those proofs of claim
Filed in the Chapter 11 Case by Consumers or private class action attorneys on behalf of
Consumers.  For avoidance of doubt, the term "Individual Consumer Proofs of Claim" shall
include the Proof of Claims filed by David O. Rucker (Claim #508) on behalf of a purported
class of Consumers.

      1.68.    ***Intercompany Claims*** means a Claim asserted by any one of the Affiliates
against the Debtor.

      1.69.    ***Interest*** means the legal, equitable, contractual and other rights of the
Holders of equity interests in the Debtor.

1.70.    ***Internal Revenue Code*** means the Internal Revenue Code of 1986, as amended.

1.71.    ***Later Monetized Assets*** means any Cash proceeds realized from the post-Effective Date sale, lease or liquidation of any of the Liquidating Trust Assets (including Litigation Claims but excluding the Malpractice Claim).

1.72.    ***Later Monetized Asset Distribution*** means the Distribution to Creditors of the Cash proceeds of the Later Monetized Assets in the following order: (a) reimbursement of all fees and expense incurred in investigating, pursuing, monetizing and collecting the Later Monetized Assets, (b) next, sufficient Cash to the Liquidating Trust so that the Trade Creditors will receive (together with all other amounts) a Distribution of not less than 31% of their Allowed Claims, and (c) finally, any remaining amounts to be split one-third to the Consumer Restitution Fund, one-third to the Liquidating Trust, and one-third to Mepco.

1.73.    ***Liquidating Trust*** means the trust established pursuant to Section 8.3 of the Plan and the Liquidating Trust Agreement to hold the Liquidating Trust Assets and make distributions to holders of Allowed Claims, other than Holders of Consumer Claims.

1.74.    ***Liquidating Trust Agreement*** means the agreement between and among the Debtor and the Liquidating Trustee, in form and substance acceptable to the Creditors Committee specifying the rights, duties and responsibilities of and to be performed by the Liquidating Trustee under the Plan, in substantially the form set forth in the Plan Supplement; *provided*, that after the Effective Date, any modifications made to the Liquidating Trust Agreement shall be in form and substance acceptable to the Liquidating Trustee.

1.75.    ***Liquidating Trust Assets*** means all assets of the Debtor or the Estate remaining after payment by the Debtor of all Allowed Unclassified Claims, the Mepco Postpetition Claim, the Mepco Prepetition Claims, the WARN Litigation Class Claim, and funding of the Debtor's obligations to contribute to the Consumer Restitution Fund, to be transferred by the Debtor under this Plan into the Liquidating Trust.

1.76.    ***Liquidating Trust Professionals*** means the agents, financial advisors, attorneys, consultants, independent contractors, representatives and other professionals of the Liquidating Trustee (in their capacities as such).

1.77.    ***Liquidating Trustee*** means the Person designated by the Creditors Committee, after consultation with the Debtor, prior to the Confirmation Date and approved by the Bankruptcy Court pursuant to the Confirmation Order to administer the Plan in accordance with the terms of the Plan and the Liquidating Trust Agreement and to take such other actions as may be authorized under the Liquidating Trust Agreement, and any successor thereto.

1.78.    ***Litigating States*** means those states or districts whose States Attorneys General have sued the Debtor or otherwise taken action against the Debtor, comprised of the following states: Arkansas, Iowa, Idaho, Kansas, Maryland, Missouri, North Carolina, Ohio, Oregon, Pennsylvania, Texas, Washington and Wisconsin.

1.79.   ***Litigating States-Debtor Consent Judgments*** means consent judgments between each of the Litigating States and the Debtor, copies of which will be included in the Plan Supplement and which will contain prospective injunctive relief, restitution to be paid in accordance with the terms of the Plan and the Global Settlement Agreement, and fines and penalties to be treated in accordance with the Plan.

1.80.   ***Litigation Claims*** means the Claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that the Debtor or Estate may hold against any Person, including, but not limited to, (a) any claims, rights of action, suits or proceedings of the Debtor or the Estate arising or arising under or resulting from contractual subordination, application of section 510(b) of the Bankruptcy Code, or existing under any other applicable law, (b) the Avoidance Actions, (c) all causes of action against the Debtor's current and former officers, directors, employees, shareholders or professionals under section 1123(b)(3) of the Bankruptcy Code related to conduct in connection with the Debtor prior to or after the Petition Date, but excluding the Malpractice Claim.  Notwithstanding the foregoing, and for the avoidance of doubt, the term "Litigation Claims" does not include the Committee-Mepco Subordination Litigation, which will be dismissed by the Creditors Committee on the Effective Date, or any other claims, demands or rights of action that the Debtor will be deemed under the Plan or the Global Settlement Agreement to have released on the occurrence of the Effective Date.

1.81.   ***Malpractice Claim*** means the claims held by the Debtor to be transferred to the Liquidating Trust on the Effective Date for any of the following:  (a) malpractice or professional negligence committed by any attorneys retained by the Debtor before or after the Petition Date; and (b) the value of any reduction in attorneys' fees to by paid by the Estate to a Professional retained by the Debtor, as is subsequently agreed to by such attorneys in resolution of any claim described in part (i) of this section or ordered by the Bankruptcy Court; and (c) the value of any attorneys' fees previously paid by the Estate to a attorneys retained by the Debtor that are subsequently disgorged and recovered by the Liquidating Trust, as is subsequently agreed to by such attorneys in resolution of any claim described in part (i) of this section or ordered by the Bankruptcy Court.

1.82.   ***Malpractice Claim Distribution*** means the Distribution to Creditors of the recoveries on account of the Malpractice Claim in the following order: (a) reimbursement of all fees and expenses incurred in investigating, pursuing, monetizing and collecting the Malpractice Claim recovery, and (b) the remaining recoveries on account of the Malpractice Claim shall be Distributed one-half to the Consumer Restitution Fund and one-half to the Liquidating Trust.

1.83.   ***Mepco*** means Mepco Finance Corporation.

1.84.   ***Mepco Claims*** means all Claims against the held or asserted by Mepco against the Debtor, whether Filed in a proof of claim or otherwise, including the Mepco Postpetition Claim, the Mepco Prepetition Secured Claim, the Claims against the Debtor represented by the Mepco Proof of Claim or the Committee-Mepco Subordination Litigation.

1.85.   ***Mepco's Notice Reimbursement Obligations***.  Within five Business Days after approval of the Disclosure Statement, Mepco shall pay to the Debtor Cash in the amount of

$132,000 to be segregated and used by the Debtor to pay Noticing Costs.  In the event that Noticing Costs are less than $368,000, then the Debtor shall refund the entire $132,000 amount to Mepco by no later than 30 days following the Effective Date.  In the event that the Notice Costs are more than $368,000 but less than $500,000, then the Debtor shall refund to Mepco by no later than 30 days following the Effective Date, the difference between $500,000 and the actual amount of the Noticing Costs. Mepco may elect to satisfy Mepco's Noticing Reimbursement Obligations by directing the Debtor to reduce the amount of Mepco's Prepetition Secured Claim by $132,000.

1.86.   ***Mepco Postpetition Claim*** means the Allowed Claim held by Mepco in the amount of $1,380,594.63 arising out of the Debtor's postpetition use of cash collateral in which Mepco held an interest and for which Mepco did not receive adequate protection.

1.87.   ***Mepco Prepetition Secured Claim*** means the Allowed Claim by Mepco in the amount of $225,465.09 which represents that portion of the Mepco Proof of Claim that is secured by a lien pursuant to Section 506(a) of the Bankruptcy Code.

1.88.   ***Mepco Proof of Claim*** means that proof of claim Filed by Mepco on November 3, 2010 and denominated by the Bankruptcy Court as Claim No. 832 in the amount of $57,974,530.03, as may heretofore or hereafter be amended.

1.89.   ***Mepco Released Parties*** means Mepco, its parent, its subsidiaries, successors, predecessors, attorneys, employees, agents, assigns, directors, officers and shareholders.

1.90.   ***Mepco Unsecured Claims*** means that portion of the Mepco Claims that are not comprised of the (a) Mepco Postpetition Claim and (b) the Mepco Prepetition Secured Claim.

1.91.   ***Mepco Unsecured Claim Distribution*** means the Distribution to Mepco from the Liquidating Trust on account of the Mepco Unsecured Claim consisting of all amounts remaining in the Liquidating Trust after payment of (a) all Unclassified Claims, (b) all Allowed Non-Tax Priority Claims, (c) the Mepco Postpetition Claim (d) the Mepco Prepetition Secured Claim, (d) the amounts due under the WARN Litigation Class Settlement Order, (e) funding the Consumer Restitution Fund, (f) all Allowed Class 5, Class 7, and Class 8 Claims, and (g) payment of all expenses of the Liquidating Trust.

1.92.   ***Non-Consumer Claim*** means a Claim held by anyone other than a Consumer, which shall include but not necessarily be limited to Claims held by Mepco, Warrantech, the WARN Litigation Class Claimants, holders of WARN Litigation Class Exclusion Claims, Trade Creditors, Prestige, the Affiliates and Governmental Units on account of Governmental Fines and Penalties Claims.

1.93.   ***Non-Tax Priority Claim*** means a Claim, other than an Unclassified Claim or the WARN Litigation Class Claims, that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

1.94.    **Notice Agent** means GCG, Inc. or any successor or replacement approved by the Bankruptcy Court.

1.95.    **Noticing Costs** means all costs incurred by the Committee and/or the Debtor in connection with establishing and maintaining the USF Notice Website, mailing notice of the Plan to Consumers pursuant to the Solicitation Order, tabulating ballots submitted by Consumers in connection with the Plan, publishing a notice of the Confirmation Hearing in the *USA Today*, and responding to telephone inquiries from Consumers before the Confirmation Hearing.  For the avoidance of doubt, the term "Noticing Costs" does not include any amounts charged by the Notice Agent in connection with the submission and evaluation of Individual Consumer Proofs of Claim.

1.96.    **Opt-Out Right** means the right of Mepco and/or Warrantech to opt out of the Plan, as described in more detail in Section 12.2 of the Plan.

1.97.    **Person** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

1.98.    **Petition Date** means March 1, 2010, the date on which the Debtor Filed the petition for relief commencing the Chapter 11 Case.

1.99.    **Plan** means this first amended chapter 11 plan of liquidation, including the Plan Supplement and all supplements, appendices and schedules thereto, either in its present form or as the same may be altered, amended or modified from time to time; *provided*, that each of the documents referenced in this definition shall be in form and substance reasonably acceptable to the Creditors Committee.

1.100.   **Plan Supplement** means the forms of documents specified in Section 15.9 of the Plan, which documents shall be in form and substance reasonably acceptable to the Creditors Committee, Mepco, Warrantech, and the Attorney General Steering Committee and such additional documents and disclosures referenced herein as being included in the Plan Supplement; *provided*, that after the Effective Date, any modifications made to any of the documents specified in Section 15.9 of the Plan shall be in form and substance reasonably acceptable to the parties thereto, and to the Liquidating Trustee and the Consumer Restitution Fund Advisory Committee, as applicable.

1.101.   **Prestige** means Prestige Administration, Inc.

1.102.   **Prestige Claims** means all Claims held by Prestige against the Debtor.

1.103.   **Priority Tax Claim** means a Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.104.   **Professional** means (a) any professional employed in the Chapter 11 Case pursuant to section 327 or 1103 of the Bankruptcy Code or otherwise , (b) any professional or other Person seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code, and (c) any professional retained

by the Liquidating Trustee following the Effective Date.  For the avoidance of doubt, the term "Professional" shall include Amherst Partners LLC and Scott A. Eisenberg, acting in his capacity as Chief Restructuring Officer of the Debtor.

1.105.  ***Professional Fee Claim*** means an Administrative Claim under section 330(a), 331 or 503 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Case on or prior to the Effective Date (including expenses of the members of the Creditors Committee incurred as members of the Creditors Committee in discharge of their duties as such).

1.106.  ***Pro Rata*** means, with respect to Claims, at any time, the proportion of the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes, unless the Plan provides otherwise.

1.107.  ***Reinsurance Companies*** means Atkinson Reinsurance, Ltd. and Atkinson II Reinsurance, Ltd.

1.108.  ***Released Parties*** means those Persons who are receiving releases pursuant to Article XIII of the Plan and/or the Global Settlement Agreement.

1.109.  ***Releases*** means those certain liability releases set forth in the Global Settlement Agreement and in Article XIII of the Plan.

1.110.  ***Scheduled*** means with respect to any Claim or Interest, the status and amount, if any, of such Claim or Interest as set forth in the Schedules.

1.111.  ***Schedules*** means the schedules of assets and liabilities, the list of Holders of Interests and the statements of financial affairs Filed by the Debtor on the Petition Date, as such schedules have been or may be further modified, amended or supplemented in accordance with Fed. R. Bankr. P. 1009 or orders of the Bankruptcy Court.

1.112.  **Solicitation Order** means Order (A) Approving Plan Summary; (B) Establishing Procedures For Solicitation and Tabulation of Voting On Proposed Joint Chapter 11 Plan, Approving Ballots and Consumer Proof of Claim Form, Establishing Final Date to File Consumer Proofs of Claim and Establishing Voting Deadline to Accept Or Reject Plan; (C) Scheduling Hearing On Confirmation of Proposed Joint Chapter 11 Plan; and (D) Granting Certain Related Relief entered by the Bankruptcy Court on or about June 5, 2012.

1.113.  ***State Attorneys Generals*** means the Attorney General for each of the 50 states and includes the attorney general, or similar government official or Person, with the authority to enforce consumer protection statutes on behalf of residents of any state, the District of Columbia, Puerto Rico and/or any United States Territory.

1.114.  ***Subordinated Governmental Fines and Penalties Claims*** means Governmental Fines and Penalties Claims that are subordinated by the Plan in priority of Distribution to payment in full of all Allowed Trade Claims.

1.115.  **Trade Claim** means a Claim against the Debtor, other than an Unclassified Claim, a Consumer Claim, a Non-Tax Priority Claim, a WARN Litigation Claim, a WARN Litigation Class Exclusion Claim, a Mepco Claim, a Warrantech Claim, a Subordinated Governmental Fines and Penalties Claim, the Prestige Claims, or an Intercompany Claim.

1.116.  **Trade Creditor** means the Holder of a Trade Claim.

1.117.  **Unclassified Claims** means all Claims described in section 1123(a)(1) of the Bankruptcy Code.

1.118.  **Unimpaired** means, when used in reference to a Claim or Interest, a Claim or Interest that is not Impaired.

1.119.  **USF Notice Website** means the website at www.usfbankruptcy.com which will be used to post relevant documents necessary or helpful for Creditors and others interested in the Plan.

1.120.  **Vehicle Service Contract** means a contract or agreement offered by the Debtor or one of the Affiliates (a) that contains a separately stated consideration for a specific duration to perform the repair, replacement or maintenance of a motor vehicle and includes vehicle protection products, commonly referred to as product warranties; or (b) that provides indemnification for repair, replacement or maintenance of a motor vehicle due to an operational or structural defect in materials, workmanship or normal wear and tear and may or may not include additional provision for incidental payment of indemnity under limited circumstances, including but not limited to towing, rental and emergency road service.  The term "Vehicle Service Contract" shall also include any contract, agreement or certificate, including engine additive product warranties, whereby the Debtor agreed to refund to a Consumer the full amount of the purchase price that the Consumer paid for a Vehicle Service Contract if certain terms and conditions are met.

1.121.  **Voting Classes** means Classes 2, 3, 5, 6, 7, and 8.

1.122.  **Voting Deadline** means the date set by the Bankruptcy Court by which all Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code must be received by the appropriate Person.

1.123.  **Voting Trust Agreement** means that certain Voting Trust Agreement dated July 30, 2010 by and between David A. Warfield and Darain E. Atkinson and Cory C. Atkinson.

1.124.  **Voting Trust Entities** means Atkinson Group of Companies, Inc., Atkinson Construction, Inc., US Fidelis Administration Services, Inc., AGI Administration Services, Inc., the Reinsurance Companies, DS Direct, Atkinson Realty, LLC, DC Atkinson Realty, LLC, Wentzville International Speedway, LLC, Crescent, Zing Advisors, LLC, and Exodus LLC.

1.125.  **WARN Litigation** means the litigation commenced by Benjamin Mantle, Sharon Szymankski and others against the Debtor for alleged violations of the Worker

Adjustment and Retraining Notification Act, which is pending as Adv. Proc. 10-4160 and similar litigation that was commenced in the U.S. District Court for the Eastern District of Missouri as Case No. 10-cv-00053.

1.126. *WARN Litigation Class Claimants* means the members of the class described in the WARN Litigation Class Settlement Order.

1.127. *WARN Litigation Class Counsel* means The Gardner Firm, P.C., Lankenau & Miller, LLP and Pitzer Snodgrass P.C.

1.128. *WARN Litigation Class Exclusion Claims* means Claims held by former employees of the Debtor who voluntarily opted-out of the WARN Litigation class certified by the Bankruptcy Court.

1.129. *WARN Litigation Class Settlement Order* means that order entered by the Bankruptcy Court in the WARN Litigation approving the terms of a settlement of the WARN Litigation Claims by allowing for the payment by the Debtor in Cash on the Effective Date of the sum of $1,450,000.

1.130. *Warrantech* means collectively Vemeco, Inc., Warrantech Automotive, Inc., Warrantech Corporation, and Butler Financial Solutions, LLC.

1.131. *Warrantech AVCs* means the Assurance of Voluntary Compliance executed by Warrantech and the states of Texas, Missouri, Ohio and Washington. The Warrantech AVCs are incorporated herein by reference.

1.132. *Warrantech Claims* means all Claims held or asserted by Warrantech or any of the Persons comprising Warrantech against the Debtor, including but not limited to the Warrantech Proofs of Claim.

1.133. *Warrantech-Mepco Subordination Litigation* means litigation commenced by Warrantech against Mepco seeking *inter alia* the equitable subordination of the Mepco Claims, which litigation is pending in the Bankruptcy Court as Adv. Proc. No. 11-04313.

1.134. *Warrantech's Notice Reimbursement Obligations.* Within five Business Days after approval of the Disclosure Statement, Warrantech shall pay to the Debtor Cash in the amount of $368,000 to be segregated and used by the Debtor to pay Noticing Costs. In the event that Noticing Costs are less than $368,000, the Debtor shall refund any remaining funds to Warrantech by no later than 30 days following the Effective Date the different between $368,000 and the actual amount of the Noticing Costs.

1.135. *Warrantech Proofs of Claim* means those proofs of claim, as amended, Filed by Vemeco, Inc., Warrantech Automotive, Inc., Warrantech Corporation, and Butler Financial Solutions, LLC on November 30, 2011, each of which is in the same amount, and which were denominated by the Bankruptcy Court as Claim Nos. 828 through 831 respectively.

1.136. **_Warrantech Released Parties_** means Warrantech and its subsidiaries, successors, predecessors, attorneys, employees, agents (except for agents who are Authorized Telemarketers), assigns, directors, officers and shareholders.

1.137. **_Warrantech Vehicle Service Contracts_** means any Vehicle Service Contract sold, marketed by or entered into by the Debtor under which Warrantech, or any of its subsidiaries or affiliates, is directly involved, as either a contracting party, an administrator for such contract, or an obligor of such contract.

*Rules of Interpretation and Computation of Time*.  For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form, or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or schedule Filed or to be Filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) any reference to a Person as a Holder of a Claim or Interest includes that Person's successors and assigns; (e) all references in the Plan to Sections, Articles and Schedules are references to Sections, Articles and Schedules of or to the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (a) in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

## ARTICLE II

### COMPROMISE AND SETTLEMENT OF DISPUTES

2.1. **_Compromise, Settlement and Sale._**  Pursuant to sections 363, 364, 365, 1123(a)(5), and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates, and is expressly contingent upon the approval of the compromise and settlement by and among the Debtor, the Creditors Committee, Mepco, Warrantech, the WARN Litigation Class Claimants, the State Attorneys General Steering Committee, and the Atkinsons, all as set forth in the Global Settlement Agreement.  The Global Settlement Agreement will be entered into and filed as part of the Plan Supplement and is incorporated into this Plan by reference as if fully set forth herein.  The Global Settlement Agreement represents a full, final and complete compromise, settlement, and release of, among other matters, the issues in dispute among the parties thereto, including, among other issues, resolution of the Mepco Claims, the Warrantech Claims, the Committee-Mepco Subordination Litigation, the Warrantech-Mepco Subordination Litigation, and the Attorney General-Debtor Actions.  Without limiting the foregoing, subsections (a) through (g) below describe certain of the principal provisions of the Global Settlement Agreement.  In the event of any inconsistency between the Global Settlement

Agreement, the Plan or the Confirmation Order, the documents shall control on the following order of priority:  (i) Confirmation Order, (b) Global Settlement Agreement, and (c) Plan.

        (a)      ***Mepco.***

            (i)      ***Treatment of Mepco's Claim***.  On the Effective Date, (a) Mepco shall receive from Warrantech the sum of $4,800,000 in Cash; (b) Darain and Mia Atkinson and the Debtor shall transfer to Mepco all of their respective rights, title and interest in and to the Caymans House, free and clear of all Claims, Interests, encumbrances and other interests of any Person to the fullest extent permitted by applicable law, with all utilities, insurance and pre-paid expenses to be prorated through the Effective Date; (c) Mepco shall receive from the Debtor payment in full in Cash of the Mepco Postpetition Claim; (d) Mepco shall receive from the Debtor payment in full in Cash of the Mepco Prepetition Secured Claim; (e) David Warfield, as the Voting Trustee, Darain E. Atkinson, Cory C. Atkinson and the Debtor shall, upon the request of Mepco, transfer to Mepco rights in the assets of DS Direct, US Fidelis Administration Services, Inc., and Crescent (subject to Section 13.3(b)(i)(f)), including the ECHO Reserve Accounts; (f) Mepco shall receive funds in the ECHO Reserve Account, (g) intangible personal property of the Debtor (including trademarks, tradenames, copyrights, and customer lists), (h) Warrantech will dismiss with prejudice the Warrantech-Mepco Subordination Litigation; (i) the Committee will dismiss with prejudice the Committee-Mepco Subordination Litigation; (j) the Debtor and the Liquidating Trustee shall forever relinquish any rights or interests in and to the ECHO Reserve Accounts and any funds that may be due to or on behalf of the Debtor under the ECHO Settlement Order; and (k) Mepco will receive the full benefit of the Releases and injunctions described more fully in the Global Settlement Agreement and in Article XIII of the Plan.  If available, Mepco shall also thereafter receive from the Liquidating Trust the Mepco Unsecured Claim Distribution and its share of the Later Monetized Asset Distribution.

            (ii)      ***Mepco's Obligations***.  Within five Business Days after approval of the Disclosure Statement, Mepco shall satisfy the Mepco Notice Reimbursement Obligations.  On the Effective Date, Mepco shall (a) forego any further Distributions from the Debtor, the Estate, or the Liquidating Trustee except for the Mepco Unsecured Claim Distribution and its share of the Later Monetized Asset Distribution, (b) relinquish any Claim, Lien, or interest in any of the Liquidating Trust Assets other than the Mepco Unsecured Claim Distribution and its share of the Later Monetized Asset Distribution, (c) relinquish any Claim, Lien, or interest in any of the Consumer Restitution Fund Assets; and (d) either release or transfer to Warrantech, at the option of Warrantech, all of Mepco's right, title and interest in and to the assets of the Reinsurance Companies, free and clear of all Claims, Interests, encumbrances and other interests created by Mepco.  Notwithstanding the foregoing, the Debtor shall not be obligated to transfer to Mepco any interest in DS Direct, US Fidelis Administration Services, Inc. and Crescent until such time as the Debtor shall be satisfied that all taxes and other charges due from those entities to any Governmental Unit on account of any period prior to the transfer have been paid from the assets of such entities.

        (b)      ***Warrantech.***

            (i)      ***Treatment of Warrantech's Claims***.  On the Effective Date, (a) David Warfield, as the Voting Trustee, Darain E. Atkinson, Cory C. Atkinson and the

Debtor shall transfer to Warrantech or an affiliate of Warrantech or release at the option of Warrantech all of their rights, title and interest in and to the Reinsurance Companies, or their assets free and clear of all Claims, Interests, encumbrances, and other interests of any Person, except any and all Claims, liens, encumbrances or rights held by CARRG (including its receiver) in the Reinsurance Companies or their assets shall not be affected by this transfer to Warrantech, (b) Mepco will either release or transfer to Warrantech, at the option of Warrantech, all of Mepco's right, title and interest in and to the assets of the Reinsurance Companies, free and clear of all Claims, Interests, encumbrances and other interests created by Mepco, and (c) Warrantech will receive the full benefit of the Releases and injunctions described in the Global Settlement Agreement and in Article XIII of the Plan.

(ii)     ***Warrantech's Obligations***.  Within five Business Days after approval of the Disclosure Statement, Warrantech shall satisfy the Warrantech Notice Reimbursement Obligations.  On the Effective Date, Warrantech shall:  (a) pay to Mepco the amount of $4,800,000 in Cash; (b) pay to the Liquidating Trustee the sum of $1,400,000 in Cash; (c) pay to the Consumer Restitution Fund the sum of $1,100,000 in Cash; (d) dismiss with prejudice the Mepco-Warrantech Subordination Litigation; and (e) withdraw with prejudice each of the Warrantech Proofs of Claim and forego any further Distributions from the Debtor, the Estate, or the Liquidating Trustee.  Notwithstanding the foregoing, the Debtor shall not be obligated to transfer to Warrantech any interest in the Reinsurance Companies until such time as the Debtor shall be satisfied that all taxes and other charges due from those entities to any Governmental Unit on account of any period prior to the transfer have been paid from the assets of such entities.

(c)     ***Atkinsons***.  On the Effective Date, the Atkinsons shall receive the full benefit of the Releases and injunctions described in the Global Settlement Agreement and in Article XIII of the Plan, provided, however, that notwithstanding anything to the contrary contained in this Plan or any other Plan related document, neither Darain Atkinson nor Cory Atkinson shall be released of any liability on account of the claims brought by the State of Maryland, Consumer Protection Division in CPD Case No.: 10-016-188217, OAH OAG CPD 04-10-25886.  On the Effective Date, the Debtor and the Estate shall be deemed to have complied fully with paragraph 15 of the Cory and Heather Atkinson Settlement Agreement and with paragraph 16 of the Darain and Mia Atkinson Settlement Agreement and the Atkinsons shall each irrevocably relinquish any further interest in any of the "Assets Proceeds Account" as that phrase is defined in each of the Cory and Heather Atkinson Settlement Agreement and in the Darain and Mia Atkinson Settlement Agreement.  On the Effective Date, the Creditors Committee or Liquidating Trustee, as the case may be, shall cause the Committee-Atkinsons Litigation to be dismissed with prejudice.

(d)     ***WARN Litigation Class Claims***.  On the Effective Date, and pursuant to the terms of the WARN Litigation Class Settlement Order, the Debtor shall pay to the WARN Litigation Class Counsel for the benefit of the WARN Litigation Class Claimants the sum of $1,450,000 in full satisfaction of all Claims asserted by the WARN Litigation Class Claimants.  The funds so transferred shall be distributed to the WARN Litigation Class Counsel and to the WARN Litigation Class Claimants in accordance with the WARN Litigation Class Settlement Order.  Upon receipt of said payment, the WARN Litigation Class Counsel shall

cause the WARN Litigation to be dismissed with prejudice. The WARN Claimants shall also receive the full benefit of the Release by the Debtor, the Estate and the Trade Creditors and injunctions described in the Global Settlement Agreement and in Section 13.15 of the Plan.

(e)     *Consumers.*  All Consumer Claims, (including the Individual Proofs of Claim) shall be channeled to the Consumer Restitution Fund established under this Plan which will be funded with a total of $14,100,000 as set forth herein. On the Effective Date, (i) the Debtor shall transfer $13,000,000 in Cash to the Consumer Restitution Fund and (ii) Warrantech shall transfer $1,100,000 in Cash to the Consumer Restitution Fund. The Consumer Restitution Fund shall also receive its share of the Later Monetized Asset Distribution and of the Malpractice Claim Distribution. The Consumer Restitution Fund shall pay Consumer Claims in the manner and hierarchy established under the Consumer Restitution Fund Agreement. In accordance with the Consumer Restitution Fund Agreement, the thirteen Litigating States shall receive reasonable compensation on the Effective Date immediately following funding of the Consumer Restitution Fund, or at a later date if requested by any Litigating State(s), for the pre-confirmation investigation of the Debtor, the pursuit of Consumer; Claims before the Bankruptcy Court and the litigation of unfair practice claims in an amount not to exceed 13.5% ($1,903,500) of the Consumer Restitution Fund's initial assets. Accordingly, on the Effective Date, (a) all liabilities, obligations, and responsibilities related to all Consumer Claims shall be transferred to the Consumer Restitution Fund; (b) the Debtor, the Liquidating Trust, and the Liquidating Trustee shall have no further liability for payment of any/all liabilities or obligations for any Consumer Claims; (c) the Debtor shall agree to entry of the Litigating States-Debtor Consent Judgments; and (d) all Consumers and all States Attorneys General shall be bound by the Releases as described in Article XIII of the Plan.

(f)     *Trade Creditors.*  As soon as practicable after the Effective Date, Trade Creditors will receive from the Liquidating Trust Pro Rata Distributions of the Available Cash remaining after payment in full of (i) all Unclassified Claims, (ii) all Allowed Non-Tax Priority Claims, (iii) the Mepco Postpetition Claim, (iv) the Mepco Prepetition Secured Claim, (v) the amounts due under the WARN Litigation Class Settlement Order, and (vi) the Estate's obligations to fund the Consumer Restitution Fund. Neither Mepco nor Warrantech will share in any Distributions due to Trade Creditors. Trade Creditors shall also receive the full benefit of the Releases and injunctions described in the Global Settlement Agreement and in Article XIII of the Plan. The Liquidating Trust shall also receive its share of the Malpractice Claim Distribution and the Later Monetized Asset Distribution.

(g)     *Releases and Injunctions Not Severable.*  The Releases and injunctions provided in the Global Settlement Agreement and in Article XIII of the Plan are integral to obtaining the value provided under the Global Settlement Agreement and the Releases and injunctions under this Plan constitute an essential component of the compromise reached and, notwithstanding anything else to the contrary contained in this Plan, are not severable from the other provisions of this Plan unless the beneficiary of such releases or injunctions shall waive its rights under this Section.

## ARTICLE III

### ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

3.1.    ***Administrative Claims.***  Each Allowed Administrative Claim (including any Allowed Claims for Professional Fees) shall be paid in Cash in an amount equal to the unpaid portion of such Allowed Administrative Claim on the later of (a) the Effective Date, or as soon as reasonably practicable thereafter; (b) thirty (30) days after the date such Claim is Allowed or otherwise authorized by a Final Order; (c) the date that the Debtor is otherwise obligated to pay such Claim in accordance with the terms and provisions of the particular transactions giving rise to such Claim, the terms and provision of this Plan and any orders of the Bankruptcy Court relating thereto; and (d) such date as the Holder of such Claim and the Debtor prior to the Effective Date or the Liquidating Trustee after the Effective Date shall agree upon.

3.2.    ***Priority Tax Claims***.  Commencing on the later of (a) the Effective Date and (b) the fifteenth Business Day of the first month following the month in which a Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon after such dates as is practicable, such Holder of an Allowed Priority Tax Claim shall receive from the Liquidating Trustee, Available Cash in an amount equal to such Allowed Priority Tax Claim.

## ARTICLE IV

### CLASSIFICATION OF CLAIMS AND INTERESTS

4.1.    ***Classification of Claims***.  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against the Debtor and Equity Interests in the Debtor.  A Claim or Interest is placed in a particular Class for the purposes of voting on this Plan and of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

4.2.    ***Unclassified Claims***.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Unclassified Claims have not been classified and their treatment is set forth in Article III above.

## ARTICLE V

### IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS IMPAIRED AND UNIMPAIRED BY THE PLAN

5.1.    ***Classes of Claims that are Unimpaired***.  The classification of Claims against the Debtor pursuant to this Plan that are Unimpaired and not entitled to vote on the Plan is as follows:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1. | Non-Tax Priority Claims | Unimpaired | Not entitled to vote |
| 4. | WARN Litigation Claims | Unimpaired | Not entitled to vote |
| 12 | Consumer Objectors' Claims | Unimpaired | Not entitled to vote |

     5.2.   ***Impaired Classes of Claims and Interests.***  The classification of Claims against the Debtor pursuant to this Plan that are Impaired is as follows:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 2. | Mepco Claims | Impaired | Entitled to vote |
| 3. | Warrantech Claims | Impaired | Entitled to vote |
| 5. | Trade Claims | Impaired | Entitled to vote |
| 6. | Consumer Claims | Impaired | Entitled to vote |
| 7. | Subordinated Governmental Fines and Penalties Claims | Impaired | Entitled to vote |
| 8. | Prestige Claims | Impaired | Entitled to vote |
| 9 | WARN Litigation Class Exclusion Claims | Impaired | Not entitled to vote; Deemed to reject Plan |
| 10. | Intercompany Claims | Impaired | Not entitled to vote; Deemed to reject Plan |
| 11. | Equity Interests | Impaired | Not entitled to vote; Deemed to reject Plan |

## ARTICLE VI

## PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS

     6.1.   **Unimpaired Classes of Claims.**

     (a)    **CLASS 1 – Non-Tax Priority Claims**

     1.    Classification:  Class 1 shall consist of all Non-Tax Priority Claims against the Debtor.

     2.    Treatment:  On the later of (i) the Effective Date and (ii) the fifteenth Business Day of the first month following the month in which a Class 1 Claim becomes an Allowed Class 1 Claim, or as soon after such dates as is practicable, each Holder of an Allowed Claim in Class 1 shall receive from the Liquidating Trustee, Available Cash in an amount equal to such Allowed Claim.

     3.    Voting:  Class 1 is Unimpaired, and holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the

Bankruptcy Code.  Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject this Plan.

    (b)    **CLASS 4 – WARN Litigation Claims**

        1.    Classification:  Class 4 shall consist of Claims held or asserted by the WARN Litigation Class Claimants.

        2.    Treatment:  The Class 4 Claimants shall receive the treatment set forth in the Global Settlement Agreement and the WARN Litigation Class Settlement Order which is summarized in Section 2.1(d) of the Plan.

        3.    Voting:  Class 4 is Unimpaired, and the Holders of the Class 4 Claims are not entitled to vote to accept or reject this Plan.

    6.2.    **Impaired Classes of Claims.**

    (a)    **CLASS 2 – Mepco Claims**

        1.    Classification:  Class 2 shall consist of the Mepco Claims.

        2.    Treatment:  Mepco shall receive the treatment set forth in the Global Settlement Agreement which is summarized in Section 2.1(a) of the Plan.

        3.    Voting:  Class 2 is Impaired, and the Holder of the Class 2 Claims is entitled to vote to accept or reject this Plan.

    (b)    **CLASS 3 – Warrantech Claims**

        1.    Classification:  Class 3 shall consist of the Warrantech Claims.

        2.    Treatment.  Warrantech shall receive the treatment set forth in the Global Settlement Agreement which is summarized in Section 2.1(b) of the Plan.

        3.    Voting:  Class 3 is Impaired, and the Holder of the Class 3 Claims is entitled to vote to accept or reject this Plan.

    (c)    **CLASS 5 – Trade Claims**

        1.    Classification:  Class 5 shall consist of all Trade Claims against the Debtor.

        2.    Treatment:  The Holders of Class 5 Claims shall be treated as set forth in the Global Settlement Agreement which is summarized in Section 2.1(f) of the Plan.

3.        Voting: Class 5 is Impaired, and Holders of Class 5 Claims are entitled to vote to accept or reject this Plan.

(d)        **CLASS 6 – Consumer Claims**

1.        Classification:  Class 6 shall consist of all Consumer Claims against the Debtor.

2.        Treatment:  The Holders of Class 6 Claims shall be treated as set forth in the Global Settlement Agreement and as summarized in Section 2.1(e) of the Plan.

3.        Voting:  Class 6 is Impaired, and Holders of Class 6 Claims are entitled to vote.

(e)        **CLASS 7 – Subordinated Governmental Fines and Penalties Claims**

1.        Classification:  Class 7 shall consist of all Subordinated Governmental Fines and Penalties Claims against the Debtor.

2.        Treatment:  Holders of Subordinated Governmental Fines Penalties Claims will receive Pro Rata Distributions of the Available Cash, if any, remaining after payment in full of (i) all Unclassified Claims, (ii) all Allowed Non-Tax Priority Claims, (iii) the Mepco Postpetition Claim, (iv) the Mepco Prepetition Secured Claim, (v) the amounts due under the WARN Litigation Class Settlement Order, (vi) the Estate's obligations to fund the Consumer Restitution Fund, and (vii) all Class 5 Trade Claims.  Any Distributions on account of Class 7 Allowed Subordinated Governmental Fines and Penalties Claims shall be paid to the Consumer Restitution.

3.        Voting: Class 7 is Impaired, and Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

(f)        **CLASS 8 – Prestige Claims**

1.        Classification:  Class 8 shall consist of the Prestige Claims against the Debtor.

2.        Treatment:  The Holder of the Prestige Claims will receive Pro Rata Distributions of the Available Cash, if any, remaining after payment in full of all (i) Unclassified Claims, (ii) all Allowed Non-Tax Priority Claims, (iii) the Mepco Postpetition Claim (iv) the Mepco Prepetition Secured Claim, (v) the amounts due under the WARN Litigation Class Settlement Order, (vi) the Estate's obligations to fund the Consumer Restitution Fund, (vii) all Allowed Class 5 Trade Claims, and (viii) all Class 7 Allowed Subordinated Governmental Fines and Penalties Claims.

3.        Voting:  Class 8 is Impaired, and Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

(g)    **CLASS 9 – WARN Litigation Class Exclusion Claims**

1.    Classification.  Class 9 shall consist of all WARN Litigation Class Exclusion Claims.

2.    Treatment.  The Holders of Class 9 WARN Litigation Class Exclusion Claims shall not receive any Distribution or retain any property on account of their Claims under this Plan.

3.    Voting:  Class 9 is Impaired, and pursuant to section 1126(g) of the Bankruptcy Code is deemed not to have accepted the Plan.

(h)    **CLASS 10 – Intercompany Claims**

1.    Classification:  Class 10 shall consist of all Intercompany Claims against the Debtor.

2.    Treatment:  The Holders of Class 10 Intercompany Claims shall not receive any Distribution or retain any property on account of their Claims under this Plan.

3.    Voting:  Class 10 is Impaired, and pursuant to section 1126(g) of the Bankruptcy Code is deemed not to have accepted the Plan.

(i)    **CLASS 11 – Interests**

1.    Classification:  Class 11 shall consist of all Interests in the Debtor.

2.    Treatment:  The Holders of Class 11 Interests shall not receive any Distribution or retain any property on account of their Claims under this Plan, but such Holders will be subject to the treatment set forth in Section 2.1(c) of the Plan.

3.    Voting:  Class 11 is Impaired, and pursuant to section 1126(g) of the Bankruptcy Code is deemed not to have accepted the Plan.

(j)    **CLASS 12 – Consumer Objectors' Claims**

1.    Classification: Class 12 shall consist of all Consumer Objectors' Claims.

2.    Treatment:  The Holders of Class 12 Claims shall, on the Effective Date, be paid in full in Cash by the Debtor the full amount of their Allowed Claims.

3.    Voting: Class 12 is Unimpaired and is conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

# ARTICLE VII

## ACCEPTANCE OR REJECTION OF THE PLAN

7.1.    ***Impaired Classes of Claims Entitled to Vote.***  Each Impaired Class of Claims that will (or may) receive or retain property or any interest in property under the Plan shall be entitled to vote to accept or reject the Plan.

7.2.    ***Classes Deemed to Accept the Plan***.  Classes 1, 4, and 12 are Unimpaired under the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, those Classes are conclusively presumed to have accepted the Plan, and the votes of Holders of Claims in such Classes therefore shall not be solicited.

7.3.    ***Acceptance by Impaired Classes.***  Classes 2, 3, 5, 6, 7, and 8 are Impaired under the Plan and thus are the Voting Classes.  Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, a Voting Class has accepted the Plan if the Plan is accepted by the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Voting Class that have timely and properly voted to accept or reject the Plan.

7.4.    ***Classes Deemed Not to Have Accepted the Plan.***  Holders of Claims and Interests in Class 9, 10, and 11 are not entitled to receive any Distribution under the Plan on account of their Claims or Interests and, therefore, votes to accept or reject the Plan shall not be solicited from Holders of Claims or Interests in such Classes.

7.5.    ***Elimination of Classes.***  Any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

7.6.    ***Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.***  To the extent that any Impaired Class votes to reject the Plan or is deemed to have rejected it, the Creditors Committee reserves the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

7.7.    ***Confirmability and Severability of a Plan.***  The confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied.  The Creditors Committee reserves the right to alter, amend, modify, revoke, or withdraw the Plan before the Confirmation Date.  A determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect the Creditors Committee's ability to modify the Plan, subject to the limitations in this Section and Section 15.6, to satisfy the confirmation requirements of section 1129 of the Bankruptcy Code.

7.8.    ***Requirements for Voting on the Plan, Etc.***  The eligibility for Holders of Claims and Interests to vote on the Plan is governed by the terms of the Solicitation Order.

Furthermore, votes on the Plan shall be tabulated and reported in accordance with the
Solicitation Order.

## ARTICLE VIII

## MEANS FOR IMPLEMENTATION OF THE PLAN

8.1. ***Execution of Consumer Restitution Fund Agreement and Liquidating
Trust Agreement***. Prior to or on the Effective Date, the Debtor shall execute (a) the Liquidating
Trust Agreement and (b) the Consumer Restitution Fund Agreement, each in substantially the
same form as set forth in the Plan Supplement. Thereafter, the Debtor and all other necessary
parties shall take all other necessary steps to establish the Consumer Restitution Fund and the
Liquidating Trust and the respective beneficial interests therein. Any nonmaterial modifications
to the Consumer Restitution Fund Agreement made with the consent of the Attorney General
Steering Committee and to the Liquidating Trust Agreement made by the Creditors Committee,
prior to the Effective Date, are hereby ratified. Each of the Consumer Restitution Fund
Agreement and the Liquidating Trust Agreement shall contain provisions permitting the
amendment or modification of such agreements as necessary to implement the provisions of the
Plan.

8.2. ***Consumer Restitution Fund.***

(a)  ***Creation of the Consumer Restitution Fund.*** On the Effective
Date, the Consumer Restitution Fund shall be created in accordance with the Consumer
Restitution Fund Agreement. The Consumer Restitution Fund shall be a "qualified settlement
fund" within the meaning of section 468B of the Internal Revenue Code and the regulations
issued thereunder. The purpose of the Consumer Restitution Fund shall be to assume liability for
all Consumer Claims (whether now existing or arising at any time hereafter) and to use the
Consumer Restitution Fund Assets to pay holders of Allowed Consumer Claims and attorneys'
fees and investigative costs for the Litigating States as set forth in the Consumer Restitution
Fund Agreement and the Consumer Restitution Fund Distribution Procedures.

(b)  ***Debtor's Contribution to the Consumer Restitution Fund***. On the
Effective Date, the Debtor shall transfer Cash to the Consumer Restitution Fund in the amount of
$13,000,000, free and clear of all Claims, Interests, encumbrances, and other interests of any
Person. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting,
sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

(c)  ***Warrantech's Contribution to Consumer Restitution Fund.*** On
the Effective Date, Warrantech shall transfer Cash to the Consumer Restitution Fund in the
amount of $1,100,000, with such transfer to vest in the Consumer Restitution Fund, in
accordance with section 1141 of the Bankruptcy Code, title to all such Consumer Restitution
Fund Assets free and clear of all Claims, Interests, encumbrances, and other interests of any
Person.

(d)  ***Appointment of Consumer Restitution Escrow Agent***. The
Creditors Committee, with the consent of the Attorney General Steering Committee, designates

GCG, Inc., a Delaware corporation ("GCG") as the initial Consumer Restitution Escrow Agent of the Consumer Restitution Fund.  On the Confirmation Date, effective as of the Effective Date, the Bankruptcy Court shall appoint the Consumer Restitution Escrow Agent in accordance with the Consumer Restitution Fund Agreement.

(e)　　*Appointment of Consumer Fund Advisory Committee Members*.  Prior to or at the Confirmation Hearing, the Attorney General Executive Committee shall designate the initial members of the Consumer Fund Advisory Committee, which appointments shall become effective as of the Effective Date.

(f)　　*Transfer of Liability for Consumer Claims to the Consumer Restitution Fund*.  On the Effective Date, all liabilities, obligations, and responsibilities relating to all Consumer Claims shall be transferred to the Consumer Restitution Fund which shall assume liability for all Consumer Claims and shall pay the Allowed Consumer Claims in accordance with the Consumer Restitution Fund Distribution Procedures.

(g)　　*Consumer Restitution Fund Expenses*.  The Consumer Restitution Fund shall pay all Consumer Restitution Fund expenses and attorneys' fees and investigative costs of the Litigating States from the Consumer Restitution Fund Assets.  The Debtor, the Liquidating Trust, and the Liquidating Trustee shall have no obligations to pay any expenses incurred by the Consumer Restitution Fund.

(h)　　*Personally Identifiable Information Contained in Consumer Claims.*  The provisions of the Consumer Restitution Fund govern the release and confidentiality of Consumer Claims.

8.3.　　*The Liquidating Trust.*

(a)　　*Creation of the Liquidating Trust*.  On the Effective Date, the Liquidating Trust shall be created in accordance with the Liquidating Trust Agreement with the intention of complying with Revenue Procedure 94-45 and otherwise satisfying the requirements for treatment as a liquidating trust under the applicable Treasury Regulations.

(b)　　*Transfer of Assets to the Liquidating Trust*.  On the Effective Date, all right, title, and interest in and to the Liquidating Trust Assets and any proceeds or causes of action thereunder shall be transferred to and vested in the Liquidating Trust, free and clear of all Claims, Interests, encumbrances, and other interests of any Person without any further action of any Person, provided however that all Claims and causes of action released or to be released under the Plan and the Global Settlement Agreement shall not be transferred.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.  The Liquidating Trustee shall take immediate possession and control of all of the assets of the Debtor and store, where appropriate, the physical assets of the Debtor.

(c)　　*Appointment*.  From and after the Effective Date, a Person to be designated by the Creditors Committee, in consultation with the Debtor, prior to the Confirmation Date shall serve as the Liquidating Trustee pursuant to the Liquidating Trust

Agreement and the Plan, until the resignation or discharge and the appointment of a successor Liquidating Trustee in accordance with the Liquidating Trust Agreement and the Plan.

(d)    ***Transfer of Liability for Claims to the Liquidating Trust***.  On the Effective Date, all liabilities, obligations, and responsibilities relating to (i) all Unclassified Claims that are not paid on the Effective Date, (ii) all Class 1, Class 5, Class 7, and Class 8 Claims, (iii) the Mepco Unsecured Claim (iv) the Later Monetized Asset Distribution, and (v) the Malpractice Claim Distribution shall be transferred to the Liquidating Trust, which shall assume liability for all such Allowed Claims and shall pay such Allowed Claims in accordance with the Plan and the Liquidation Trust.

(e)    ***Liquidating Trust Expenses***.  The Liquidating Trust shall pay all Liquidating Trust expenses from the Liquidating Trust Assets.  The Debtor, the Consumer Restitution Fund, and the Consumer Restitution Escrow Agent shall have no obligation to pay any Liquidating Trust expenses.

(f)    ***Special Provisions Regarding Litigation Claims***.  On the Effective Date, and subject to the terms of the Plan, the Debtor and the Creditors Committee shall be deemed to have transferred all Litigation Claims to the Liquidating Trust.  Neither this Plan nor the Confirmation Order shall constitute a waiver or release by the Debtor nor the Estate of any cause of action except as expressly provided for by the Plan.  After the Effective Date, the Liquidating Trustee shall be substituted as a party in lieu of the Debtor or the Creditors Committee, as the case may be, in any pending Litigation Claims.  In addition, after the Effective Date, the Liquidating Trust and the Liquidating Trustee shall have the sole and exclusive right to pursue any Litigation Claims. The method of Distribution of the Estate's assets pursuant to the Plan shall not, and shall not be deemed to, prejudice the causes of action, which shall survive entry of the Confirmation Order.  The net proceeds of any such litigation or settlement shall be transferred to the Liquidating Trust for Distribution in accordance with the Plan and the Liquidating Trust Agreement.

8.4.    ***Extinguishment of Liability.*** The transfer to, vesting in, and assumption by the Liquidating Trust of the Liquidating Trust Assets as contemplated by the Plan, among other things, on the Effective Date shall release and extinguish all obligations and liabilities of the Debtor, the Consumer Restitution Fund, and the Consumer Restitution Escrow Agent, for and in respect of all liabilities transferred to the Liquidating Trust as described in Section 8.3(d) of the Plan.

8.5.    ***Creditors Committee.***  On the Effective Date, the Creditors Committee shall dissolve automatically and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Case or the Plan and its implementation, and the retention or employment of the Creditors Committee's attorneys, accountants, and other agents shall terminate, except with respect to (a) all matters related to Professional Fee Claims and (b) any appeals of the Confirmation Order.  All expenses of members of the Creditors Committee and the fees and expenses of their professionals through the Effective Date shall be paid in accordance with the terms and conditions of the applicable orders of the Bankruptcy Court.

8.6.    ***Post-Confirmation Duties of the Debtor; Dissolution of the Debtor.***
After the Effective Date, the Debtor shall continue to exist solely for the purposes of carrying out
the provisions of the Plan and the completion and filing of all state, local and final franchise and
income tax returns required by the United States and the State of Missouri.  After all such final
tax returns have been filed, the Debtor shall be deemed dissolved for all purposes without the
necessity for any other or further actions to be taken by or on behalf of the Debtor or payments to
be made in connection therewith; provided, however, that the Debtor shall file with the office of
the Missouri Secretary of State, a certificate of dissolution which may be executed by Scott A.
Eisenberg without the need for approval by the board of directors or shareholders.  From and
after the Effective Date, the Debtor shall not be required to file any document, or take any other
action, or obtain any approval from board of directors or shareholders, to withdraw its business
operations from any state in which the Debtor previously conducted its business operations.
Sixty days following the filing of the Debtor's final franchise and income tax returns, or such
longer period as may be approved by the Bankruptcy Court, Scott A. Eisenberg shall no longer
be deemed to occupy any position with the Debtor, including but not limited to Chief
Restructuring Officer.

8.7.    ***Exemption from Transfer Taxes.***  Pursuant to section 1146 of the
Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under the
Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the
making or assignment of any contract, lease or sublease; or (d) the making or delivery of any
deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,
including, without limitation, any merger agreements, agreements of consolidation, restructuring,
disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will
not be subject to any stamp tax, recording tax, personal property tax, transfer tax, sales or use
tax, or other similar tax.  The Confirmation Order shall direct the appropriate state or local
government officials or agents to forgo the collection of any such tax or governmental
assessment and to accept for filing and recordation any of the foregoing instruments or other
documents without the payment of any such tax or governmental assessment.

8.8.    ***Notification of Intended Effective Date***.  The Creditors Committee shall
provide written notice of the intended Effective Date at least five (5) Business Days before such
intended date to the parties to the Global Settlement Agreement, the Consumer Restitution
Escrow Agent and the Liquidating Trustee.

8.9.    ***Payment of Class 12 Claims.***  Notwithstanding anything to the contrary
contained here, on the Effective Date, the Debtor shall pay the Class 12 Allowed Claims in full.


## ARTICLE IX

### PROVISIONS GOVERNING DISTRIBUTIONS

9.1.    ***Distribution to Holders of Claims.***  This Article IX applies only to
Distributions made to Holders of Trade Claims, Subordinated Governmental Fines and Penalties
Claims, and Prestige Claims.  All Distributions to holders of Consumer Claims will be made
pursuant to the terms of the Consumer Restitution Fund Agreement.

9.2.   **_Interest on Claims; Attorneys' Fees._**  Except as expressly noted to the contrary in the Plan, interest, fees, costs, and other charges accruing or incurred on or after the Petition Date shall not accrue or be paid on any Allowed Claims.

9.3.   **_Distributions by the Liquidating Trust._**  The Liquidating Trustee shall make all Distributions of Available Cash required to be distributed under the applicable provisions of the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee may employ or contract with other entities to assist in or make the Distributions required by the Plan and the Liquidating Trust Agreement.

9.4.   **_Record Date for Distributions._**  The Liquidating Trustee will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the date the Bankruptcy Court approves the Disclosure Statement, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the date the Bankruptcy Court approves the Disclosure Statement.  The Liquidating Trustee shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official claims register.

9.5.   **_Withholding and Reporting Requirements._**  The Liquidating Trustee is authorized to take any and all actions that may be necessary or appropriate to comply with all withholding, payment, and reporting requirements imposed by any federal, state, local, or foreign taxing authority.  All Holders of Claims shall be required to provide any information necessary to effect information reporting, payment, and withholding with respect to such taxes. Notwithstanding the foregoing, neither the Debtor, the Liquidating Trust, nor the Liquidating Trustee shall be responsible for withholding any portion or paying any withholding taxes with respect to the payments made to the WARN Litigation Class Claimants pursuant to the WARN Litigation Class Settlement Order.

9.6.   **_Setoff._**  The Liquidating Trust may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor, Estate, or Liquidating Trust may have against the Holder of such Claim (except to the extent that such claims have been dismissed, released or waived in the Plan or otherwise); _provided, however_, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidating Trust of any such claim that the Debtor or Liquidating Trust may have against such Holder.

## ARTICLE X

### TREATMENT OF EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES

10.1.   **_Rejected Contracts and Leases._**  Except as otherwise provided in the Plan, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all prepetition executory contracts and unexpired leases to which the Debtor is a party,

on and subject to the occurrence of the Effective Date, unless such contract or lease
(a) previously shall have been assumed or rejected by the Debtor, (b) previously shall have
expired or terminated pursuant to its own terms before the Effective Date, or (c) is identified in
the Plan Supplement as a contract or lease to be assumed; *provided, however*, that the Creditors
Committee may amend such list of contracts or leases to be assumed at any time prior to the
Confirmation Date.

        10.2.   **Bar to Rejection Damages.**  If the rejection of an executory contract or
unexpired lease pursuant to Section 10.1 above gives rise to a Claim by the other party or parties
to such contract or lease, such Claim shall be forever barred and shall not be enforceable against
the Debtor or its Estate, the Liquidating Trust, the Liquidating Trustee or their respective
successors or properties unless a proof of Claim is Filed and served on the Liquidating Trustee
within thirty (30) days after the Confirmation Date.

### ARTICLE XI

PROCEDURES FOR RESOLVING DISPUTED,
CONTINGENT AND UNLIQUIDATED NON-CONSUMER CLAIMS

        11.1.   **Application of this Article.**  This Article XI applies only to procedures for
resolving Disputed Non-Consumer Claims.  The procedures for resolving Disputed Consumer
Claims are provided in the Consumer Restitution Fund Agreement.  Subject only to Section 14.2,
the Bankruptcy Court will have no role in the resolution of Disputed Consumer Claims.

        11.2.   **Objection Deadline; Prosecution of Objections.**  No later than the Claims
Objection Deadline (unless extended by an order of the Bankruptcy Court), the Liquidating
Trustee shall File objections to Claims with the Bankruptcy Court and serve such objections
upon the Holders of each of the Claims to which objections are made.  Nothing contained herein,
however, shall limit the right to object to Claims, if any, Filed or amended after the Claims
Objection Deadline.  Subject to the limitations set forth in the Liquidating Trust Agreement and
Section 8.3 of the Plan, after the Effective Date, the Liquidating Trustee shall be authorized to,
and shall, resolve all Disputed Claims by withdrawing or settling such objections thereto, or by
litigating to judgment in the Bankruptcy Court or such other court having jurisdiction over the
validity, nature and/or amount thereof.

        11.3.   **No Distributions Pending Allowance.**  Notwithstanding any other
provision of the Plan, no payments or Distributions shall be made with respect to all or any
portion of a Disputed Claim unless and until all objections to such Disputed Claim have been
settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some
portion thereof, has become an Allowed Claim.

### ARTICLE XII

CONFIRMATION AND CONSUMMATION OF THE PLAN

        12.1.   **Conditions to Confirmation.**  The Bankruptcy Court shall not approve the
Confirmation Order unless and until (a) the Bankruptcy Court shall have approved the

Disclosure Statement, in a manner reasonably acceptable in form and substance to the Creditors Committee, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code; (b) Mepco shall have satisfied the Mepco Notice Reimbursement Obligations, (c) Warrantech shall have satisfied the Warrantech Notice Reimbursement Obligations, (d) the proposed Confirmation Order shall be reasonably acceptable in form and substance to the Creditors Committee and the parties to the Global Settlement Agreement; (e) the Global Settlement Agreement has been fully executed; (f) the most current version of the Plan, the Plan Supplement and all of the schedules, documents, and exhibits contained therein (including the Liquidating Trust Agreement and Consumer Restitution Fund Agreement) shall be Filed in form and substance reasonably acceptable to the Creditors Committee and the parties to the Global Settlement Agreement, and (g) neither Mepco nor Warrantech shall have exercised the Opt-Out Right described in Section 12.2 of the Plan .

12.2.    ***Opt-Out.***  Warrantech and Mepco may each elect to opt-out of this Plan for any reason at any time prior to the entry of the Confirmation Order by (a) delivering to the Committee a written notice of its intent to opt-out of the Plan, and (b) payment of $200,000 in Cash in the aggregate to the Debtor.  Upon receipt of the opt-out notice from either Mepco or Warrantech and confirmation of the payment of the $200,000, the Committee shall promptly withdraw the Plan and any request for confirmation of the Plan.  The Debtor and the Attorney General Steering Committee will retain the $200,000 to compensate them for the anticipated additional costs to be incurred in the pursuit of an alternative Plan.  Notwithstanding the foregoing, neither Mepco nor Warrantech shall be required to make the $200,000 opt-out payment if more than five states have objected to the Plan and had their objections sustained under Section 13.3(d) of this Plan.

12.3.    ***Conditions to Effective Date.***  The Creditors Committee intends to request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Rule 3020(e) of the Federal Rules of Bankruptcy Procedure, the Confirmation Order shall take effect immediately upon its entry.  The following are conditions precedent to the occurrence of the Effective Date:  (a) the Debtor shall have Cash on hand sufficient to make all payments required hereunder on the Effective Date; (b) the Confirmation Order shall be a Final Order in form and substance reasonably acceptable to the Creditors Committee and no request for revocation of the Confirmation Order shall have been made or, if made, shall remain pending; (c) the WARN Litigation Class Settlement Order and the Consumer Class Proof of Claims Order shall each have become a Final Order; and (d) the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (including the executed Global Settlement Agreement) shall be Filed in form and substance reasonably acceptable to the Creditors Committee.

12.4.    ***Waiver of Conditions Precedent.***  The Creditors Committee may waive any of the conditions set forth in Section 12.1 or Section 12.3 at any time, without any notice to other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action.  However, the Creditors Committee may not waive the approval rights of any other party to the conditions to Confirmation and to the Effective Date set forth in Section 12.1 or Section 12.3 above.

12.5. *Consequences of Non-Occurrence of Effective Date.* If the Effective Date does not occur within sixty (60) days after the Confirmation Date, or by such later date, after notice and hearing, as is proposed by the Creditors Committee, then upon motion by any party to the Global Settlement Agreement and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; *provided, however*, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court approves an order granting such motion. If the Confirmation Order is vacated, the Plan shall be null and void in all respects, any settlement of Claims provided for hereby shall be null and void without further order of the Bankruptcy Court. The time within which the Debtor may assume and assign, or reject all executory contracts and unexpired leases shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated; and nothing contained in the Plan or Disclosure Statement shall constitute a waiver or release of any Claims, Interests, or Litigation Claims.

## ARTICLE XIII

## EFFECT OF PLAN CONFIRMATION; RELEASES AND INJUNCTIONS

13.1. *Binding Effect.* The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Liquidating Trustee.

13.2. *Releases of Certain Claims.* On the Effective Date, in consideration of the terms described herein and in the Global Settlement Agreement, each Holder of a Claim described below and any Person (including but not limited to private class action representatives) acting on behalf of such Holder, but expressly excluding a State Attorney General or other Governmental Unit, shall be deemed to release unconditionally, and hereby is deemed to forever release and discharge unconditionally:

       (a)    Warrantech, its parent, affiliates, subsidiaries, successors, predecessors, attorneys, employees, agents (except for agents who are Authorized Telemarketers), assigns, directors, officers and shareholders (collectively the "Warrantech Released Parties"), from the following Claims arising at any time prior to the Effective Date;

       (i)    Consumer Claims (a defined term at Section 1.35);

       (ii)    Claims that arise out of or relate to soliciting, marketing or contacting a Person to purchase or enter into a Vehicle Service Contract offered by Debtor or an Affiliate, whether or not the Person purchased a Vehicle Service Contract, and whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to the such Claim;

       (iii)    Claims that arise out of or relate to refunds of all or a portion of the consideration paid for Vehicle Service Contracts purchased from or through

the Debtor or an Affiliate, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim;

(iv)     Claims that arise out of or relate to a Consumer Payment Plan sold or offered to a Consumer by the Debtor or an Affiliate, including but not limited to the statements, representations or disclosures made to a Consumer by the Debtor or an Affiliate, and the servicing or the termination of the Consumer Payment Plan, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim;

(v)     Claims that arise out of the termination of a Vehicle Service Contract purchased or entered into by a Consumer from or through the Debtor or an Affiliate, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim;

(vi)     Claims that arise out of or relate to the administration, handling, servicing, or settlement and/or payment of claims made under a Warrantech Vehicle Service Contract sold by the Debtor or an Affiliate, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim;

(vii)     Claims that arise out of or are attributable to the selection, hiring, training, or supervision of the Debtor or an Affiliate allegedly undertaken or allegedly not taken by Warrantech, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim;

(viii)     Claims that arise out of any misconduct or wrongdoing of any kind whatsoever on the part of Warrantech relating to a Warrantech Vehicle Service Contract sold or offered by the Debtor or an Affiliate, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such claim; and

(ix)     Claims that relate to or are attributable to a Warrantech Vehicle Service Contract sold or offered to a Consumer by the Debtor or an Affiliate and that arise from: (a) breach of duty of good faith and fair dealing, (b) unfair claims practices, (c) unfair trade practices, (d) bad faith, (e) violations of any statute, regulation or code (except violations of any criminal law that has resulted in a criminal charge), or (f) any other type of extra-contractual liability, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim

(b)     Mepco, its parent, affiliates, subsidiaries, successors, predecessors, attorneys, employees, agents, assigns, directors, officers and shareholders (collectively, the "Mepco Released Parties") from the following Claims arising at any time prior to the Effective Date:

(i)     Consumer Claims (a defined term at Section 1.35);

(ii)     Claims that arise out of or relate to soliciting, marketing or contacting a Person to purchase or enter into a Vehicle Service Contract offered by Debtor or an Affiliate, whether or not the Person purchased a Vehicle Service Contract,

and whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to the such Claim;

(iii)    Claims that arise out of or relate to refunds of all or a portion of the consideration paid for Vehicle Service Contracts purchased from or through the Debtor or an Affiliate, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim;

(iv)    Claims that arise out of or relate to a Consumer Payment Plan sold or offered to a Consumer by the Debtor or an Affiliate, including but not limited to the statements, representations or disclosures made to a Consumer by the Debtor or an Affiliate, and the servicing or the termination of the Consumer Payment Plan, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim;

(v)    Claims that arise out of the termination of a Vehicle Service Contract purchased or entered into by a Consumer from or through the Debtor or an Affiliate, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim;

(vi)    Claims that arise out of or relate to the administration, handling, servicing, or settlement and/or payment of claims made under a Vehicle Service Contract sold by the Debtor or an Affiliate, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim;

(vii)    Claims that arise out of or are attributable to the selection, hiring, training, or supervision of the Debtor or an Affiliate allegedly undertaken or allegedly not taken by Mepco, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim;

(viii)    Claims that arise out of any misconduct or wrongdoing of any kind whatsoever on the part of Mepco relating to a Vehicle Service Contract sold or offered by the Debtor or an Affiliate, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such claim; and

(ix)    Claims that relate to or are attributable to a Vehicle Service Contract sold or offered to a Consumer by the Debtor or an Affiliate and that arise from: (a) breach of duty of good faith and fair dealing, (b) unfair claims practices, (c) unfair trade practices, (d) bad faith, (e) violations of any statute, regulation or code (except violations of any criminal law that has resulted in a criminal charge), or (f) any other type of extra-contractual liability, whether or not a Proof of Claim has been Filed under Section 1.33 or 1.67 with respect to such Claim.

(c)    the Atkinsons from any and all Consumer Claims arising at any time prior to the Effective Date.  This release does not extend to any party who has previously obtained an administrative order/judgment against Darain Atkinson or Cory Atkinson individually.

Each of the releases contained in this Section 13.2 herein shall be self-executing and enforceable on the Effective Date without further action by any Person.

13.3. *Releases by States Attorneys General and Governmental Units.* On the Effective Date, in consideration of the material consideration described herein and in the Global Settlement Agreement with, *inter alia*, the states of Missouri, Ohio, Texas and Washington, each State Attorneys General and each other Governmental Unit (as defined in Section 1.64) shall be deemed to release unconditionally, and hereby is deemed to forever release and discharge unconditionally:

(a)    Notwithstanding anything to the contrary in the Plan, nothing in this release is intended to release or discharge, nor shall release or discharge, any of the Warrantech Released Parties from: (i) any Tax claims, workforce commission claims or similar governmental revenue matters; (ii) the performance of any of their respective obligations under the Warrantech AVCs; (iii) claims arising from any violation of state insurance laws; (iv) claims asserted by any State Attorney General or other Governmental Unit in pending litigation or administrative proceedings against Warrantech; (v) any claims or obligations against any of the Warrantech Released Parties arising out of contracts or dealings with any Person other than the Debtor or an Affiliate; and (vi) any other claim by a Governmental Unit not derived from a consumer protection, "Do Not Call," automatic dialing and announcing device, telemarketing or other similar statute or regulation (e.g. tax claims and workforce commission claims). The Warrantech Released Parties are released from all civil Claims arising from or related to the Warrantech Vehicle Service Contracts offered by the Debtor and its predecessors or an Affiliate, or arising from or related to the acts of the Debtor in marketing, selling, entering into, servicing, terminating and the refunding of Warrantech Vehicle Service Contracts, pursuant to consumer protection statutes and regulations, including "Do Not Call" statutes, automatic dialing and announcing device laws, telemarketing laws and other similar statutes and regulations that could have been brought by any State Attorney General or other Governmental Unit at any time prior to the Effective Date of this Plan, including all Claims identified in Section 1.35(f).

(b)(i)    Notwithstanding anything to the contrary in the Plan, nothing in this release is intended to release or discharge, nor shall release or discharge, any of the Mepco Released Parties from: (a) any Tax claims, workforce commission claims or similar governmental revenue matters; (b) claims arising from any violation of state insurance laws; (c) claims asserted by any State Attorney General or other Governmental Unit in pending litigation or administrative proceeding against Mepco; (d) any claims or obligations against any of the Mepco Released Parties arising out of contracts or dealings with any Person other than the Debtor or an Affiliate; (e) any other claim by a Governmental Unit not derived from a consumer protection, "Do Not Call," automatic dialing and announcing device, telemarketing or other similar statute or regulation (e.g. Tax claims and workforce commission claims); (f) any claim by a Governmental Unit related to or arising from the appropriation of funds related to Crescent Manufacturing.

(b)(ii)    Subject to paragraph 13.3(b)(i) above, the Mepco Released Parties are released from all civil Claims that could have been brought by any State

Attorney General or other Governmental Unit at any time prior to the Effective Date, pursuant to any consumer protection statute or regulation, including but not limited to "Do Not Call" statutes, automatic dialing and announcing device laws, Drivers' Privacy Protection Laws, the Telemarketing Sales Rule, 16 C.F.R § 310.3(b), and the Telephone Consumer Protection Act, 47 U.S.C. 227, et seq., that arise under, from, or relate to:  (a) a Vehicle Service Contract purchased or entered into by a Consumer from the Debtor or an Affiliate; (b) the actions or conduct of the Debtor or an Affiliate in soliciting, marketing, contacting a Person to purchase or enter into a Vehicle Service Contract, whether or not the Person purchased a Vehicle Service Contract; (c) Debtor's or an Affiliate's offer of a Consumer Payment Plan, including but not limited to the statements, representations, or disclosures made to a Consumer by the Debtor or an Affiliate, and the servicing or termination of a Consumer Payment Plan by the Debtor; and (d) all Claims identified in section 1.35(f).

(c)     the Atkinsons are released from all civil claims arising from or related to the financing by Mepco of Vehicle Service Contracts offered through the Debtor, or arising from or related to the acts of the Debtor or an Affiliate in marketing, selling, entering into and refunding Vehicle Service Contracts, that could have been brought by any State Attorney General other Governmental Unit at any time prior to the Effective Date of this Plan.  This release is intended to only provide the Atkinsons with release from liability under consumer protection statutes and regulations, including, but not limited to "Do Not Call" statutes, automatic dialing and announcing device laws, telemarketing laws and other similar statutes and regulations.  This release does not extend to any Person who has previously obtained an administrative order or judgment against the Atkinsons individually (by way of example, but not limitation, the State of Maryland), nor does it affect in any way any pending future or adjudicated state or federal criminal action against the Atkinsons (by way of example, but not limitation, the pending criminal action brought by the Missouri Attorney General).

(d)     *Objection to Releases by State Attorneys General*.  Any State Attorney General or Governmental Unit which timely files and prosecutes an objection to confirmation of this Plan on the basis that Warrantech and/or Mepco are to receive releases as set forth in section 13.3(a) and (b), respectively, and which objection is sustained by the Bankruptcy Court, shall not be bound by the releases provided in section 13.3(a) and/or (b).  However, any and all Consumers who resided in the state of the successfully objecting State Attorney General or Governmental Unit at the time the Consumer Claim arose shall not receive a distribution from the Consumer Restitution Fund or under this Plan.[2]

---

[2] A Global Settlement Agreement was reached among all major constituencies in the case following two days of mediation.  As part of the consideration for that Global Settlement Agreement, Mepco and Warrantech were provided global civil releases from all Consumer Claims and claims arising under consumer protection statutes and regulations.  Any objecting State Attorney General whose Objection is sustained by the Bankruptcy Court shall be carved out from the scope of those releases; and any and all residents of those respective states shall not be eligible for or receive a distribution from the Consumer Restitution Fund.  These third-party releases for Mepco and Warrantech being granted under the Plan were a material consideration for the funds being contributed to the Consumer Restitution Fund.

13.4.    *Release of Claims by Mepco.*  On the Effective Date, in consideration of the terms described herein and in the Global Settlement Agreement, Mepco, on behalf of itself, its parent corporation, shareholders, affiliates, agents (including legal representatives), successors, and assigns, shall be deemed to release unconditionally, and hereby is deemed to forever to release unconditionally the Creditors Committee, the Warrantech Released Parties and each of the Atkinsons, and their respective heirs, successors and assigns, from any and all Claims of every kind and nature, whether or not known, direct or indirect, asserted in connection with, arising out of, or in any way relating to the Debtor or its business, including the Debtor's marketing, sales, servicing, or administration of Vehicle Service Contracts, and any agreement to refund all or a portion of the consideration paid for such Vehicle Service Contracts; provided however, that the Mepco Released Parties do not release the Warrantech Released Parties from any Claims in connection with, arising out of or relating to the marketing, sale, financing, service or administration of a Vehicle Service Contract by any Person other than, or unrelated to, the Debtor or an Affiliate.  Mepco covenants that it will not assert any additional claims of any sort against the Debtor, but this shall not affect Mepco's ability to receive Distributions on account of its share of the Later Monetized Assets and on account of the Mepco Unsecured Claim.  This release shall be self-executing and enforceable on the Effective Date without further action by any Person.

13.5.    *Release of Claims by Warrantech*.  On the Effective Date, in consideration of the terms described herein and in the Global Settlement Agreement, Warrantech, on behalf of itself, its parent corporation, shareholders, affiliates, agents (including legal representatives), successors, and assigns, shall be deemed to release unconditionally, and hereby are deemed to forever release unconditionally the Creditors Committee, the Mepco Released Parties, and each of the Atkinsons, and their respective heirs, successors and assigns, from any and all Claims of every kind and nature, whether or not known, direct or indirect, asserted in connection with, arising out of, or in any way relating to the Debtor or its business, including the Debtor's marketing, sales, servicing, or administration of Vehicle Service Contracts and any agreement to refund all or a portion of the consideration paid for such Vehicle Service Contracts; provided, however, that the Warrantech Released Parties do not release the Mepco Released Parties from any Claims arising from the marketing, sale, financing, service or administration of a Vehicle Service Contract by any Person other than, or unrelated to, the Debtor or an Affiliate. Warrantech covenants that it will not assert any additional Claims of any sort against the Debtor. This release shall be self-executing and enforceable on the Effective Date without further action by any Person,

13.6.    *Release of Claims by Debtor.*  On the Effective Date, in consideration of the terms described herein and in the Global Settlement Agreement, the Debtor, on behalf of itself and the Estate, agents (including legal representatives), successors, and assigns (including the Liquidating Trust and the Consumer Restitution Fund), shall be deemed to release unconditionally, and hereby is deemed to forever release unconditionally the Warrantech Released Parties, the Mepco Released Parties, each of the Atkinsons, and their respective heirs, successors and assigns, from any and all Claims of every kind and nature, whether or not known, direct or indirect, asserted in connection with, arising out of, or in any way relating to the Debtor or its business, including the Debtor's marketing,

sales, servicing, or administration of Vehicle Service Contracts and any agreement to refund all or a portion of the consideration paid for such Vehicle Service Contracts. This release shall be self-executing and enforceable on the Effective Date without further action by any Person.

13.7. *Release of Claims by WARN Claimants.* On the Effective Date, in consideration of the terms described herein and in the Global Settlement Agreement, the WARN Litigation Claimants, together with their heirs, agents (including legal representatives), successors, and assigns, shall be deemed to release unconditionally, and hereby are deemed to forever release unconditionally the Debtor, the Estate, the Trade Creditors, the Mepco Released Parties, the Warrantech Released Parties, and each of the Atkinsons, and their respective heirs, successors and assigns, from any and all Claims of every kind and nature, whether or not known, direct or indirect, asserted in connection with, arising out of, or in any way relating to the Debtor or its business, the Debtor's business shutdown, or the termination of any employee or employee benefit. This release shall be self-executing and enforceable on the Effective Date without further action by any Person.

13.8. *Release of Claims by Trade Creditors.* On the Effective Date, in consideration of the terms described herein and in the Global Settlement Agreement, the Trade Creditors receiving Distributions on account of the Plan, their agents (including legal representatives), successors, and assigns, shall be deemed to release unconditionally, and hereby are deemed to forever release unconditionally the Debtor, the Estate, the Mepco Released Parties, the Warrantech Released Parties, each of the Atkinsons, and their respective heirs, successors and assigns, from any and all Claims of every kind and nature, whether or not known, direct or indirect, asserted in connection with, arising out of, or in any way relating to the Debtor or its business, including the Debtor's marketing, sales, servicing, or administration of Vehicle Service Contracts and any agreement to refund all or a portion of the consideration paid for such Vehicle Service Contracts. This release shall be self-executing and enforceable on the Effective Date without further action by any Person. Notwithstanding the foregoing, nothing in this Plan shall be deemed to release Mepco or Warrantech from any Claims that any Trade Creditors may now have, or may in the future have against either Mepco or Warrantech arising out of or relating to any direct contractual relationships or direct dealings with either Warrantech or Mepco that do not involve the Debtor or the Affiliates. Further, nothing in this Plan shall be deemed to release Warrantech from any Claims of any nature that CARRG may have, or may in the future have, in connection with, arising out of, or in any way relating to any contracts, agreements or court orders arising from other direct dealings between Warrantech and CARRG.

13.9. *Release of Claims by Prestige.* On the Effective Date, in consideration of the terms described herein and in the Global Settlement Agreement, Prestige, its successors and assigns, shall be deemed to release unconditionally, and hereby are deemed to forever release unconditionally, the Mepco Released Parties from any and all Claims relating to or arising from the marketing and/or sale of a Vehicle Service Contract by the Debtor or an Affiliate.

13.10.  *Release of Claims by Atkinsons.*  On the Effective Date, in consideration of the terms described herein and in the Global Settlement Agreement, the Atkinsons, and each of them, on behalf of themselves, their heirs, successors, and assigns, shall be deemed to release unconditionally, and hereby are deemed to forever release unconditionally the Debtor, the Estate, the Mepco Released Parties, the Warrantech Released Parties, all Creditors holding or asserting Claims against the Estate, the Creditors Committee, the Professionals retained by the Estate and/or the Creditors Committee, and their respective heirs, successors, assigns, subsidiaries, parents and affiliates from any and all Claims of every kind and nature, whether or not known, direct or indirect, asserted in connection with, arising out of, or in any way relating to the Debtor or its business, including the Debtor's marketing, sales, servicing, or administration of Vehicle Service Contracts, any Consumer Payment Plan and any agreement to refund all or a portion of the consideration paid for such Vehicle Service Contracts.  This release shall be self-executing and enforceable on the Effective Date without further action by any Person.

13.11.  *Limitations on Releases.*  Nothing in the releases provided under this Article XIII of the Plan shall release or relieve any Person: (a) from its obligations under the Plan or the Global Settlement Agreement; (b) other than the Debtor and the Estate from its obligations under a Vehicle Service Contract or Payment Plan that was effective as of the Effective Date; or (c) from any Claim which does not arise from, out of, or in any way relate to, the Debtor, an Affiliate, or their businesses.

13.12.  *Exculpation and Limitation of Liability*.  Except as otherwise specifically provided in the Plan, to the maximum extent permitted by the Bankruptcy Code and applicable law, none of (a) the Liquidating Trust, (b) the Liquidating Trustee, (c) the members of the Creditors' Committee in their official capacities, (d) the Professionals (except for the Malpractice Claims), (e) the Attorney General Steering Committee, (e) the Consumer Restitution Escrow Agent, (f) David A. Warfield and Scott A. Eisenberg, in their capacities under the Voting Trust Agreement and with respect to their positions with the Voting Trust Entities, and (g) any of their respective members, officers, directors, shareholders, employees, advisors, attorneys, or agents acting in such capacity on or after the Petition Date, shall have or incur any liability to, or be subject to any right of action by, any Holder of an Allowed Claim or Interest relating to, or arising out of, the Debtor's Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan, or the property to be distributed under the Plan, except for their willful misconduct, gross negligence, and ordinary professional negligence, and in all respects the Persons described in Sections 13.12(a) through (g) above shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Nothing herein shall prohibit any Person from objecting to the allowance of compensation for any Professional retained by the Debtor, the Estate or the Creditors Committee.

13.13.  **No Discharge of the Debtor; Injunction**

(a)     **Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will *not* discharge Claims against the Debtor;**

(b)     **However, except as otherwise provided in this Plan, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date all Persons who have held, hold, or may hold Claims or Interests are permanently enjoined from commencing, continuing or prosecuting any judicial, administrative or other action or proceeding, whether directly, indirectly, derivatively or otherwise, to recover any civil Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities that are the subject of the Releases or taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Plan and the Plan Supplement documents against any of the Debtor, the Creditors' Committee (or any of its members from time to time), the Liquidating Trust, the Mepco Released Parties, the Warrantech Released Parties, the Liquidating Trustee, the Consumer Restitution Fund, and the Consumer Restitution Escrow Agent.**

13.14.  ***Channeling Injunction; Permanent Injunction Against Released Claims.*  In order to preserve and promote the settlements contemplated by and provided for in the Plan and the Global Settlement Agreement and to supplement, where necessary, the effect of the releases and other provisions set forth in this Article XIII, pursuant to section 105(a) of the Bankruptcy Code, the Confirmation Order shall provide that as of the Effective Date:**

(a)     **All Consumer Claims shall be permanently channeled to, and paid solely from, the Consumer Restitution Fund.**

(b)     **All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Claims released under this Article XIII shall be permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment, satisfaction or recovery from or against the Debtor, the Liquidating Trust, Liquidating Trustee, the Mepco Released Parties, the Warrantech Released Parties, the Consumer Restitution Fund, the Consumer Restitution Escrow Agent or the Atkinsons (or any of them)(collectively, the "Released Parties") with respect to such Claim released under Article XIII, including but not limited to:**

(i)     **commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims released under this Article XIII against any of the Released Parties, or against the property of any Released Party, including without limitation, the class action proceeding bearing the caption of *Ochotnicki* v. *Warrantech Corporation, et al.*, Case Number 10 L 774 pending in the Circuit Court of the Third Judicial Circuit, Madison County, Illinois;**

(ii)      **enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree, or order against any of the Released Parties or against the property of any Released Party with respect to any Claims released under this Article XIII;**

(iii)      **creating, perfecting, or enforcing any lien of any kind against any Released Party or the property of any Released Party with respect to any Claims released under this Article XIII;**

(iv)      **except as otherwise specifically provided in the Plan, asserting any right of, subrogation, indemnity, or contribution of any kind against any Released Party or against the property of any Released Party with respect to any Claims released under this Article XIII; and**

(v)      **taking any action, in any manner, in any place whatsoever, against any of the Released Parties or their property, that does not conform to, or comply with, the provisions of the Plan or the Plan Supplement relating to a Claims released under this Article XIII.**

(c)      **Notwithstanding anything to the contrary above, this Permanent Injunction Against Released Claims shall not enjoin:**

(i)      **the rights of Persons to the treatment accorded them under Articles VI and VIII of the Plan, as applicable, including the rights of Persons holding Consumer Claims to File Proofs of Claim relating to such Claims and to have such Claims resolved in accordance with Section 8.2 of the Plan;**

(ii)      **the rights of Persons to assert any Consumer Claims against the Consumer Restitution Fund in accordance with Section 8.2 of the Plan, or to assert any debt, obligation, or liability for payment of Consumer Restitution Fund expenses against the Consumer Restitution res; or**

(iii)      **the rights of Persons to assert any Claim, debt, obligation, or liability for payment against other Persons that are not Released Parties, unless otherwise enjoined by order of the Bankruptcy Court or estopped by provisions of the Plan.**

13.15.  *Limited Release of the WARN Litigation Class Claimants*.  **On the Effective Date, the Debtor, Mepco, Warrantech, the Estate and the Trade Creditors shall be deemed to release unconditionally, and hereby are deemed to forever release unconditionally, the WARN Litigation Class Claimants from any claims of any sort that seek to disallow, subordinate or interfere with the collection by such claimants of any amounts due to them as a result of the WARN Litigation Class Settlement Order.  Nothing in this section, or any other part of the Plan or the Global Settlement Agreement shall impair, alter or affect the right of any State Attorney General to bring civil or criminal proceedings against any of the WARN Litigation Class Claimants arising out of their former employment by the Debtor but unrelated to their status as WARN Litigation Class Claimants**

13.16. *Duration of Bankruptcy Injunction or Stays*. **All injunctions or stays provided for in the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all property of the Liquidating Trust has been distributed, the Liquidating Trust has been dissolved, the Liquidating Trust Agreement has terminated, and the Bankruptcy Court has entered an order closing the Chapter 11 Case; *provided, however*, that any injunction that by its terms is permanent or otherwise is intended to survive the Effective Date and Distributions hereunder (whether by law or pursuant to order of the Court) shall be continued without modification, notwithstanding anything to the contrary in the Plan. Neither the Debtor nor the Liquidating Trustee must wait until all funds in the Consumer Restitution Fund have been distributed before filing a motion to close the Chapter 11 Case.**

## ARTICLE XIV

### RETENTION OF JURISDICTION

14.1. *Retention of Jurisdiction.* Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)     Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor or the Liquidating Trust may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(c)     Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan provided, however, and subject to Section 14.2 below, that the Bankruptcy Court shall not have continuing jurisdiction over the adjudication or resolution of any Consumer Claims that are channeled into the Consumer Trust;

(d)     Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtor, the Estate, or the Creditors Committee that may be pending on the Effective Date;

(e)     Approve such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(f)        Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any Person's rights arising from or obligations incurred in connection with the Plan or such documents;

(g)        Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(h)        Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, and 503(b) of the Bankruptcy Code; provided, however, that from and after the Effective Date the payment of fees and expenses of (i) the Liquidating Trust and the Liquidating Trustee, including counsel fees, and (ii) the Consumer Restitution Escrow Agent shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(i)        Issue and enforce injunctions, approve and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation, or enforcement of the Plan, the Global Settlement Agreement or the Confirmation Order;

(j)        Hear and determine the causes of action by or on behalf of the Debtor or the Liquidating Trust, including causes of action relating to the Litigation Claims;

(k)        Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(l)        Approve and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated or if Distributions pursuant to the Plan are enjoined or stayed;

(m)        Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(n)        Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

(o)        Hear and determine all matters related to (i) the property of the Estate or of the Liquidating Trust from and after the Confirmation Date, (ii) the winding up of the Debtor's affairs, and (c) the activities of the Liquidating Trust;

(p)     Hear and determine disputes with respect to compensation of (i) the Liquidating Trustee and (ii) the Liquidating Trust Professionals;

(q)     Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code;

(r)     Approve an order closing the Chapter 11 Case.

14.2.    ***Jurisdiction Over the Consumer Restitution Fund***.  Consistent with the purposes of the Consumer Restitution Fund and Section 8.2 of the Plan and subject to the delegation by the Bankruptcy Court of the rights and obligations in respect of the administration, maintenance and operation of the Consumer Restitution Fund, all as provided therein and herein, the Consumer Restitution Fund shall be subject to the continuing jurisdiction of the Bankruptcy Court.

## ARTICLE XV

MISCELLANEOUS PROVISIONS

15.1.    ***Voting Trust and Voting Trust Entities***.  Within thirty (30) days after all transfers involving Crescent, DS Direct, the US Fidelis Administrative Services, Inc., and the Reinsurance Companies that are contemplated by the Plan have been completed, David A. Warfield shall exercise his rights under the Voting Trust Agreement to relieve Scott A. Eisenberg of any position with or interest in any of the Voting Trust Entities and to restore generally the *status quo ante* execution of the Voting Trust Agreement in respect of the corporate governance of the Voting Trust Entities.  Upon restoration of the *status quo ante*, the Voting Trust Agreement shall be deemed terminated and of no force and effect and thereafter neither David A. Warfield nor Scott A. Eisenberg shall have any further duties or responsibilities in respect of any of the Voting Trust Entities, including but not limited to the filing of state, local or federal tax returns for such entities for any period of time.

15.2.    ***Effectuating Documents and Further Transactions***.  On the Effective Date, each of the Debtor, the Consumer Restitution Escrow Agent, and the Liquidating Trustee, as applicable, is authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

15.3.    ***Corporate Action***.  Prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of the Debtor shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable general corporation law of the state in which the Debtor is incorporated without any requirement of further action by the stockholders or directors of the Debtor.  Scott A. Eisenberg is authorized on behalf of the Debtor to execute and deliver any documents, agreements, and instruments to effectuate the terms of the Plan, including but not limited to the documents or pleadings needed

to enter into consent judgments on behalf of the Debtor in each of the Attorney General-Debtor Actions.

### 15.4.  *Bar Dates for Certain Claims.*

(a)  *Administrative Claims; Substantial Contribution Claims.*  The Confirmation Order will establish an Administrative Claims Bar Date for Filing Administrative Claims (including requests under section 503(b) of the Bankruptcy Code by any Person for making a substantial contribution in the Chapter 11 Case) which date will be thirty (30) days after the Confirmation Date, except with respect to Professional Fee Claims, which shall be subject to the provisions of Section 15.4(b).  Holders of asserted Administrative Claims, except for Professional Fee Claims, not paid prior to the Confirmation Date shall submit proofs of Claim on or before such Administrative Claims Bar Date or forever be barred from doing so. The notice of Confirmation to be delivered pursuant to Fed. R. Bankr. P. 3020(c) and 2002(f) will set forth such date and constitute notice of this Administrative Claims Bar Date.  The Liquidating Trustee shall have sixty (60) days from the Effective Date (or such longer period as may be Allowed by order of the Bankruptcy Court upon the request of the Liquidating Trustee) following the Administrative Claims Bar Date to review and object to such Administrative Claims**.**

(b)  *Professional Fee Claims.*  All Professionals and other entities requesting compensation or reimbursement of Professional Fee Claims pursuant to section 327, 328, 330, 331, or 503(b) of the Bankruptcy Code for services rendered prior to the Effective Date shall File and serve on the Liquidating Trust and counsel for the Liquidating Trustee an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be Filed and served on the Liquidating Trust, counsel for the Liquidating Trustee, and the requesting Professional or other Person no later than twenty-one (21) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for compensation or reimbursement was served.  Except as otherwise provided in the Plan, Professionals shall be paid pursuant to sections 328, 330, or 331 of the Bankruptcy Code and prior orders of the Bankruptcy Court for amounts earned through the Effective Date.  After the Effective Date, the Liquidating Trustee shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses, incurred after the Effective Date, of the Professionals employed by the Debtor, the Creditors Committee, or the Liquidating Trust, as the case may be, in connection with the implementation and consummation of the Plan, the claims reconciliation process, and any other matters as to which such Professionals may be engaged.  If the Liquidating Trustee disputes the reasonableness of any invoice submitted by a Professional, the Liquidating Trustee shall timely pay the undisputed portion of such invoice, and the Liquidating Trustee or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of such invoice.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Liquidating Trustee may employ any Professional in the ordinary course of business.

15.5.   ***Payment of Statutory Fees.***   All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Liquidating Trustee shall be responsible for any quarterly fees validly due and owing to the United States Trustee under 28 U.S.C. § 1930 through and including such date that its Chapter 11 Case is converted to a case under chapter 7, dismissed, or closed.

15.6.   ***Amendment or Modification of the Plan.***   Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code and Rule 3019 of the Bankruptcy Rules, the Creditors Committee reserves the right to alter, amend, or modify the Plan at any time prior to the Confirmation Date.  Any amendments to the Plan after the Confirmation Date but before the Effective Date are subject to prior approval of all parties to the Global Settlement Agreement.  A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

15.7.   ***Severability of Plan Provisions.***   Subject to Section 2.1(g) of the Plan, if, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

15.8.   ***Successors and Assigns.***   The Plan shall be binding upon and inure to the benefit of the Debtor, and its successors and assigns, including, without limitation, the Liquidating Trust.  The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign of such Person.

15.9.   ***Plan Supplement.***   The Plan Supplement, comprised of, among other things, the unexecuted forms of the documents relating to the Liquidating Trust Agreement, the Consumer Restitution Fund Agreement, the Litigating States – Debtor Consent Judgments, and the Global Settlement Agreement shall be (a) Filed with the Bankruptcy Court and (b) posted on the USF Notice Website no later than three business days prior to the Voting Deadline.  Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours.  Holders of Claims and Interests may obtain a copy of the Plan Supplement upon written request to the Creditors Committee.  The documents contained in the Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

15.10.  *Notice.*  All notices, requests, and demands to or upon the Debtor, the Liquidating Trustee, the Creditors Committee or the Consumer Restitution Escrow Agent shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by electronic mail, when received and telephonically confirmed, addressed as follows (or at such other address for such Person as shall be specified by like notice):

*If to the Creditors Committee:*

David A. Warfield
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, MO  63101
Telephone:  (314) 552-6000
Email: dwarfield@thompsoncoburn.com

*If to the Liquidating Trustee:*

[To be identified in the Plan Supplement]

*If to the Consumer Restitution Escrow Agent:*

Emily S. Gottlieb
Assistant Vice President, Midwest Operations
GCG, Inc.
190 S. LaSalle Street, Suite 1520
Chicago, IL 60603
Telephone: (312) 499-6901
Email: Gottlieb@gcginc.com

15.11.  *Governing Law.*  Except to the extent the Bankruptcy Code, the Bankruptcy Rules, or other federal law is applicable, or to the extent a schedule to the Plan or a document or instrument contained in the Plan Supplement provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of Missouri, without giving effect to the principles of conflicts of law of such jurisdiction.

15.12.  *Schedules.*  All schedules, exhibits, or other related documents to the Plan and the Plan Supplement are incorporated and are a part of the Plan as if set forth in full herein.

15.13.  *Cooperation with Document and Information Request.*  Each of the Debtor, Mepco, Warrantech, the Consumer Restitution Fund, and the Liquidating Trust shall, from and after the Effective Date, cooperate with reasonable requests from any of the others for information and documentation in the requestee's possession, provided, however, that in the event that the Liquidating Trust will incur more than $100 in out-of-pocket expense to comply

with such request, then the Liquidating Trust may insist upon reimbursement from the requesting party as a condition of producing such information.

15.14. ***Filing of Additional Documents.*** On or before the Effective Date, the Debtor shall file such agreements and other documents, in form and substance acceptable to the Creditors Committee as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

Dated:   June 5, 2012 (and modified on July 11, 2012)
        St. Louis, Missouri

                                        Respectfully submitted,

                                        THOMPSON COBURN LLP


                                        By: _/s/ David A. Warfield_____
                                            David A. Warfield, 34288MO
                                            dwarfield@thompsoncoburn.com
                                            Brian W. Hockett, 52984MO
                                            bhockett@thompsoncoburn.com
                                            One US Bank Plaza, Suite 2600
                                            St. Louis, MO 63101
                                            Telephone: (314) 552-6000
                                            Telecopier: (314-552-7000

                                            Attorneys for the Official Committee of
                                            Unsecured Creditors

# **EXHIBIT B**

## PART II
## OF THE CONFIRMED
## PLAN OF LIQUIDATION:

## SUPPLEMENT TO
## THE FIRST AMENDED PLAN, AS
## MODIFIED ON JULY 13, 2012

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| US FIDELIS, INC., | ) | Hon. Charles E. Rendlen, III |
| | ) | |
| Debtor. | ) | Case No. 10-41902 |
| | ) | |

## MEPCO FINANCE CORPORATION'S CONFIRMATION OF REPRESENTATION MADE IN AID OF CONFIRMATION OF THE FIRST AMENDED PLAN OF LIQUIDATION (AS MODIFIED)

COMES NOW Mepco Finance Corporation ("Mepco"), by and through its undersigned counsel, and hereby confirms and restates its representation made to the Court at the July 16, 2012 Confirmation Hearing that Mepco will not apply or enforce the releases, exculpations, and injunctions with respect to and in favor of Mepco contained in the *First Amended Plan of Liquidation For US Fidelis, Inc. dated June 5, 2012 Proposed by the Official Committee of Unsecured Creditors (As Modified)* against Jackie High, Loretta Alva, and Travis Peavy.

ARMSTRONG TEASDALE, LLP

By:  /s/  David L. Going
   David L. Going  #33435MO
   7700 Forsyth Blvd., Suite 1800
   St. Louis, Missouri  63105
   T: 314.621.5070
   F: 314.621.5065
   doing@armstrongteasdale.com

Attorneys for Mepco Finance Corporation

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served on all parties receiving service through the Court's CM/ECF system on this 17th day of August, 2012.

/s/  David L. Going

# **EXHIBIT C**

## PART III
## OF THE CONFIRMED
## PLAN OF LIQUIDATION:

## FIRST PLAN SUPPLEMENT

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| US FIDELIS, INC., | ) | Hon. Charles E. Rendlen, III |
| | ) | |
| Debtor. | ) | Case No. 10-41902 |
| | ) | |

## PLAN SUPPLEMENT

COMES NOW the Official Committee of Unsecured Creditors for US Fidelis, Inc. (the

"Committee") and submits the following documents in supplement to the Plan of Liquidation

filed on June 5, 2012 (the "Plan") pursuant to Section 15.9 of the Plan:

| Document | Pages |
|---|---|
| Liquidating Trust Agreement pursuant to Section 8.3 of the Plan | 1-11 |
| Notice of Appointment of Initial Liquidating Trustee of the Liquidating Trust pursuant to Section 8.3(c) of the Plan | 12 |
| Consumer Restitution Fund Agreement with Consumer Fund Distribution Procedures and Escrow Agreement pursuant to Section 8.2 of the Plan | 13-54 |
| Plan Support Agreement | 55-64 |
| Global Settlement Agreement | 65-103 |
| Identification of Executory Contracts for Assumption pursuant to Section 10.1 of the Plan | 104 |
| Identification of Litigation Claims pursuant to Section 1.8 of the Plan | 105-106 |
| Attorney General Consent Judgments pursuant to Section 2.1(e) of the Plan | 107-460 |
| Arkansas | 107-133 |
| Idaho | 134-160 |
| Iowa | 161-186 |

| Kansas | 187-211 |
| Maryland | 212-267 |
| Missouri | 268-284 |
| North Carolina | 285-307 |
| Ohio | 308-334 |
| Oregon | 335-358 |
| Pennsylvania | 359-383 |
| Texas | 384-407 |
| Washington | 408-434 |
| Wisconsin | 435-460 |

Respectfully submitted,

THOMPSON COBURN LLP

By:/s/ David A. Warfield
    David A. Warfield, #34288MO
    dwarfield@thompsoncoburn.com
    Brian W. Hockett, # 52984MO
    bhockett@thompsoncoburn.com
    One US Bank Plaza, Suite 2600
    St. Louis, MO 63101
    Telephone: (314) 552-6000
    Telecopier: (314-552-7079

Attorneys for the Creditors Committee

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing was served on all parties receiving notice through the Court's CM/ECF system this 3rd day of July, 2012.

*/s/ David A. Warfield*

## LIQUIDATING TRUST AGREEMENT (US Fidelis, Inc.)

This Liquidating Trust Agreement (this "Liquidating Trust Agreement") is effective as of the Effective Date among _____ (the "Liquidating Trustee") as trustee under this Liquidating Trust Agreement, and US Fidelis, Inc. (the "Debtor"), a Missouri corporation.

## RECITALS

**WHEREAS**, on March 1, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under of the U.S. Bankruptcy Code (the "Code" or the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court"), designated as Case No. 10-41902 (the "Bankruptcy Case").

**WHEREAS**, on _____, 2012, the Bankruptcy Court entered an order pursuant to which it confirmed that certain Plan of Liquidation dated as of June 5, 2012 jointly proposed by the Debtor and the Creditors' Committee (the "Plan"); and

**WHEREAS**, pursuant to Section 8.3(b) of the Plan, all of the Liquidating Trust Assets[1] will be transferred to the Liquidating Trust, free and clear of all Claims and liens and contractually imposed restrictions, except as otherwise provided for in the Plan; and

**WHEREAS**, the Liquidating Trustee has been appointed to administer the Liquidating Trust Assets with the objective to liquidate the same in a manner which balances expeditious administration of such assets with realization of maximum returns, subject to the distribution requirements established by the Plan, to the holders of (i) all Unclassified Claims that are not paid on the Effective Date, (ii) all Class 1, Class 5, Class 7, and Class 8 Claims, (iii) the Mepco Unsecured Claim (iv) the Later Monetized Asset Distribution, and (v) the Malpractice Claim Distribution (the "Liquidating Trust Beneficiaries").

**WHEREAS**, the Bankruptcy Court shall retain jurisdiction over the Liquidating Trustee, the Liquidating Trust Assets and the Litigations Claims as provided in the Plan.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do covenant and agree as follows:

## DECLARATION OF TRUST

**NOW, THEREFORE**, in order to declare the terms and conditions hereof, and in consideration of the Recitals, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions of the Plan and this Liquidating Trust Agreement, and in accordance with the terms of the Plan and the order confirming the Plan, all right, title and interest in and to the Liquidating Trust Assets, and any and all of the Debtor's rights under Section 541 of the Bankruptcy Code, are hereby absolutely and irrevocably granted, assigned, transferred, conveyed and delivered to, the

---

[1] Those capitalized terms that are not otherwise defined herein shall have the meaning defined for those terms in the Plan.

1

Liquidating Trustee, and its successors and assigns. The Debtor shall, as needed and requested by the Liquidating Trustee, execute and deliver or cause to be executed and delivered to or upon the order of the Liquidating Trustee, all such confirmatory deeds or other instruments, in recordable form where necessary or appropriate, and the Debtor shall take or cause to be taken such other action, as the Liquidating Trustee may reasonably deem necessary or appropriate, in order to vest or perfect in or confirm to the Liquidating Trustee (or upon the order of the Liquidating Trustee), title to and possession of all of the Liquidating Trust Assets.

**TO HAVE AND TO HOLD** unto the Liquidating Trustee and its successors in trust; and

**THE LIQUIDATING TRUSTEE HEREBY ACCEPTS** said Liquidating Trust Assets assigned and transferred to it and the trust imposed upon it, and agrees to take any and all actions reasonably necessary to liquidate and/or prosecute the Liquidating Trust Assets for the benefit of the Liquidating Trust Beneficiaries, and agrees to its appointment as Liquidating Trustee hereunder for such purpose under section 1123(b)(3)(B) of the Bankruptcy Code and to hold the Liquidating Trust Assets in trust for the beneficiaries;

**PROVIDED, HOWEVER**, that upon termination of this Liquidating Trust in accordance with Section 7.7 hereof, this Liquidating Trust Agreement shall cease, terminate and be of no further force and effect and the then remaining Liquidating Trust Assets shall be distributed to the Liquidating Trust Beneficiaries in accordance with their interest therein as provided in Section 3.4 hereof.

**IT IS HEREBY FURTHER COVENANTED AND DECLARED**, that the Liquidating Trust Assets are to be held and applied by the Liquidating Trustee solely for the benefit of the Liquidating Trust Beneficiaries and for no other party, subject to the further covenants, conditions and terms hereinafter set forth.

## I.    DEFINITIONS

1.1    "Termination Date" shall mean the date on which the Liquidating Trust established hereunder is terminated as specified in Article VII hereof.

1.2    Other Defined Terms. Each term defined in the Plan or the Bankruptcy Code and not otherwise specifically defined herein, shall, when used herein, have the same meaning attributed to it in the Plan or the Bankruptcy Code.

## II.    TRUSTEE'S ACCEPTANCE

2.1    Acceptance. The Liquidating Trustee accepts the Liquidating Trust created by this Liquidating Trust Agreement and the transfer and assignment of the Liquidating Trust Assets, including but not limited to the Litigation Claims, on behalf of and for the benefit of the Liquidating Trust Beneficiaries, and agrees to observe and perform the trust, upon and subject to the terms and conditions set forth herein in the Plan. The Liquidating Trust shall be irrevocable.

2.2    Purpose of Liquidating Trust. The purpose of this Liquidating Trust is to implement Article 8.3 of the Plan by providing for the vesting in the Liquidating Trustee of the ownership of, the responsibility for, and the obligation for, the protection and conservation of the

2

Liquidating Trust Assets and the Litigation Claims on behalf of and for the benefit of the
Liquidating Trust Beneficiaries, as follows:  (i) the receipt of Liquidating Trust Assets of the
Debtor's Estate on behalf of and for the benefit of the holders of (a) all Unclassified Claims that
are not paid on the Effective Date, (b) all Class 1, Class 5, Class 7, and Class 8 Claims, (c) the
Mepco Unsecured Claim (d) the Later Monetized Asset Distribution, and (e) the Malpractice
Claim Distribution that are Allowed Claims against the Debtor; (ii) establishing and maintaining
such operating account and trust account(s) as are necessary; (iii) investing the cash held in any
trust account in one or more FDIC insured bank accounts, funds invested in United States
Treasury Bills or other instruments backed by the full faith and credit of the United States, or
otherwise permissible under Section 345 of the Bankruptcy Code; (iv) prosecuting, settling
and/or compromising any causes of action of the Estate including Litigation Claims; (v)
calculating and implementing all distributions to be made under the Plan to holders of (a) all
Unclassified Claims that are not paid on the Effective Date, (b) all Class 1, Class 5, Class 7, and
Class 8 Claims, (c) the Mepco Unsecured Claim (d) the Later Monetized Asset Distribution, and
(e) the Malpractice Claim Distribution that are Allowed Claims against the Debtor; (vi)
marketing, selling, leasing or otherwise disposing of or realizing the value of all Liquidating
Trust Assets; (vii) filing all required tax returns of the Liquidating Trust from its inception to its
termination (all returns of the debtor, USF, are the responsibility of the Debtor and not the
responsibility of the Liquidating Trustee) and paying taxes (if any) and all other obligations on
behalf of the Liquidating Trust from Estate funds; (viii) periodic reporting to interested parties of
the status of distributions on Claims; (ix) annual distributions to Liquidating Trust Beneficiaries
of the Liquidating Trust's net income plus all net proceeds from the sale of assets, except that the
Liquidating Trust may retain an amount of net proceeds or net income reasonably necessary to
maintain the value of its assets or to meet claims and contingent liabilities (including disputed
claims);  (x) and such other responsibilities and obligations as may be vested in the Liquidating
Trustee pursuant to this Plan, the Liquidating Trust Agreement or Court order as may be
necessary and proper to carry out the provisions of this Plan, in each case including the powers
with respect thereto set forth in Article VII hereof, provided, however, that notwithstanding
anything to the contrary contained in the Plan or this Liquidating Trustee Agreement, the
Liquidating Trustee shall have no authority or responsibility to file any tax returns on behalf of
USF.

  2.3 <u>Incidents of Ownership</u>.  The Liquidating Trust Beneficiaries shall be the sole
beneficiaries of the Liquidating Trust and the Liquidating Trustee shall retain only such incidents
of ownership as are necessary to undertake the actions and transactions authorized herein on
behalf of the Liquidating Trust Beneficiaries.

## III. RIGHTS, POWERS AND DUTIES OF TRUSTEE

  3.1 <u>Acknowledgement of Beneficial Interest</u>.  The Liquidating Trustee hereby
acknowledges that, on and after the Effective Date and to the extent that each such Liquidating
Trust Beneficiary is entitled to one or more distributions of the Liquidating Trust Assets (or the
proceeds thereof) pursuant to the terms and conditions of the Plan, the Liquidating Trust
Beneficiaries and their successors and assigns will have a beneficial interest in the Liquidating
Trust Assets.  The Liquidating Trustee will retain only such powers as are granted herein or in
the Plan.

3

3.2    <u>Management of Liquidating Trust</u>.  Subject to the terms hereof and the Plan, the Liquidating Trustee shall take charge of the Liquidating Trust Assets and shall endeavor to collect, conserve, protect, manage and liquidate or otherwise convert into Cash all claims, causes of action and assets which constitute the Liquidating Trust Assets and all such other property incidental thereto as may hereafter be acquired from time to time under this Liquidating Trust Agreement.  To this end and subject to the provisions hereof, the Liquidating Trustee shall manage the affairs of the Liquidating Trust, negotiate and enter into agreements binding the Liquidating Trust, and execute, acknowledge, and deliver any and all instruments which are necessary, required or deemed by the Liquidating Trustee to be advisable in connection with the performance of the Liquidating Trustee's duties hereunder and shall have full power and authority to take any action consistent with the purpose and provisions of the Plan.  Except as otherwise provided in the Plan or in this Liquidating Trust Agreement, and without prior or further authorization of the Bankruptcy Court, the Liquidating Trustee may control and exercise authority over the Liquidating Trust Assets, the acquisition, management and disposition thereof, and the management and conduct of the business of the Liquidating Trust to the same extent as if the Liquidating Trustee were the sole legal and beneficial owner thereof in his own right.  No person dealing with the Liquidating Trust shall be obligated to inquire into the authority of the Liquidating Trustee in connection with the acquisition, management or disposition of the Liquidating Trust Assets.  In connection with the management and use of the Liquidating Trust Assets, the Liquidating Trustee, without limitation of his power and authority, may do the following:

a.    accept the Liquidating Trust Assets;

b.    distribute Cash to the Liquidating Trust  Beneficiaries in accordance with the terms of this Liquidating Trust Agreement and the Plan, net of any taxes;

c.    liquidate, invest, administer and manage the Liquidating Trust Assets, including but not limited to the marketable securities owned by the Debtor and enforce claims of the Debtor's estate and collect amounts due with respect to such claims, all without any need for further Bankruptcy Court approval; provided, however, that the scope of the permitted investments shall be limited to include only demand and time deposits, including without limitation, short-term certificates of deposit in banks or other savings institutions or other temporary, liquid investment such as U.S. Treasury Bills, and those investments that a liquidating trust, within the meaning of Treasury Regulation § 301.7701-4(d), may be permitted to invest in, pursuant to the Treasury Regulations and Rev. Proc. 94-45, 1994-28 C.B. 124, or any modification in IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

d.    generally exercise any and all rights and remedies available to a trustee in bankruptcy in a bankruptcy case;

e.    execute deeds, bills of sale and other instruments of transfer in connection with the sale, assignment or transfer of the Liquidating Trust Assets;

4

    f.       establish bank accounts as necessary or appropriate, draw checks on such bank accounts and perform such other necessary and appropriate duties with respect to such accounts;

    g.      engage employees and professional persons to assist the Liquidating Trustee with respect to his responsibilities, and pay, on a monthly basis or other basis as they come due, the fees and expenses of the professional persons, agents and employees engaged by the Liquidating Trust and to pay all expenses for winding down the affairs of the Debtor's Estate;

    h.      settle all matters involving less than one hundred thousand dollars ($100,000.00) without the need for further court approval or notice to creditors, and with respect to any matters involving an amount at issue in excess of one hundred thousand dollars ($100,000.00), present any settlement or compromise of such matter for approval by the Bankruptcy Court after notice and a hearing in accordance with Bankruptcy Rule 9019.

    i.       All other powers as are vested in or assumed by the Liquidating Trustee pursuant to the Plan or any Bankruptcy Court order or as may be necessary to carry out the provisions of the Plan.

3.3    <u>Segregation of Funds</u>. The Liquidating Trustee shall at all times segregate and keep separate all funds relating to the Liquidating Trust Assets.

3.4    <u>Final Distribution Report</u>. The Liquidating Trust shall prepare and file with the Bankruptcy Court a final report (the "Final Distribution Report") twenty-one (21) days prior to making the final distribution under the Plan. The report shall disclose the total amount distributed or to be distributed under the Plan.

3.5    <u>Post-Final Distribution Assets</u>. Unless the Bankruptcy Court orders otherwise, any assets received by the Liquidating Trust after the filing of the Final Distribution Report shall be tendered to the Clerk of the Bankruptcy Court for distribution to parties who shall make their claims upon such Clerk in the same manner as provided for in liquidation pursuant to section 347(a) of the Bankruptcy Code and Bankruptcy Rule 3011.

3.6    <u>Compensation</u>. The Liquidating Trustee and all professionals retained by the Liquidating Trustee shall be reimbursed from the Liquidating Trust for all out-of-pocket fees, costs, and expenses (including for services at the then prevailing hourly rates) in acting under the Plan and this Liquidating Trust Agreement. The Liquidating Trustee and its professionals shall have a first priority lien on the Liquidating Trust Assets to secure payment of the reimbursement of costs and expenses.

## IV.    CONDUCT OF THE TRUSTEE

4.1    <u>Exercise of Duties and Responsibilities</u>. The Liquidating Trustee shall exercise the rights and powers vested in him under the Plan and this Liquidating Trust Agreement and use the same degree of care and skill in the exercise of such rights and powers, as a prudent person

5

would exercise or use under such circumstances in the administration of such person's own affairs. The Liquidating Trustee shall not be personally liable in connection with the affairs of the Liquidating Trust to any Liquidating Trust Beneficiary, the Liquidating Trust or any other person, provided that no provision of the Plan or this Liquidating Trust Agreement shall be construed to relieve the Liquidating Trustee from liability for his own gross negligence in acting or failing to act, or his own willful misconduct or fraud.

4.2     Removal.  The Liquidating Trustee may also be removed from office upon written motion by a Liquidating Trust Beneficiary and a finding by the Bankruptcy Court of fraud or willful misconduct by the Liquidating Trustee or of the Liquidating Trustee's physical or mental disability after a hearing on not less than 14 days' notice.

4.3     Appointment of Successor Liquidating Trustee.  In the event of the death, incompetency, resignation or removal of the Liquidating Trustee, the Liquidating Trustee or any Liquidating Trust Beneficiary may file a motion with the Bankruptcy Court seeking appointment of a successor Liquidating Trustee.

4.4     Indemnification.  Except in those situations in which the Liquidating Trustee is not exonerated of personal liability as set forth herein, the Liquidating Trustee shall be defended, held harmless and indemnified from time to time from the Liquidating Trust Assets against any and all losses, claims, costs, expenses and liabilities, including legal fees and expenses, and any costs of defending any action to which the Liquidating Trustee may be subject in connection with any action, suit, proceeding or investigation brought or threatened against the Liquidating Trustee in the Liquidating Trustee's capacity as Liquidating Trustee or in any matter arising out of or related to this Liquidating Trust Agreement or the affairs of the Liquidating Trust, except that the Liquidating Trustee shall not be indemnified for acts of gross negligence, fraud or willful misconduct.  The indemnities set forth herein shall apply with the same force, effect and limitations as to any professionals retained by the Liquidating Trustee.

4.5     No Liability for Acts of Predecessors.  The Liquidating Trustee shall not in any way be responsible for the acts or omissions of the Debtor, or the officers, directors, agents, predecessors or successors thereof.

4.6     No Personal Obligation for Liquidating Trust Liabilities.  Persons dealing with the Liquidating Trustee or seeking to assert claims against the Debtor shall look only to the Liquidating Trust Assets to satisfy any liability incurred by the Liquidating Trustee to such person in carrying out the terms of this Liquidating Trust Agreement, and the Liquidating Trustee shall have no personal, individual obligation to satisfy such liability except to the extent that such liability arises from the Liquidating Trustee's gross negligence in acting or failing to act, or the Liquidating Trustee's willful misconduct or fraud.

## V.     RIGHTS, POWERS AND DUTIES OF BENEFICIARIES

5.1     Absolute Owners.  The Liquidating Trustee may deem and treat the applicable Liquidating Trust Beneficiaries of record as the absolute owners of the corresponding Liquidating Trust Interests for the purpose of receiving distributions and payments thereon or on account hereof and for all other purposes whatsoever.

6

5.2    Record Date.  The date of record for determining entitlement of any holder of a Liquidating Trust Interest to any payments shall be in the case of the initial distributions following confirmation of the Plan, the Effective Date, and in the case of any subsequent distributions, fifteen (15) business days prior to the distribution.

5.3    Interest Beneficial Only.  The ownership of a beneficial interest hereunder shall not entitle any Liquidating Trust Beneficiary to any title in or to the Liquidating Trust Assets as such, or to any right to call for a partition or division of same.

## VI.    TAX MATTERS

6.1    Income Tax Status.  For purposes of the Internal Revenue Code (the "Code), the Debtor shall be deemed to have transferred the Liquidating Trust Assets to the Liquidating Trust Beneficiaries (subject only to the interests provided for or permitted herein) and thereupon the Liquidating Trust Beneficiaries shall be deemed to have transferred to Liquidating Trust Assets to the Liquidating Trust (subject only to the interests provided for or permitted herein).  For all federal income tax purposes, consistent valuations shall be used by the Liquidating Trust and the Liquidating Trust Beneficiaries for the Liquidating Trust Assets.  The Liquidating Trust Beneficiaries are required under the Plan and hereunder in their tax returns to value all assets of the Debtor's' Estate for federal income tax purposes in a manner consistent with the valuation provided by the Liquidating Trust in its tax returns.  The determination of the Liquidating Trust with respect to such matters as reflected in its tax returns as well as the ratable gains, income, and expenses allocable to each Liquidating Trust Beneficiary as reflected in the required tax returns described herein shall be final and binding on all Liquidating Trust Beneficiaries.  The Liquidating Trust is intended to be treated as a liquidating trust pursuant to Treasury Regulations § 301.7701-4(d) and Revenue Procedure 94-45, 1994-28 C.B. 124, and as a grantor trust subject to Sections 671-677 of the Code. The Liquidating Trust  Beneficiaries shall be treated as grantors and donors of a grantor trust for U.S. federal income tax purposes (subject to the rights of holders of Allowed Claims that are not Liquidating Trust  Beneficiaries).  Any items of income, deduction, credit, or loss of the Liquidating Trust shall be allocated for federal income tax purposes among the Liquidating Trust Beneficiaries pro-rata on the basis of their beneficial interests.  The Liquidating Trustee is authorized to take any action that may be necessary or appropriate or minimize any potential tax liability of the Liquidating Trust Beneficiaries arising out of the operations of the Liquidating Trust.

6.2.    Purpose of Liquidating Trust. Subject to Article VII, the Liquidating Trust shall continue in existence so long as necessary for the purpose of liquidating the Liquidating Trust Assets, in accordance with Treasury Regulations § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to , and consistent with the liquidating purpose of the Liquidating Trust.

6.3    Tax Returns and Reports.  To the extent required, the Liquidating Trustee shall cause to be prepared and filed at the cost and expense of the Liquidating Trust, all information tax returns with the Internal Revenue Service and the Liquidating Trust Beneficiaries, as required for grantor trusts.  In addition, the Liquidating Trustee shall cause to be prepared and filed in a timely manner, such other state or local tax returns as are required by applicable law by virtue of

7

the existence and operation of the Liquidating Trust and shall pay any taxes shown as due thereon.

6.3    Withholding.  The Liquidating Trustee may withhold from the amount distributable from the Liquidating Trust at any time such sum or sums as may be sufficient to pay any tax or taxes or other charge or charges which have been or may be imposed on the distributee or upon the Liquidating Trust with respect to the amount distributable or to be distributed under the income tax laws of the United States or any state or political subdivision or entity by reason or any distribution provided for any law, regulation, rule, ruling, directive, or other governmental requirement.

6.4    Beneficiary Tax Information.  Each Liquidating Trust Beneficiary shall be required, before any distribution is made to such holder, to provide the Liquidating Trustee with an executed IRS Form W-9 or such other appropriate taxpayer identification information, to allow the Liquidating Trustee to file the appropriate tax return on behalf of the Liquidating Trust. If a Liquidating Trust Beneficiary shall fail to provide the Liquidating Trustee with any requested taxpayer identification information within 90 days after a request for this information, this failure shall be deemed a waiver of all claims by the Beneficiary against the Liquidating Trust, including the right to distributions, and the funds that would otherwise have been distributed to such holder shall revert to the Liquidating Trust to be distributed to other Beneficiaries who have provided the requested taxpayer identification information.

6.5    Taxable Year.  The taxable year of the Liquidating Trust shall, unless otherwise required by the Code, be the calendar year.

## VII.        MISCELLANEOUS

7.1    Notices.  All communications and notices provided for in this Liquidating Trust Agreement shall be in writing and addressed, as applicable, at the following address:

Liquidating Trustee:

Douglas A. Hartz
US Fidelis Liquidating Trustee
4353 Tuller Road, Bldg L
Dublin, OH  43017

Debtor:

US Fidelis, Inc.
c/o Scott Eisenberg
Amherst Partners, LLC
Brown Street Centre
255 East Brown Street, Suite 120
Birmingham, MI 48009

Attorneys for the Debtor:

8

Brian Fenimore
Lathrop & Gage LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618

Attorneys for the Creditors' Committee:

David A. Warfield
Brain Hockett
Thompson Coburn LLP
One US Bank Plaza
St. Louis, MO 63101

Notices given by facsimile, hand or overnight delivery shall be deemed given upon delivery, and notices by mail shall be deemed given on the first business day following deposit into the United States mail.

All communications and notices provided under this Agreement shall be in writing and addressed to the Liquidating Trust Beneficiaries at their registered addresses, as amended in writing from time to time. Any notice, if properly addressed, shall be deemed given upon the first business day after placement in the United States mail, first class postage prepaid. The Liquidating Trustee may rely on the addresses of the Liquidating Trust Beneficiaries provided by the Debtor in the Schedules or by the Liquidating Trust Beneficiaries in their timely-filed proofs of claim.

7.2     Applicable Law.  The Liquidating Trust created herein shall be construed, regulated and administered under the laws of the State of Missouri and the United States of America, provided that the Liquidating Trust and any interpretation or enforcement of the provisions of this Liquidating Trust Agreement shall be subject to the jurisdiction of the Bankruptcy Court, as provided by the Plan.

7.3     Relationship Created.  The only relationship created by this Liquidating Trust is the trustee-beneficiary relationship between the Liquidating Trustee and Liquidating Trust Beneficiaries.  No other relationship or liability is created, and nothing herein shall be construed so as to constitute an association, partnership, or joint venture of any kind between or among the Liquidating Trustee, the Liquidating Trust Beneficiaries, or the parties to this Liquidating Trust Agreement.

7.4     Modification.  This Liquidating Trust Agreement shall not be modified without further order of the Bankruptcy Court after such notice as may be required by the Bankruptcy Court and a hearing.  Upon motion of the Liquidating Trustee, the Bankruptcy Court or other court of competent jurisdiction may approve, without notice to the Liquidating Trust Beneficiaries, technical modifications to this Liquidating Trust Agreement which do not adversely affect the rights or interest of the Liquidating Trust Beneficiaries or which conform the terms of this Liquidating Trust Agreement to the terms of the Plan.

9

7.5     <u>Severability</u>.  Any provision of this Liquidating Trust Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent such provision is unenforceable without invalidating the remaining provisions of this Liquidating Trust Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

7.6     <u>Interpretation</u>.  The various headings of this Liquidating Trust Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Liquidating Trust Agreement.  In the event of any conflict between the terms of this Liquidating Trust Agreement and the Plan, the terms of the Plan shall govern.

7.7     <u>Termination of Liquidating Trust</u>.  This Liquidating Trust shall terminate on the later to occur of:  (i) the fulfillment of the Liquidating Trust's purpose by liquidation of all of the Liquidating Trust Assets and the distribution of all proceeds in accordance with the Plan; and (ii) two years after the Effective Date

10

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first written above.

Dated: _____, 2012

**US FIDELIS, INC.**

BY: _____

Its Chief Restructuring Officer

**TRUSTEE OF THE LIQUIDATING TRUST**

BY: _____

Liquidating Trustee

11

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| US FIDELIS, INC., | ) | Hon. Charles E. Rendlen, III |
| | ) | |
| Debtor. | ) | Case No. 10-41902 |
| | ) | |

**NOTICE OF DESIGNATION OF LIQUIDATING TRUSTEE
FOR LIQUIDATING TRUST**

COMES NOW the Official Committee of Unsecured Creditors for US Fidelis, Inc. (the

"Committee") and states that the following has been designated to serve as the initial trustee for

the Liquidating Trust that will be created pursuant to Section 8.3 of the Plan of Liquidation filed

on June 5, 2012:

> Douglas A. Hartz
> US Fidelis Liquidating Trustee
> 4353 Tuller Road, Bldg L
> Dublin, OH  43017

Respectfully submitted,

THOMPSON COBURN LLP

By:_/s/  David A. Warfield_____
    David A. Warfield, #34288MO
    dwarfield@thompsoncoburn.com
    Brian W. Hockett, # 52984MO
    bhockett@thompsoncoburn.com
    One US Bank Plaza, Suite 2600
    St. Louis, MO 63101
    Telephone: (314) 552-6000
    Telecopier: (314-552-7079

Attorneys for the Creditors Committee

12

**US FIDELIS CONSUMER RESTITUTION FUND AGREEMENT**
**Dated _____, 2012**
**By and among**

**US FIDELIS, INC.**
**[St. Louis, Missouri vehicle service contract marketer]**

**and**

**the persons listed on the signature pages attached hereto**

14022297.1

13

This CONSUMER RESTITUTION FUND AGREEMENT, dated as of _____, 2012, is made by and among US Fidelis, Inc. ("US Fidelis"), a Missouri corporation that markets vehicle service contracts and that is a debtor-in-possession in Case No. 10-41902 in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court"), as the transferor of the Fund's assets established pursuant to this Agreement (the "Consumer Restitution Fund") in accordance with the First Amended Plan of Liquidation of US Fidelis, Inc. under Chapter 11 of the Bankruptcy Code, filed pursuant to section 1121(a) of Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and confirmed by an order of the Bankruptcy Court entered on _____, 2012 (the "Plan"), the Attorney General Steering Committee, and The Garden City Group, Inc., a Delaware corporation, as Claims Administrator.

All terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.  All terms used but not defined herein or in the Plan but defined in the Bankruptcy Code or Bankruptcy Rules shall have the meanings ascribed to them in the Bankruptcy Code and Bankruptcy Rules, as the case may be.

WHEREAS, US Fidelis has liquidated under the provisions of chapter 11 of the Bankruptcy Code in a case pending in the Bankruptcy Court for the Eastern District of Missouri and styled In re US Fidelis, Inc., Case No10-41902; and

WHEREAS, the Plan has been confirmed by the Bankruptcy Court; and

WHEREAS, the Plan provides, *inter alia*, for the creation of the Consumer Restitution Fund in accordance with this Agreement; and

WHEREAS, the Consumer Restitution Fund shall be subject to the continuing jurisdiction of the Bankruptcy Court; and

WHEREAS, pursuant to the Plan, the Consumer Restitution Fund is to use its assets and income to satisfy the Consumer Claims; and

WHEREAS, it is the intent of US Fidelis and the Consumer Restitution Advisory Committee that the Consumer Restitution Fund be administered, maintained and operated at all times in a manner that endeavors to satisfy Consumer Claims in accordance with the Consumer Restitution Fund Distribution Procedures, this Agreement and the Escrow Agreement; and

WHEREAS, the Consumer Restitution Fund Distribution Procedures (attached hereto as Exhibit A) and the Escrow Agreement (attached hereto as Exhibit B) are intended to be incorporated by reference into this Agreement.

WHEREAS, pursuant to the Plan, the Consumer Restitution Fund is intended to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the United States Internal Revenue Code (the "IRC"); and

WHEREAS, the confirmed Plan provides for a channeling injunction pursuant to section 105(a) of the Bankruptcy Code, and all Consumer Claims have been channeled to the Consumer Restitution Fund;

NOW, THEREFORE, it is hereby agreed as follows:

### Article I.

### DEFINITIONS

The following are the definitions for the words and terms used in this Agreement. Unless otherwise defined in this Agreement, words and terms used herein have the meaning ascribed to them in the Plan.

**Section 1.01**      **"Agreement"** means this Consumer Restitution Fund Agreement or as amended.

**Section 1.02**      **"Attorney General Executive Committee"** means a committee comprised of representatives of the Attorneys General for the following states: the States of Ohio, Texas and Washington..

**Section 1.03**      **"Attorney General Steering Committee"** means a committee comprised of representatives of the Attorneys General for the Attorney General Executive Committee and the State of Missouri.

**Section 1.04**      **"Bankruptcy Case"** means the chapter 11 case pending for US Fidelis, Inc. in the United States Bankruptcy Court for the Eastern District of Missouri, case number 10-41902.

**Section 1.05**      **"Bankruptcy Code"** means title 11 of the United States Code, as now in effect or hereafter amended.

**Section 1.06**      **"Bankruptcy Court"** means the United States Bankruptcy Court for the Eastern District of Missouri.

**Section 1.07**      **"Beneficiaries"** mean the holders of allowed Consumer Claims.

**Section 1.08**      **"Claims Administrator"** shall mean The Garden City Group, Inc.

**Section 1.09**      **"Confirmation Order"** means the order of the Bankruptcy Court confirming the US Fidelis Plan pursuant to section 1129 of the Bankruptcy Code.

**Section 1.10**      **"Consumer"** means a Person who purchased a Vehicle Service Contract from the Debtor.

**Section 1.11**      **"Consumer Claim"** shall have the meaning ascribed in Section 1.35 of the Plan of Liquidation for US Fidelis, Inc. dated May 1, 2012 Proposed by the Official Committee of Unsecured Creditors or any revisions thereto.

**Section 1.12** **"Consumer Restitution Advisory Committee"** means the committee composed of Attorneys General as established by the Attorney General Executive Committee.

**Section 1.13** **"Consumer Restitution Fund" or "US Fidelis Consumer Restitution Fund"** means the fund created by this Agreement pursuant to the Plan.

**Section 1.14** **"Consumer Restitution Fund Assets" or "Escrow Fund"** means those monetary assets channeled from the US Fidelis Chapter 11 plan to the Consumer Restitution Fund and held by the Escrow Agent.   The Consumer Restitution Fund may also include contributions by non-Debtor third parties.

**Section 1.15** **"Consumer Restitution Fund Bar Date"** means the date established by the US Fidelis Plan of Liquidation.

**Section 1.16** **"Consumer Restitution Fund Distribution Procedures"** means the procedures for liquidating Consumer Claims and distributing funds from the Consumer Restitution Fund. The Consumer Restitution Fund Distribution Procedures are attached hereto as Exhibit A and may be amended from time to time by the Consumer Restitution Advisory Committee in accordance with the procedures established under this Agreement.

**Section 1.17** "**Consumer Restitution Fund Expenses**" means those expenses described in Sections 5.07, 5.08, 5.09, 5.10 and 7.03 of this Agreement.

**Section 1.18** **"Creditors' Committee"** means the Official Committee of Unsecured Creditors in the Bankruptcy Case.

**Section 1.19** **"Effective Date"** means the effective date of the Plan.

**Section 1.20** **"Escrow Agent"** shall be The Garden City Group. Inc.

**Section 1.21** **"Escrow Agreement"** means the Escrow Agency Agreement of even date herewith in connection with the Consumer Restitution Fund Agreement and the Consumer Restitution Fund Distribution Procedures created in accordance with the Plan of Liquidation of US Fidelis, Inc under Chapter 11 of the Bankruptcy Code.

**Section 1.22** **"Fund"** means the fund created by this Agreement pursuant to the Plan.

**Section 1.23** **"IRC"** means Title 26 of the United States Code as now in effect or hereafter amended.

**Section 1.24** **"Litigating States"** means the Attorneys Generals of the following 13 states:  Arkansas, Idaho, Iowa, Kansas, Maryland, Missouri, North Carolina, Ohio, Oregon, Pennsylvania, Texas, Washington, and Wisconsin.

**Section 1.25** **"Non-Categorized Claim"** means any Consumer Claim of any nature or kind that has no Assigned Claim Value or Maximum Value as a Class One, Class Two or Class Three Claim in Article VI of the Consumer Restitution Fund Distribution Procedures. By way of example, but not limitation, a Consumer Claim for punitive damages or a claim filed by a

14022297.1

16

Consumer in a State that opted out of the Consumer Restitution Fund pursuant to an order of the Bankruptcy Court are Non-Categorized Claims.

**Section 1.26**     **"Plan"** means the First Amended Plan of Liquidation for US Fidelis, Inc., dated June 5, 2012, Proposed by the Official Committee of Unsecured Creditors that was confirmed by the Bankruptcy Court.

**Section 1.27**     **"US Fidelis"** means US Fidelis, Inc., NAWS, National Auto Warranty Services, Inc., Dealer Services, and any registered fictitious names under which US Fidelis marketed or sold vehicle service contracts.  As used herein, "US Fidelis" means the St. Louis, Missouri based vehicle service contract marketer and shall not in any manner refer to the New York State Catholic Health Plan, Inc., d/b/a Fidelis Care New York, a New York-based healthcare entity who has no relationship to US Fidelis.

**Section 1.27**     **"Vehicle Service Contract"** for purposes of this Agreement means a contract or agreement (a) that contains a separately stated consideration for a specific duration to perform the repair, replacement or maintenance of a motor vehicle and includes vehicle protection products, commonly referred to as product warranties; or (b) that provides indemnification for repair, replacement or maintenance of a motor vehicle due to an operational or structural defect in materials, workmanship or normal wear and tear; or (c) that may or may not include additional provision for incidental payment of indemnity under limited circumstances, including but not limited to, towing, rental and emergency road service.

**Section 1.28**     **"Vehicle Service Contract Refund Claim"** means a claim for a refund pursuant to the terms of a Vehicle Service Contract by a Consumer that purchased such contract through US Fidelis.  The term "Vehicle Service Contract Refund Claim" does not include (a) a refund claim by a holder of a Ultimate Warranty Vehicle Service Contract; (b) a refund claim subject to the receivership of the Capital Assurance Risk Retention Group; (c) a refund claim in which the Vehicle Service Contract obligor is solvent and able to provide the holder a refund; or (d) a refund claim in which the Vehicle Service Contract obligor is solvent and is obligated to provide the holder a refund pursuant to an agreement with the Attorney General Executive Committee .

## Article II.

## DECLARATION OF CONSUMER RESTITUTION FUND

**Section 2.01**     **Creation and Name.**  The Plan hereby creates a Fund known as the "US Fidelis Consumer Restitution Fund."  The assets and administration of the Consumer Restitution Fund shall be managed by the Claims Administrator in accordance with the Escrow Agreement and the Consumer Restitution Advisory Committee for the benefit of the Beneficiaries.

**Section 2.02        Purpose.**  The purpose of the Consumer Restitution Fund is to implement and to carry out the provisions and purposes of the Plan and Confirmation Order, including but not limited to, receiving the Consumer Restitution Fund Assets from US Fidelis; receiving contributions from non-Debtor third parties at the direction of any state Attorney General or its designee; establishing procedures and mechanisms for liquidating Consumer Claims; and distributing the Consumer Restitution Fund Assets to Beneficiaries in accordance with the terms and conditions set forth in this Agreement and the Consumer Restitution Fund Distribution Procedures.

**Section 2.03        Qualified Settlement Fund.**  The Consumer Restitution Fund is intended to be a qualified settlement fund within the meaning of Section 1.468B-1(c) of the Treasury Regulations promulgated under Section 468B of the IRC.   The Claims Administrator and Consumer Restitution Advisory Committee shall use their respective best efforts to take any action or cause the Consumer Restitution Fund to take any action necessary to create and maintain the status of the Consumer Restitution Fund as a qualified settlement fund.  The Claims Administrator and Consumer Restitution Advisory Committee shall not take any action that will knowingly adversely affect the qualification of the Consumer Restitution Fund as a qualified settlement fund.

**Section 2.04        Transfer of Assets.**  Pursuant to the Plan, US Fidelis shall contribute $13,000,000 to the Consumer Restitution Fund and Warrantech shall contribute $1,100,000 to the Consumer Restitution Fund.  Additional monetary amounts may be contributed by any non-Debtor third party to the Consumer Restitution Fund at the direction of a state Attorney General or the Attorney General's designee.  All assets received by the Consumer Restitution Fund and any earnings thereon, shall be held, administered and disbursed under the terms of this Agreement and the Escrow Agreement.

**Section 2.05        Acceptance of Assets and Assumption of Liabilities.**  Pursuant to the confirmed Plan and as set forth in the Escrow Agreement, the Claims Administrator (a) accepts the transfer of the Consumer Restitution Fund Assets and any non-Debtor third party contributions as an Escrow Agent on behalf of the Consumer Restitution Fund; and (b) shall have the duties of an Escrow Agent in connection with the Consumer Restitution Fund's payment of Consumer Claims in accordance with the Consumer Restitution Fund Distribution Procedures.  Notwithstanding the foregoing or any other provision of this Agreement to the contrary, in the event of any conflict or inconsistency between this Agreement and the Escrow Agreement, with regard to the Escrow Agent's and/or Claims Administrator's rights, duties or obligations or otherwise, the provisions of the Escrow Agreement shall govern and control.

## Article III.

## POWERS OF CONSUMER RESTITUTION FUND ADMINISTRATION

**Section 3.01    Claims Administrator.**  The Claims Administrator is and shall act as Escrow Agent to the Consumer Restitution Fund in accordance with the provisions of the confirmed Plan, this Agreement and the Escrow Agreement.  The Claims Administrator shall at all times administer the Consumer Restitution Fund and the Consumer Restitution Fund Assets in accordance with the purposes of the Consumer Restitution Fund set forth in Section 2.02 above.  Subject to the Plan and this Agreement, the Claims Administrator shall have the power to take any and all actions upon the consent and direction of the Consumer Restitution Advisory Committee that are necessary or proper to fulfill the purposes of the Consumer Restitution Fund, including, without limitation, each power expressly granted in Section 3.03, all powers reasonably incidental thereto, and any escrow power now or hereafter permitted under the law governing the Consumer Restitution Fund.

**Section 3.02    Approval.**  Except as required by applicable law, the Plan, this Agreement or the Escrow Agreement, the Claims Administrator need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

**Section 3.03    Powers.**  Subject to and without limiting the generality of Section 3.01 above, and except as limited below, the Claims Administrator, with the consent and direction of the Consumer Restitution Advisory Committee, shall have the power to:

(A)  Receive and hold the Consumer Restitution Fund Assets in escrow and exercise all rights and powers with respect thereto, in accordance with the terms and conditions of the Escrow Agreement;

(B)  Invest the Consumer Restitution Fund Assets held from time to time by the Consumer Restitution Fund as set forth in Article IV and the Escrow Agreement.

(C)  Sell, transfer or exchange any or all of the Consumer Restitution Fund Assets at such prices and upon such terms as the Claims Administrator may consider necessary, appropriate or desirable in fulfilling the purpose of the Consumer Restitution Fund and the Escrow Agreement;

(D)  Pay liabilities and expenses of the Consumer Restitution Fund, including without limitation Consumer Restitution Fund Expenses;

(E)  Sue and participate, as party or otherwise, in any judicial, administrative, arbitrative or other proceeding related to fraudulent claims or to collect, compromise or settle, in the name of the Consumer Restitution Fund, any claim, right, action or cause of action in the Consumer Restitution Fund Assets, if any;

(F)  Establish such funds, reserves and accounts as the Claims Administrator may consider necessary, appropriate or desirable in fulfilling the purpose of the Consumer Restitution Fund and the Escrow Agreement;

(G)  Establish, supervise and administer the Consumer Restitution Fund in accordance with this Agreement, the Consumer Restitution Fund Distribution Procedures and the Escrow Agreement;

(H)  Compensate the Claims Administrator, and its officers, employees, legal, financial, accounting, investment, auditing, forecasting and other advisors, consultants, independent contractors and agents, and reimburse the Claims Administrator and the members of the Consumer Restitution Advisory Committee for any reasonable out-of-pocket fees and expenses incurred by or on behalf of it, him or her in connection with the performance of its, his or her duties hereunder, all as provided below;

(I)  Execute and deliver such instruments as the Claims Administrator may consider necessary, appropriate or desirable in administering the Consumer Restitution Fund;

(J)  Enter into such other arrangements with third parties as the Claims Administrator may consider necessary, appropriate or desirable in fulfilling the purpose of the Consumer Restitution Fund, provided such arrangements do not conflict with any other provision of this Agreement;

(K)  Maintain appropriate general liability insurance;

(L)  Delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Consumer Restitution Fund Assets to any one or more recognized institutional investment advisors or recognized institutional investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 5.05; and

(M)  Consult with the Consumer Restitution Advisory Committee at such times and with respect to such issues relating to the conduct of the Consumer Restitution Fund as the Consumer Restitution Advisory Committee may consider necessary, appropriate or desirable.

**Section 3.04      Consent of the  Consumer Restitution Advisory Committee**.  The Claims Administrator shall obtain the consent and direction of the Consumer Restitution Advisory Committee as provided in this Agreement and the Consumer Fund Restitution Distribution Procedures.  Consent shall be obtained in writing, whether electronic or otherwise, from a majority of members of the Committee or from the Committee Chairperson, when authorized by the other members of the Restitution Advisory Committee.  Compensation of the Claims Administrator shall be governed by Section 5.08 of this Agreement and the Bankruptcy Administration Agreement.

**Section 3.05      Principal Office**.  The Fund shall maintain its principal office in the state of Washington.

## Article IV.

## ACCOUNTS AND INVESTMENTS

**Section 4.01      Accounts.**  The Claims Administrator may from time to time create such accounts and reserves for the Consumer Restitution Fund as the Claims Administrator, in consultation with the Consumer Restitution Advisory Committee, may consider necessary, appropriate or desirable in order to provide for payment, or to make provisions for future payment of Consumer Claims in accordance with the Consumer Restitution Fund Distribution Procedures or to provide for payment, or to make provisions for future payment of Consumer Restitution Fund Expenses in accordance with this Agreement and may, with respect to any such account or reserve, restrict the use of monies therein.

The Claims Administrator shall include in a Semi-annual Report, or in such other reports as may be reasonably requested by the Consumer Restitution Advisory Committee, (a) a reasonably detailed description of any account or reserve created in accordance with this Section; (b) the transfers made to such account, (c) the proceeds of or earnings on the assets held in each such account and (d) the payments from each such account.

**Section 4.02      Investments.**  Investment of monies held in the Consumer Restitution Fund shall be administered in the manner consistent with the standards set forth in the Uniform Prudent Investor Act drafted by the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995, subject to the following limitations and provisions.  The Consumer Restitution Fund shall not:

(A)   acquire, directly or indirectly, equity in any entity or business enterprise;

(B)   acquire or hold any long-term debt securities unless such securities have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof;

(C)   acquire or hold commercial paper, accounts or chattel paper;

(D)   acquire or hold any preferred stock or securities;

(E)   hold any debt securities or other debt instruments issued by any entity (other than debt securities or other debt instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof);

(F)   acquire or hold any certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 4.02(C) above;

(G)   acquire or hold any repurchase obligations; or

(H)   acquire or hold any rights, warrants, options or similar securities;

**Section 4.03        Source of Payments.**

(A) All payments to be made by the Consumer Restitution Fund, including, without limitation, payments in respect of Consumer Claims and Consumer Restitution Fund Expenses, shall be payable solely by the Consumer Restitution Fund out of the Consumer Restitution Fund Assets. US Fidelis, the present or former directors, officers, employees, advisors, consultants, or representatives of US Fidelis, the Unsecured Creditor's Committee, the Consumer Restitution Advisory Committee, or members thereof or the present or former officers, employees, advisors, consultants, agents or Representatives of any of them, shall not be liable for the payment of any Consumer Claim or any Consumer Restitution Fund Expense or other liability of the Consumer Restitution Fund. Notwithstanding the foregoing, nothing in this Agreement is intended to release any obligor, other than Warrantech, to the extent provided for under the Plan, from any liability on a Vehicle Service Contract sold by US Fidelis.

(B) The Claims Administrator shall include a reasonably detailed description of any payments made in accordance with this Section 4.03 in a Semi-annual Report or in such other reports as may reasonably be requested by the Consumer Restitution Advisory Committee.

## Article V.

## CLAIMS ADMINISTRATOR AND COMMITTEE

**Section 5.01        Supervision.**    The Claims Administrator and the Consumer Restitution Advisory Committee shall operate the Consumer Restitution Fund.

**Section 5.02        Appointment of Consumer Restitution Advisory Committee.**    The initial Consumer Restitution Advisory Committee shall be appointed by the Executive Committee.

**Section 5.03        Operation of the Consumer Restitution Advisory Committee.**

(A) Chairperson.  The Consumer Restitution Advisory Committee shall elect by majority vote an initial chairperson of the Consumer Restitution Advisory Committee.

(B) Meetings.  The Consumer Restitution Advisory Committee shall meet:

   (1) on a periodic basis that is acceptable to the Consumer Restitution Advisory Committee;

   (2) via telephone conference or in person as is appropriate under the circumstances; and

   (3) following reasonable written notice by a member or the Claims Administrator, electronically or otherwise, provided to each member prior to such meeting.

(C) Number.  The number of members of the Consumer Restitution Advisory Committee shall be no fewer than three.

(D) Quorum; Vote.  A majority of the members of the Consumer Restitution Advisory Committee shall constitute a quorum, and approval of a majority of all the members of the Consumer Restitution Advisory Committee shall be necessary to approve any matter.

(E) Purpose.  The Consumer Restitution Advisory Committee shall meet to implement distribution procedures in consultation with the Claims Administrator.

(F) Amendments and Modifications.  After reasonable notice and consultation with the Claims Administrator, the Consumer Restitution Advisory Committee may amend or modify the Consumer Restitution Fund Distribution Procedures and other similar mechanisms by which Beneficiaries may receive distributions from the Claims Administrator.

**Section 5.04        Terms of Service; Resignation; Removal.**

(A) The Claims Administrator shall serve for the duration of the Consumer Restitution Fund subject to resignation or removal.  The Attorneys General serving as members of the Consumer Restitution Advisory Committee shall serve for the duration of the Consumer Restitution Fund subject to resignation or removal.

(B) Resignation.  The Claims Administrator or a member of the Consumer Restitution Advisory Committee may resign at any time by written notice to the remaining Consumer Restitution Advisory Committee members.  Such notice shall specify a date when such resignation shall take effect that shall not be less than ninety days after the date such notice is given, where practicable.

(C) Removal.  The Claims Administrator or a member of the Consumer Restitution Advisory Committee may be removed by a unanimous vote of the Consumer Restitution Advisory Committee that does not include the Committee member being removed.  A Claims Administrator or member of the Consumer Restitution Advisory Committee may be removed for good cause shown.  Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions in this Agreement, a consistent pattern of neglect and failure to perform or participate in performing the duties of a member of the Consumer Restitution Advisory Committee hereunder or repeated non-attendance at scheduled meetings.

(D) Appointment of Successor Claims Administrator.  In the event that the Claims Administrator resigns or is removed, the Consumer Restitution Advisory Committee shall, as promptly as is practicable, select a replacement Claims Administrator.  Upon appointment of a successor Claims Administrator, the successor Claims Administrator shall have all rights, titles, duties, obligations, powers, and authority of the predecessor Claims Administrator under this Agreement.

23

(E)   Appointment of Replacement Members of the Consumer Restitution Advisory Committee.  In the event that an Attorney General resigns or is removed from the Consumer Restitution Advisory Committee, the remaining members of the Consumer Restitution Advisory Committee shall elect a replacement.

**Section 5.05        Limitations on Liability of Claims Administrator and Members of the Consumer Restitution Advisory Committee.**

(A)   The Claims Administrator shall not be liable to the Consumer Restitution Fund or to any Beneficiaries for anything done or omitted to be done in accordance with the terms of this Agreement, the Consumer Restitution Fund Distribution Procedures or the Escrow Agreement if (1) done or omitted to be done at the written direction of the Consumer Restitution Advisory Committee or (2) done in good faith and without willful or wanton misconduct. The Claims Administrator shall be entitled to rely upon any notice, consent, certificate, affidavit, statement, paper, document, writing or communication reasonably believed by it to be genuine and to have been signed, sent or made by the proper person or persons.

(B)    The members of the Consumer Restitution Advisory Committee shall not be liable to the Consumer Restitution Fund or to any Beneficiaries except for acts of willful misappropriation or their own breach of trust committed in bad faith.

(C)   To the extent that, at law or equity, the Claims Administrator, the Consumer Restitution Advisory Committee or its members have duties (including fiduciary duties) and liabilities relating thereto, they shall not be liable to the Consumer Restitution Fund or any holder of a Consumer Claim for their good faith reliance on the provisions of this Agreement.

(D)   Notwithstanding any other provision of this Agreement or otherwise applicable law, whenever in this Agreement, the Claims Administrator and the members of the Consumer Restitution Advisory Committee are permitted or required to make a decision in their "good faith," at their "discretion" or under another express standard, the Claims Administrator's and the member's actions shall be evaluated under such express standard and shall not be subject to any other or different standard.

24

**Section 5.06      Indemnification.**

(A)   The Consumer Restitution Fund shall indemnify, defend and hold harmless, the Claims Administrator and its affiliates, officers, directors, employees and agents (collectively referred to as the "Indemnitees") against any and all claims, demands, suits, liabilities, awards, expenses, losses, costs, fees (including reasonable attorneys' fees and costs), damages, causes of action and judgments incurred by the Indemnitees in the performance of their respective duties hereunder or under the Escrow Agreement, or in connection with the activities undertaken by any or all of them prior to the date of this Agreement relating to the formation, establishment or funding of the Consumer Restitution Fund; provided that the Indemnitees, whether one or more than one, acted in good faith and in a manner that such Indemnitee(s) reasonably believed to be in or not opposed to the best interests of the Consumer Restitution Fund and in furtherance of its purposes.

(B)   Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of an Indemnitee in connection with any action, suit or proceeding from which he or she is indemnified by the Consumer Restitution Fund shall be paid by the Consumer Restitution Fund unless covered by the Indemnitee's insurance.

(C)   The Consumer Restitution Fund shall further indemnify, defend and hold harmless the Consumer Restitution Advisory Committee and its members against any and all claims, demands, suits, liabilities, awards, expenses, losses, costs, fees, damages, causes of action and judgments incurred by the Consumer Restitution Advisory Committee and its members in the performance of their duties hereunder, or in connection with the activities undertaken by them prior to the date of this Agreement relating to the formation, establishment or funding of the Consumer Restitution Fund, provided that the Consumer Restitution Advisory Committee and its members, whether one or more than one, acted in good faith and in a manner that such individual reasonably believed to be in or not opposed to the best interests of the Consumer Restitution Fund and in furtherance of its purposes.

(D)   Reasonable expenses and costs incurred by or on behalf of the Consumer Restitution Advisory Committee or its members in connection with any action, suit or proceeding from which such individual is indemnified by the Consumer Restitution Fund shall be paid by the Consumer Restitution Fund.

**Section 5.07  Consumer Restitution Fund Expenses.**      All expenses, costs, and expenditures associated with the formation, operation, administration and termination of the Consumer Restitution Fund shall be paid out of the Consumer Restitution Fund Assets.  This shall include but is not limited to expenses of a Claims Administrator incurred to administer and to pay claims in a manner consistent with the Consumer Restitution Fund Distribution Procedures; and any other expenses consistent with the purposes of this Agreement.

**Section 5.08   Compensation and Expenses of Claims Administrator.**   The Claims Administrator shall receive compensation from the Consumer Restitution Fund upon approval of the Consumer Restitution Advisory Committee for its services as Claims Administrator as provided by the Bankruptcy Administration Agreement between the Debtor and the Claims Administrator.

**Section 5.09   Compensation and Expenses of the Members of the Consumer Restitution Advisory Committee.**   The members of the Consumer Restitution Advisory Committee shall serve without compensation.   The members of the Consumer Restitution Advisory Committee, however, shall be reimbursed from the Consumer Restitution Fund Assets for their reasonable out-of-pocket expenses incurred in the performance of their duties related to administration of the Consumer Restitution Fund, including but not limited to any reasonable travel expenses, and other expenses related to administration of the Consumer Restitution Fund as well as attorney fees and costs related to post-confirmation contributions to the Consumer Restitution Fund by non-Debtor third parties.

**Section 5.10   Compensation of Litigating States.**   The Litigating States shall receive reasonable compensation on the Effective Date of the US Fidelis Plan immediately following funding of this Consumer Restitution Fund, or at a later date if requested by any Litigating State(s), for the pre-confirmation investigation of US Fidelis, the pursuit of consumer interests before the Bankruptcy Court and the litigation of unfair practice claims in an amount not to exceed 13.5 percent ($1,903,500) of the Consumer Restitution Fund's initial Assets.   The Litigating States shall be paid in accordance with a Attorney Fee Schedule distributed to the Litigating States not less than 7 days prior to the Confirmation Hearing in the US Fidelis Bankruptcy Case.

**Section 5.11      Bond.**   The Claims Administrator and Consumer Restitution Advisory Committee shall not be required to post any bond or other form of surety.

**Section 5.12      Independence of Claims Administrator and Consumer Restitution Advisory Committee.**   Any person or entity appointed as Claims Administrator shall be independent of US Fidelis and the Beneficiaries.

**Section 5.13      Reporting**.   The Claims Administrator shall provide a Semi-annual Report to the Consumer Restitution Advisory Committee each calendar year and more frequently as reasonably directed by the Consumer Restitution Advisory Committee.

**Article VI.**

**DISTRIBUTION AND BENEFICIARIES**

**Section 6.01      Distribution Decision Making Authority.**   The Claims Administrator shall make all decisions concerning the management and disbursement of the Consumer Restitution Fund Assets after consultation with the Consumer Restitution Advisory Committee and in conformity with this Agreement, the Plan, the Consumer Restitution Fund Distribution Procedures and the Escrow Agreement.

**Section 6.02     Consumer Restitution Advisory Committee Advice and Recommendations.**  In performing its responsibilities, the Claims Administrator shall regularly meet and confer with and consider the advice and recommendations of and, when necessary or required, obtain the consent of the Consumer Restitution Advisory Committee, as more fully set forth in this Agreement.

**Section 6.03     Allocation.**  The Consumer Restitution Fund Assets shall be allocated among Beneficiaries who are identified as qualifying for distributions as provided in this Agreement and the Consumer Restitution Fund Distribution Procedures.

**Section 6.04     Distributions.**  The Consumer Restitution Fund Assets, in amounts to be determined by the Consumer Restitution Advisory Committee after conferring with and considering the advice and recommendations of the Claims Administrator, shall be distributed to Beneficiaries for the purposes of paying Consumer Claims against US Fidelis and in such amounts and in such manner as permitted under the Consumer Restitution Fund Distribution Procedures. The Escrow Agent shall, to the extent required by law, be obligated to withhold from any distributions any funds necessary to pay taxes, including the establishment of adequate reserves for such taxes as well as any amount that may be required to be withheld under section 1.458B-(1)(2) of the Treasury Regulations or otherwise under applicable law in respect of such distributions.  All Beneficiaries shall provide any and all such information that the Escrow Agent may reasonably require and is required by applicable law in respect of taxes and filings and reporting for taxes, before any distributions are made to  Beneficiaries as contemplated hereby, and the Escrow Agent may, without liability to the Beneficiaries, delay such distributions unless and until such information is provided in the form required by the Escrow Agent.

**Article VII.**

**QUALIFIED SETTLEMENT FUND**

**Section 7.01     Tax Treatment.**  The Consumer Restitution Fund is intended to be treated for U.S. federal income tax purposes as a "qualified settlement fund" as described within section 1.468B-1 *et seq.* of the Treasury Regulations.  Accordingly, for all U.S. federal income tax purposes the transfer of assets to the Consumer Restitution Fund will be treated as a transfer to a Fund satisfying the requirements of section 1.468B-1(c) of the Treasury Regulations by the Company, as transferor, for distribution to holders of Consumer Claims and in complete settlement of such Consumer Claims.  Any income on the assets of the Consumer Restitution Fund will be treated as subject to tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for taxes and subject to the withholding and reporting requirements set forth in the Plan and this Agreement.

**Section 7.02     No Right to Reversion with Respect to Consumer Restitution Fund Assets.**  US Fidelis will have no right to any refunds or reversion with respect to any Consumer Restitution Fund Assets or any earnings thereon.

14022297.1                                          - 15 -

27

**Section 7.03      Obligations of the Claims Administrator.**  The Escrow Agent shall be the "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the Consumer Restitution Fund and shall (a) timely file such income tax and other returns and statements and timely pay all taxes, if any, required to be paid from the assets in the Consumer Restitution Fund as required by law and in accordance with the provisions of the Plan and this Agreement; (b) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder; (c) meet all other requirements necessary to qualify and maintain qualification of the Consumer Restitution Fund as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations; and (d) take no action that could cause the Consumer Restitution Fund to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations.

**Section 7.04      Obligations of US Fidelis.**  Following the funding of the Consumer Restitution Fund (and in no event later than February 15th of the calendar year following the date of this Agreement), US Fidelis shall provide, or cause to be provided, to the Consumer Restitution Fund a "§ 1.468B-3 Statement" in accordance with section 1.468B-3 of the Treasury Regulations.  Following any subsequent transfers of cash or other property to the Consumer Restitution Fund, US Fidelis (or the entity treated as the transferor for U.S. federal income tax purposes) shall provide, or cause to be provided, to the Claims Administrator a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

**Section 7.05      No Contravention of Requirements.**  No provision in this Agreement or the Consumer Restitution Fund Distribution Procedures shall be construed to mandate any distribution on any claim or other action that would contravene the Consumer Restitution Fund's compliance with the requirements of a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the IRC.

**Article VIII.**

**GENERAL TERMS AND PROVISIONS**

**Section 8.01      Irrevocable.**  The Consumer Restitution Fund is irrevocable.

**Section 8.02      Term and Termination.**

(A)  The term for which the Consumer Restitution Fund is to exist shall commence on the date of the filing of the Certificate of Fund and shall terminate pursuant to the provisions of Section 8.02(B) below.

(B)  The Consumer Restitution Fund shall automatically dissolve on the date (the "Dissolution Date") ninety days after the first of the following to occur:

the date on which the Consumer Restitution Advisory Committee decides to dissolve the Consumer Restitution Fund because (1) all Consumer Claims duly filed with the Consumer Restitution Fund have been liquidated, paid or disallowed by a non-

appealable determination to the extent provided in this Agreement and in the Consumer Restitution Fund Distribution Procedures; (2) available Fund Assets have been distributed to claimants in at least one class of claims; or (3) the Consumer Restitution Advisory Committee deems it unlikely that any new Consumer Claims will be asserted against the Consumer Restitution Fund.

(C)   In the event all allowed Consumer Claims have been paid in full and there are remaining assets on the Dissolution Date after payment of all Consumer Fund expenses, all assets remaining in the Consumer Restitution Fund shall be distributed at the sole discretion of the Consumer Restitution Advisory Committee for the purpose of funding consumer fraud education, investigation, enforcement operations, litigation, public protection or local consumer aid, including contributions to national consumer advocacy programs.  Transfer of such assets shall be only to organization(s) exempt from federal income tax under the IRC.  All un-cashed checks as of the Dissolution Date will revert to the holder's last state of residence under unclaimed property laws.

(D)   Following the dissolution and distribution of the assets of the Consumer Restitution Fund, the Consumer Restitution Fund shall terminate.

**Section 8.03      Amendments.**   The Consumer Restitution Advisory Committee may modify or amend this Agreement by a writing signed by each consenting member of the Consumer Restitution Advisory Committee; provided, however, that any such amendment shall require the consent of the majority of the members of the Consumer Restitution Advisory Committee.   The Consumer Restitution Advisory Committee may modify or amend the Consumer Restitution Fund Distribution Procedures by a writing signed by a majority of the members of the Consumer Restitution Advisory Committee; provided, however, that no amendment to such procedures shall be inconsistent with the purposes of the Consumer Restitution Fund.  Any amendment that affects the duties, obligations, responsibilities, rights or entitlements of the Claims Administrator shall require the consent of the Claims Administrator. Notwithstanding anything contained in this Agreement to the contrary, none of this Agreement, the Consumer Restitution Fund Distribution Procedures, or any document annexed to the foregoing, shall be modified or amended in any way that could jeopardize, impair or modify the Plan, the efficacy or enforceability of the Consumer Channeling Injunction or the Consumer Restitution Fund's qualified settlement fund status under section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the IRC.

**Section 8.04      Severability.**   Should any provision in this Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Agreement.

**Section 8.05      Notices.**

(A)   Any notices or other communications required or permitted hereunder to any person asserting a Consumer Claim shall be in writing and mailed to the address for such person or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the Consumer Restitution Fund.

(B)   Any notices or other communications required or permitted hereunder to any of the following parties shall be in writing and delivered at the address, email address or facsimile number for such party designated below, or in accordance with such other instructions as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To US Fidelis:

BRIAN T. FENIMORE, Esq.
Lathrop & Gage LLP
2345 Grand Blvd, Ste 2200
Kansas City, Missouri 64108
Facsimile:  (816) 292-2001
Email:  bfenimore@lathropgage.com

with a copy to:

DAVID A. WARFIELD
Thompson Coburn LLP
One US Bank Plaza
St. Louis, Missouri  63101
Facsimile:  (314) 552-7079
Email:  DWarfield@thompsoncoburn.com

To the Consumer Restitution Advisory Committee:

MARY C. LOBDELL
Senior Counsel
Consumer Protection Division
1019 Pacific Avenue – 3rd Floor
P.O. Box 2317
Tacoma, Washington 98401-2317
Facsimile: (253) 597-4408
Email:  maryl@atg.wa.gov

**To the Claims Administrator**:

David Isaac, CEO
Garden City Group, Inc.
1985 Marcus Avenue, Ste. 200
Lake Success, New York 11042
Facsimile:  (631) 940-6554

(C)   All notices and communications in accordance with this Section shall be deemed given (1) when sent by email or facsimile before 5:00 p.m., prevailing Pacific time, on a

14022297.1                                      - 18 -

30

Business Day with a copy of such email or facsimile sent on the same day to the recipient by reputable overnight courier service (charges prepaid), (2) three days after deposit in the U.S. mail or (3) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid).

**Section 8.06        Successors and Assigns.**    The provisions of this Agreement shall be binding upon and inure to the benefit the US Fidelis, the Consumer Restitution Fund, the Claims Administrator, the members of the Consumer Restitution Advisory Committee, and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its rights or obligations under this Agreement except, as contemplated by Article V above.

**Section 8.07        Limitation on Claim Interests for Securities Laws Purposes.** Consumer Claims and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; or (d) shall not be entitled to receive any dividends or interest.  Clause (a) of this Section 8.07, however, shall not apply to the holder of a claim that is subrogated to a Consumer Claim as a result of its satisfaction of such claim.

**Section 8.08        Entire Agreement; No Waiver.**    The entire agreement of the parties relating to the subject matter of this Agreement is contained herein, contained the Consumer Fund Distribution Procedures, and the Attorney Fee Schedule referred to in Section 5.10. This Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.  No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**Section 8.09        Headings.**    The headings used in this Agreement are inserted for convenience only and do not constitute a portion of this Agreement, nor in any manner affect the construction of the provisions of this Agreement.

**Section 8.10        Governing Law.**    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Washington without regard to Washington conflict of laws principles; provided, however, that there shall not be applicable to the parties hereunder or this Agreement any provision of the laws (common or statutory) of the state of  Washington that are inconsistent with the terms of this Agreement, including such laws that relate or regulate (a) the filing with any court or governmental body or agency of accounts or schedules of fees and charges; (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust;  (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property; (d) fees or other sums payable to trustees, officers, agents or employees of a trust or fund; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount or concentration of investments or requirements relating to the titling, storage or other manner of holding or investing assets; or (g) the establishment of fiduciary or other standards of

14022297.1                                                  - 19 -

31

responsibility or limitations on the acts or powers that are inconsistent with the limitations or authorities and powers hereunder as set forth or referenced in this Agreement.

**Section 8.11      Settlors Representative and Cooperation.**  US Fidelis is hereby irrevocably designated as the settlor of the Consumer Restitution Fund, and it is hereby authorized to take any action required as such in connection with this Agreement.  US Fidelis agrees to cooperate in implementing the goals and objectives of the Consumer Restitution Fund.

**Section 8.12      Effectiveness.**  This Agreement shall not become effective until (a) it has been executed and delivered by all the parties hereto; (b) the Plan become effective pursuant to the Bankruptcy Code; and (c) the Consumer Restitution Fund is funded.

**Section 8.13      Counterpart Signatures.**   This Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.


On Behalf Of US Fidelis, Inc.:




BRIAN T. FENIMORE, Esq.                              DATED
Lathrop & Gage LLP
2345 Grand Blvd, Ste 2200
Kansas City, Missouri 64108
Facsimile:  (816) 292-2001
Email:  bfenimore@lathropgage.com


On Behalf of the US Fidelis Unsecured Creditors Committee:




DAVID A. WARFIELD                              DATED
Thompson Coburn LLP
One US Bank Plaza
St. Louis, Missouri  63101
Facsimile:  (314) 552-7079
Email:  DWarfield@thompsoncoburn.com


14022297.1                              - 20 -

32

On Behalf of the Washington Attorney General:

_____                    _____
MARY C. LOBDELL                                      DATED
Senior Counsel - Consumer Protection Division
Office of the Washington Attorney General
1250 Pacific Avenue, Ste 105
P.O. Box 2317
Tacoma, WA 98401-2317
Facsimile: (253) 593-2449
Email: maryl@atg.wa.gov

On Behalf of the Texas Attorney General:

_____                    _____
PEDRO PEREZ                                          DATED
Assistant Attorney General
Consumer Protection Division
Office of the Texas Attorney General
300 W. 15th Street
P.O. Box 12548
Austin, TX 78711-2548
Facsimile: (512) 475-4656
Email: Pedro.Perez@texasattorneygeneral.gov

On behalf of the Ohio Attorney General:

_____                    _____
MELISSA WRIGHT                                       DATED
TERESA HEFFERNAN
Associate Assistant Attorneys General
Consumer Protection Section
Office of the Ohio Attorney General Mike DeWine
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Facsimile: (866) 528-7423
Email: melissa.wright@ohioattorneygeneral.gov
Email: Teresa.heffernan@ohioattorneygeneral.gov

14022297.1                                     - 21 -

33

On Behalf of the Missouri Attorney General:


_____          _____
JOSHUA M. JONES                           DATED
Assistant Attorney General
Consumer Protection Division
Office of the Missouri Attorney General
PO Box 861
St. Louis, Missouri 63188
Facsimile:  314.340.7957
Email:  joshua.jones@ago.mo.gov


On behalf of Garden City Group:


_____          _____
KAREN B. SHAER, Esq.                      DATED
General Counsel
Senior Executive Vice President
The Garden City Group, Inc.
1985 Marcus Avenue, 2nd Floor
Lake Success, NY  11042
Phone:  (631) 470-6861
Fax:  (631) 940-6560
Email:  Karen.Shaer@GCGinc.com

**EXHIBIT A**

**CONSUMER RESTITUTION FUND DISTRIBUTION PROCEDURES**

**FOR THE**

**US FIDELIS**
**[St. Louis, Missouri vehicle service contract marketer]**

**CONSUMER RESTITUTION FUND AGREEMENT**

# **EXHIBIT D**

# PART IV
# OF THE CONFIRMED
# PLAN OF LIQUIDATION:

# SECOND PLAN SUPPLEMENT

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| US FIDELIS, INC., | ) | Hon. Charles E. Rendlen, III |
| | ) | |
| Debtor. | ) | Case No. 10-41902 |
| | ) | |

**AMENDMENT BY INTERLINEATION TO LIST OF
IDENTIFICATION OF LITIGATION CLAIMS TO BE TRANSFERRED
PURSUANT TO THE PLAN OF LIQUIDATION**

COMES NOW the Official Committee of Unsecured Creditors for US Fidelis, Inc. (the

"Creditors Committee") and amends its Identification of Litigation Claims to Be Transferred

Pursuant to the Plan of Liquidation filed as pages 105-106 of the Plan Supplement on July 3,

2012 (Dkt. No. 1129) by interlineation (changes in bold) as follows:

5. In addition to the foregoing the all claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that the Debtor or Estate may hold against any Person, including, but not limited to, (a) any claims, rights of action, suits or proceedings of the Debtor or the Estate arising or arising under or resulting from contractual subordination, application of section 510(b) of the Bankruptcy Code, or existing under any other applicable law, (b) the Avoidance Actions, (c) all causes of action against the Debtor's current and former officers, directors, employees, shareholders or professionals under section 1123(b)(3) of the Bankruptcy Code related to conduct in connection with the Debtor prior to or after the Petition Date, but excluding the Malpractice Claim **except that the Debtor, the Estate and the Creditors Committee expressly exclude Prestige Administration, Inc. from any reservation and transfer of causes of action**.

Respectfully submitted,

THOMPSON COBURN LLP


By: /s/ David A. Warfield_____
    David A. Warfield, #34288MO
    dwarfield@thompsoncoburn.com
    Brian W. Hockett, # 52984MO
    bhockett@thompsoncoburn.com
    One US Bank Plaza, Suite 2600
    St. Louis, MO 63101
    Telephone: (314) 552-6000
    Telecopier: (314-552-7079

    Attorneys for the Creditors Committee



**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing was served on all parties receiving notice through the Court's CM/ECF system this 10th day of July, 2012.



/s/ David A. Warfield_____


- 2 -